# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE, MISSISSIPPI REPUBLICAN PARTY, JAMES PERRY, MATTHEW LAMB,

*Plaintiffs-Appellants,*

v.

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; TONI JO DIAZ, in their official capacities as members of the Harrison County Election Commission; BECKY PAYNE, in their official capacities as members of the Harrison County Election Commission; BARBARA KIMBALL, in their official capacities as members of the Harrison County Election Commission; CHRISTENE BRICE, in their official capacities as members of the Harrison County Election Commission; CAROLYN HANDLER, in their official capacities as members of the Harrison County Election Commission; MICHAEL WATSON, in his official capacity as the Secretary of State of Mississippi,

*Defendants-Appellees,*

VET VOICE FOUNDATION, MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS,

*Intervenor Defendants-Appellees.*

LIBERTARIAN PARTY OF MISSISSIPPI,

*Plaintiff-Appellant,*

v.

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; TONI JO DIAZ in their official capacities as members of the Harrison County Election Commission; BECKY PAYNE, in their official capacities as members of the Harrison County Election Commission; BARBARA KIMBALL, in their official capacities as members of the Harrison County Election Commission; CRISTENE BRICE, in their official capacities as members of the Harrison County Election Commission; CAROLYN HANDLER, in their official capacities as members of the Harrison County Election Commission; MICHAEL WATSON, in his official capacity as the Secretary of State of Mississippi,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Mississippi
Nos. 1:24-cv-25, 1:24-cv-37 (Guirola, J.)

**OPENING BRIEF OF APPELLANTS
REPUBLICAN NATIONAL COMMITTEE,
MISSISSIPPI REPUBLICAN PARTY, JAMES PERRY,
AND MATTHEW LAMB**

Spencer M. Ritchie
Forman Watkins & Krutz LLP
210 East Capitol Street, Ste. 2200
Jackson, MS 39201
(601) 960-3172
spencer.ritchie@formanwatkins.com

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Dated: August 16, 2024

*Counsel for Appellants Republican National Committee,
Mississippi Republican Party, James Perry, and Matthew Lamb*

## CERTIFICATE OF INTERESTED PERSONS

No. 24-60395, *Republican National Committee v. Wetzel*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court can evaluate possible disqualification or recusal:

| **Plaintiffs (No. 1:24-cv-25):** | **Counsel for Plaintiffs (No. 1:24-cv-25):** |
|---|---|
| Republican National Committee, Mississippi Republican Party, James Perry, Matthew Lamb | Spencer M. Ritchie<br>Forman Watkins & Krutz, LLP<br>210 E. Capitol St., Suite 2200<br>Jackson, MS 39225-2608<br>(601) 960-3172<br>spencer.ritchie@formanwatkins.com<br><br>Thomas R. McCarthy<br>Conor D. Woodfin<br>Consovoy McCarthy, PLLC<br>1600 Wilson Blvd., Suite 700<br>Arlington, VA 22209<br>(703) 243-9423<br>tom@consovoymccarthy.com<br>conor@consovoymccarthy.com |
| **Plaintiff (No. 1:24-cv-37):** | **Counsel for Plaintiff (No. 1:24-cv-37):** |
| Libertarian Party of Mississippi | T. Russell Nobile<br>Judicial Watch, Inc.<br>Post Office Box 6592<br>Gulfport, MS 39506<br>(202) 527-9866<br>rnobile@judicialwatch.org |

**State Defendant**:

Secretary of State Michael Watson

**Counsel for State Defendant**:

Scott G. Stewart, *Solicitor General*
Rex M. Shannon, III
Wilson D. Minor
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-6279
scott.stewart@ago.ms.gov
rex.shannon@ago.ms.gov
wilson.minor@ago.ms.gov

**County Defendants**:

Justin Wetzel, Toni Jo Diaz, Becky
Payne, Barbara Kimball, Christene
Brice, Carolyn Handler

**Counsel for County Defendants**:

Tim C. Holleman
Boyce Holleman and Associates, P.A.
1720 23rd Avenue
Gulfport, MS 39501
(228) 863-3142
tim@boyceholleman.com

**Intervenor-Defendants**:

Vet Voice Foundation, Mississippi
Alliance for Retired Americans

**Counsel for Intervenor-Defendants**:

Christopher D. Dodge
Elisabeth C. Frost
Michael Brandon Jones
Richard Alexander Medina
Tina Meng Morrison
Elias Law Group, LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 987-4928
cdodge@elias.law
efrost@elias.law
mbj@michaelbrandonjones.com
rmedina@elias.law
tmengmorrison@elias.law

Paloma Wu
Mississippi Center for Justice
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
601-352-2269
pwu@mscenterforjustice.org

Robert B. McDuff
The Law Office of Robert McDuff
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
RBM@McDuffLaw.com

**Amici:**

Disability Rights Mississippi, League of Women Voters of Mississippi

**Counsel for Amici:**

Angela M. Liu
Dechert, LLP
35 W. Wacker Drive, Suite 3400
Chicago, IL 60601
312-646-5816
angela.liu@dechert.com

Julia Markham-Cameron
Neil Steiner
Dechert, LLP
1095 6th Ave
New York, NY 10036
917-388-8304
julia.markham-cameron@dechert.com
neil.steiner@dechert.com

Christopher J. R. Merken
Dechert, LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
215-994-2380
christopher.merken@dechert.com

Davin M. Rosborough
Sophia Lin Lakin
ACLU Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2613
drosborough@aclu.org
slakin@aclu.org

Greta K. Martin
Disability Rights Mississippi
5 Old River Place, Suite 101
Jackson, MS 39202
601-968-0600
gmartin@drms.ms
Jacob Matthew van Leer
ACLU Foundation, Inc.
915 15th Street, NW, 6th Floor
Washington, DC 20005
603-277-0314
jvanleer@aclu.org

Joshua F. Tom
ACLU of Mississippi
P. O. Box 2242
101 S. Congress Street
Jackson, MS 39225-2242
(601) 354-3408
jtom@aclu-ms.org

Democratic National Committee

David W. Baria
Cosmich, Simmons & Brown, PLLC
P. O. Box 22626
One Eastover Center
100 Vision Drive, Suite 200
Jackson, MS 39225-2626
601-863-2100
david.baria@cs-law.com

United States of America

Kristen Clarke, *Assistant Attorney General*
R. Tamar Hagler
Timothy F. Mellett
Janie Allison Sitton
Sejal Jhaveri
U.S. Department of Justice
950 Pennsylvania Ave NW Washington,
DC 20530 (202) 532-5610
Sejal.Jhaveri@usdoj.gov

Todd W. Gee, *United States Attorney*
Angela Givens Williams
Mitzi Dease Paige
Assistant U.S. Attorneys
501 E. Court St. Suite 4.430
Jackson, MS 39201
 (601) 965-4480
Angela.Williams3@usdoj.gov
Mitzi.Paige@usdoj.gov


*/s/ Thomas R. McCarthy*
Thomas R. McCarthy
*Counsel for Republican Party Appellants*

## CORPORATE DISCLOSURE STATEMENT

The Republican National Committee and the Mississippi Republican Party have no parent corporation, and no corporation owns 10% or more of their stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy
*Counsel for Republican Party Appellants*

## ORAL ARGUMENT STATEMENT

This case is scheduled for oral argument on Tuesday, September 24, 2024, at 3:00 PM in the En Banc Courtroom of the Wisdom Courthouse in New Orleans.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................................. i

Corporate Disclosure Statement ........................................................................... vi

Oral Argument Statement......................................................................................... vi

Table of Authorities ................................................................................................ viii

Introduction ............................................................................................................... 1

Jurisdictional Statement............................................................................................ 2

Statement of the Issue .............................................................................................. 2

Statement of the Case ............................................................................................... 3

    I.     History of the national election day .................................................. 3

    II.    This lawsuit ............................................................................................ 8

Summary of Argument.............................................................................................. 12

Argument ................................................................................................................... 14

    I.     Congress preempted state laws that extend the election beyond "the day for the election." ................................................................................... 16

        A.    The statutory text prohibits receiving ballots after "the day for the election" is over. ............................................................................... 18

        B.    History confirms that the election-day statutes set a ballot-receipt deadline........................................................................................... 21

        C.    Precedent indicates that the "election" occurs when election officials receive the ballots. ...................................................... 24

        D.    Legislative history indicates that the "election" occurs when election officials receive the ballots. ...................................... 29

        E.    Congress has neither endorsed nor acquiesced to post-election receipt of mail ballots. ............................................................. 31

    II.    Post-election receipt of mail ballots violates the rights of candidates and voters. ............................................................................................... 36

Conclusion.................................................................................................................. 38

Certificate of Compliance ....................................................................................... 39

Certificate of Service ................................................................................................ 39

# TABLE OF AUTHORITIES

## Cases

*Anderson v. United States*,
417 U.S. 211 (1974) ................................................................37

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ................................ 12, 15, 16, 17, 18, 24, 27, 34

*Bognet v. Degraffenreid*,
141 S. Ct. 2508 (2021) ........................................................7, 28

*Bognet v. Sec'y Commonwealth of Pa.*,
980 F.3d 336 (3d Cir. 2020)................................................7, 27

*Bost v. Ill. State Bd. of Elections*,
684 F. Supp. 3d 720 (N.D. Ill. July 26, 2023)........................ 7, 11, 28, 33

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) ............................................................31

*Burson v. Freeman*,
504 U.S. 191 (1992) ................................................................ 3

*Busbee v. Smith*,
549 F. Supp. 494 (D.D.C. 1982) ............................................21

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
75 F.3d 1429 (10th Cir. 1996) ................................................35

*Cent. Pines Land Co. v. United States*,
274 F.3d 881 (5th Cir. 2001) ..................................................17

*CFTFC v. Schor*,
478 U.S. 833 (1986) ................................................................35

*Cherokee Nation of Okla. v. Leavitt*,
543 U.S. 631 (2005) ................................................................36

*Colony Ins. v. First Mercury Ins.*,
88 F.4th 1100 (5th Cir. 2023) ................................................15

*Conn. Nat. Bank v. Germain*,
503 U.S. 249 (1992) ................................................................24

*Corner Post, Inc. v. Bd. of Gov. of Fed. Reserve Sys.*,
144 S. Ct. 2440 (2024) ........................................................1, 2

*Democratic Nat'l Comm. v. Wis. State Legislature*,
141 S. Ct. 28 (2020) ..........................................................30, 31

*Donald J. Trump for President, Inc. v. Way*,
  492 F. Supp. 3d 354 (D.N.J. Oct. 22, 2020) ..................................................... 7

*Earnest v. Palfinger Marine U S A, Inc.*,
  90 F.4th 804 (5th Cir. 2024) .................................................................. 14

*Ex parte Siebold*,
  100 U.S. 371 (1880) ..................................................................... 17, 18

*Ex parte Young*,
  209 U.S. 123 (1908) ........................................................................... 2

*Foster v. Love*,
  522 U.S. 67 (1997) ......................... 11, 13, 15, 16, 17, 20, 24, 25, 26, 27, 28, 30, 31, 36

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) ................................................................. 27

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ................................................................. 38

*Harris v. Fla. Elections Canvassing Comm'n*,
  122 F. Supp. 2d 1317 (N.D. Fla.) ...................................................... 11, 28, 36

*Hotze v. Hudspeth*,
  16 F.4th 1121 (5th Cir. 2021) ............................................................... 28

*Love v. Foster*,
  90 F.3d 1026 (5th Cir. 1996) ................................................................ 37

*Maddox v. Bd. of State Canvassers*,
  149 P.2d 112 (Mont. 1944) ...................................... 11, 13, 19, 20, 25, 27

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001) ...................................................... 18, 30, 31, 37

*Moore v. Harper*,
  600 U.S. 1 (2023) ........................................................................... 22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ........................................................................... 23

*Newberry v. United States*,
  256 U.S. 232 (1921) .................................................................. 1, 19, 21

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) .......................................................................... 2

*Paresky v. United States*,
  995 F.3d 1281 (11th Cir. 2021) ............................................................. 18

*Pub. Citizen, Inc. v. Miller,*
813 F. Supp. 821 (N.D. Ga.) ...................................................... 20

*Rapanos v. United States,*
547 U.S. 715 (2006) ................................................................... 35

*Regions Bank v. Legal Outsource PA,*
936 F.3d 1184 (11th Cir. 2019) ................................................ 35

*SKF USA, Inc. v. U.S. Customs & Border Prot.,*
556 F.3d 1337 (Fed. Cir. 2009) ................................................ 36

*Smiley v. Holm,*
285 U.S. 355 (1932) ................................................................... 37

*Splonskowski v. White,*
2024 WL 402629 (D.N.D. Feb. 2, 2024) ..................................... 7

*Tex. Democratic Party v. Benkiser,*
459 F.3d 582 (5th Cir. 2006) .................................................... 10

*Trump v. Wis. Elections Comm'n,*
983 F.3d 919 (7th Cir. 2020) .................................................... 37

*United States v. Reorganized CF & I Fabricators of Utah, Inc.,*
518 U.S. 213 (1996) ................................................................... 36

*United States v. West Virginia,*
2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014) ........................ 34

*Vote.org v. Callanen,*
89 F.4th 459 (5th Cir. 2023) ..................................................... 10

*Voting for Am., Inc. v. Steen,*
732 F.3d 382 (5th Cir. 2013) .................................................... 17

*Voting Integrity Project, Inc. v. Bomer,*
199 F.3d 773 (5th Cir. 2000) ............... 11, 17, 23, 24, 25, 26, 27, 30, 31, 37

*Voting Integrity Project, Inc. v. Bomer,*
61 F. Supp. 2d 600 (S.D. Tex. 1999) ........................................ 37

*Voting Integrity Project, Inc. v. Keisling,*
259 F.3d 1169 (9th Cir. 2001) ............... 4, 21, 23, 24, 29, 30, 31, 35, 37

*Wis. Cent. Ltd v. United States,*
585 U.S. 274 (2018) .................................................. 11, 18, 21

**Statutes**

2 U.S.C. §1 ................................................................................ 1, 16

2 U.S.C. §7 ...............................................................................1, 2, 12, 16, 18, 24

2 U.S.C. §8 ................................................................................................20, 21

28 U.S.C. §1291 ...................................................................................................2

28 U.S.C. §1331 ...................................................................................................2

3 U.S.C. §1 ........................................................................... 1, 11, 17, 31

42 U.S.C. §1983 .....................................................................2, 14, 36, 37, 38

52 U.S.C. §10502 ........................................................................................32, 33

52 U.S.C. §20302 ...............................................................................................33

52 U.S.C. §20304 ...............................................................................................33

Act of Apr. 17, 1963, ch. 23, 1963 Wash. Laws 1454 ................................7, 23

Act of Feb. 2, 1872, ch. 11, 17 Stat. 28 ...........................................4, 18, 20

Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 .............................................4, 20

Act of July 8, 2020, ch. 472, 2020 Miss. Laws Chapter 1410 ..........................7

Act of June 4, 1914, ch. 103, 38 Stat. 384 ..............................................4

Act of Mar. 1, 1792, ch. 8, 1 Stat. 239 .................................................3

Act of May 23, 1872, ch. 198, 17 Stat. 157 ..............................................32

Act of Sept. 16, 1942, ch. 561, 56 Stat. 753 .............................................32

An Act Relating to Elections, ch. 159, 1917 Wash. Sess. Laws 712 ..............22

Miss. Code §23-15-637 ..................................................................................3

Neb. Rev. Stat. §32-950 ..............................................................................7, 23

**Other Authorities**

III The Century Dictionary and Cyclopedia (1901) ....................................19

Josiah Henry Benton, *Voting in the Field* (1915) ...................................4, 5

Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (June 12, 2024) ..........................7, 24

Noah Webster, An American Dictionary of the English Language (1830) .............1, 19

*Overseas Absentee Voting: Hearing on S. 703 before the S. Comm. on Rules and Admin.,* 95th Cong. 33 (1977) .................................6, 7, 22

P. Orman Ray, *Absent-voting Laws, 1917,* 12 Am. Pol. Sci. Rev. 251 (May 1918) .................................5, 6, 7, 22

**Rules**

Fed. R. Civ. P. 56......................................................................................15

**Constitutional Provisions**

U.S. Const. art. I, §4...................................................................1, 16, 34

U.S. Const. art. II, §1....................................................................1, 16

# INTRODUCTION

For over a century, Congress has established a uniform election day for congressional and presidential elections. Exercising its powers to dictate the time of federal elections, *see* U.S. Const. art. I, §4, art. II, §1, Congress instructed that "the day for the election" is the "Tuesday next after the 1st Monday in November" in "every even numbered year." 2 U.S.C. §7; *see also id.* §1; 3 U.S.C. §1.

For most of that time, there has been little dispute about what Congress's instruction requires: ballots must be placed in the custody of election officials by the congressionally mandated date. That understanding follows from the text of the election-day statutes. The day of an "election" is "[t]he day of a public choice of officers." *Election*, Noah Webster, An American Dictionary of the English Language (1830), perma.cc/8N7A-D3VS. The term "election" "has the same general significance as it did when the Constitution came into existence—final choice of an officer by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921). A qualified elector does not make that final choice merely by expressing a preference for a candidate; he must cast a ballot by depositing it with a state election official.

History removes any doubt that this was the well-settled meaning of "election" when Congress enacted the election-day statutes. *See Corner Post, Inc. v. Bd. of Gov. of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2451 (2024). States uniformly required ballots to be received by election officials by election day when the election-day statutes were enacted. Even as States developed processes for absentee ballots, these procedures permitted only ballots deposited with an election official by election day to be counted. "This

traditional rule constitutes a strong background presumption" that can be overcome only with strong textual evidence. *Id.*

The district court, however, departed from the settled meaning of "election" without any textual evidence at all to uphold Mississippi's practice of counting ballots received after election day. The district court cited uncertainty about the precise acts that must be completed for a final selection to have been made by election day. ROA.1177-78. But instead of turning to the well-settled answer to that question at the time of enactment, the district court looked to a series of nonbinding opinions— including a decision vacated by the Supreme Court—and to broadly stated congressional intent not to impede voting. ROA.1178-80. But "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022).

This Court should reverse the district court's decision.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because the Republican Plaintiffs claimed that Mississippi's absentee-ballot deadline violates federal law. 28 U.S.C. §1331; 42 U.S.C. §1983; *Ex parte Young*, 209 U.S. 123 (1908). This Court has jurisdiction because the Republican Plaintiffs appeal from a final judgment under 28 U.S.C. §1291. The district court entered that judgment on July 29, 2024, and the Republican Plaintiffs timely appealed four days later. ROA.794-95.

## STATEMENT OF THE ISSUE

Under federal law, "the day for the election" for federal offices is the "Tuesday next after the 1st Monday in November" in "every even numbered year." 2 U.S.C. §7.

Mississippi counts mail ballots that are received by election officials after election day. *See* Miss. Code §23-15-637(1)(a). Does counting ballots that are received after "the day for the election" violate federal law?

## STATEMENT OF THE CASE

### I. History of the national election day

For much of our nation's history, elections were marked by disorganization and a lack of uniformity. "During the Colonial period," elections were generally conducted by a voice vote or show of hands. *Burson v. Freeman*, 504 U.S. 191, 200 (1992) (plurality op.). Gradually, States adopted paper ballots. "Individual voters made their own handwritten ballots, marked them in the privacy of their homes, and then brought them to the polls for counting." *Id.* Political parties began developing their own ballots, which resulted in system "akin to entering an open auction place" marked by bribery and intimidation. *Id.* at 201-02. To counteract this chaos, Louisville, Kentucky, Massachusetts, and New York pioneered the secret-ballot system in 1888. *Id.* at 203. The new system was so successful that by 1896, nearly all States conducted their elections on secret ballots. *Id.* at 204-05.

Meanwhile, election scheduling suffered from similar disorganization. In 1792, Congress established a month-long window for States to appoint presidential electors. The statute required States to appoint presidential electors "within thirty-four days preceding the first Wednesday in December in every fourth year succeeding the last election." Act of Mar. 1, 1792, ch. 8, §1, 1 Stat. 239. This resulted in States holding presidential elections on different days over the month of November. For the better part of a century, "Congress left the actual conduct of federal elections to the diversity

of state arrangements." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1171 (9th Cir. 2001).

As the telegraph ushered in an era of instant communication, Congress saw the need for a uniform election day. In 1845, Congress mandated that in presidential election years "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in the month of November." Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. After the Civil War, Congress extended the rule to the House of Representatives by providing that "the Tuesday next after the first Monday in November, in every second year … is established as the day for the election." Act of Feb. 2, 1872, ch. 11, §3, 17 Stat. 28. Finally, soon after the Seventeenth Amendment was ratified, Congress included Senators in the uniform election day. *See* Act of June 4, 1914, ch. 103, §1, 38 Stat. 384. By necessity, elections throughout this period were conducted on a single day, and votes were cast and received in person.

When absentee voting first appeared during the Civil War, it did not change the rules of election day. At the beginning of the war, "there was no legislation under which a soldier or sailor, having the right to vote in an election district of any State could vote anywhere outside of his district." Josiah Henry Benton, *Voting in the Field* 5 (1915), perma.cc/QEY2-92FK. States sought to ensure that soldiers deployed across the nation could still exercise their right to vote. They employed two methods. The first method was "voting in the field," where an election official took the ballot box to the soldiers to enable them to cast their ballots. *Id.* at 15. Through this method, the soldier's "connection with his vote ended when he put it in the box, precisely as it would have ended if he had put it into the box in his voting precinct, at home." *Id.* The other

4

method, "proxy voting," enabled an authorized agent to take the soldier's ballot and cast it into the ballot box back home. *Id.* The soldier's agent would deliver his ballot, "[o]n the day of the election, between the opening and the closing of the polls." *Id.* at 145 (describing New York's procedure). "Under this method it was claimed that the voter's connection with his ballot did not end until it was cast into the box at the home precinct, and therefore that the soldier really did vote, not in the field, but in his precinct." *Id.* at 15.

The idea that soldiers would receive ballots was a frequent source of objection to field-voting. The problem "was avoided by the appointment in the soldiers' voting acts, of officers or soldiers to act in an election as constables, supervisors, etc., as the laws of the State might designate, would act in elections at home." *Id.* at 17. The soldiers took oaths and occupied election offices as judges, clerks, registrars, supervisors, and constables. *E.g., id.* at 17, 49-50, 71-72, 74, 87-89, 106-07, 115-16, 122-26. In other words, States designated the soldiers to serve as state election officials so that they could receive ballots on election day. In the absence of that designation, receiving ballots "could not be done by military officers, even if they were authorized to do it by the State," because "voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not the military power." *Id.* at 17. Absentee voting largely ended with the war. *See id.* at 314.

When war returned, so did absentee voting. By 1918, many States had adopted a variety of absentee voting laws. Washington, for example, permitted absent voters to vote anywhere within the State on election day. P. Orman Ray, *Absent-voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918), perma.cc/8Z6Y-GSMJ. If a voter was

unable to return to his home county in time to vote, he could cast a ballot in another county by writing in the names of officers in his home precinct. The ballot was then "sealed and returned to the voter's home county." *Id.* "In order to be counted the ballot must have been received by the [home] county auditor within six days from the date of the election or primary." *Id.* at 253-54. That is, under Washington's absentee rules, the ballot needed to be received by a state election official by election day.

Many States did not specify a receipt date—it was simply understood that absentee ballots were to be received by election day. For example, Minnesota's law indicated that "when received at the voter's home post office before the day of election … ballots are to be retained there in the custody of the postal officials until their delivery to the precinct officials on the day of election." *Id.* at 258. In Texas, the "county clerk is required to forward the absent voter's ballots to the precincts on the second day prior to election," likewise implying that the ballots must be received before then. *Id.* at 259. "In Indiana, Montana and Wisconsin, the ballot envelopes may be opened at any time between the opening and the closing of the polls, and this [was] the provision most commonly found in such laws." *Id.* In fact, Illinois was the only State during this time "to make any provision for ballots received too late to be counted." *Id.* Those ballots were to be marked as late, maintained for a time, and destroyed. *Id.* Universally, ballots received after election day were not counted.

Post-election receipt of absentee ballots is a relatively new phenomenon. In 1971, the Department of Defense surveyed state absentee-ballot deadlines. *Overseas Absentee Voting: Hearing on S. 703 before the S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977) (Statement of John C. Broger, Deputy Coordinator of the Federal Voting Assistance

Program, Department of Defense), perma.cc/P4PK-LTL2. At that time, 48 States plus Guam, Puerto Rico, the Virgin Islands, and Washington, D.C., counted ballots only if received by election day at the latest. *Id.* Only two States counted ballots received after election day: Nebraska accepted ballots one day after the election—it has since repealed that law and now requires absentee ballots to be "returned not later than the hour established for the closing of the polls." Neb. Rev. Stat. §32-950. The other State, Washington, still required absentee voters to deliver their ballot to an election official by election day, who would then mail the ballot to the proper county. *See* Ray, *supra*, at 253-54. Later, Washington allowed voters to mail ballots directly, and would count ballots "postmarked or received (if not delivered by mail) not later than the primary or election day." Act of Apr. 17, 1963, ch. 23, §5, 1963 Wash. Laws 1454, 1458.

Only in the last few years did States begin counting mail ballots received after election day. *See* Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (June 12, 2024), perma.cc/X254-RTK2. Many of those States, including Mississippi, adopted post-election deadlines in response to the COVID-19 pandemic. *See* Act of July 8, 2020, ch. 472, §1, 2020 Miss. Laws Chapter 1410, 1411. Some of those recent changes were challenged in federal court. *See Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. July 26, 2023), *on appeal* No. 23-2644 (7th Cir.); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020); *Splonskowski v. White*, 2024 WL 402629 (D.N.D. Feb. 2, 2024). Most of those cases were dismissed on standing grounds. The two that

addressed the merits did not engage with the history that informs the election-day statutes. *See Way*, 492 F. Supp. 3d at 369-73; *Bost*, 684 F. Supp. 3d at 735-39.

## II.    This lawsuit

The Republican Plaintiffs—comprised of the Republican National Committee (RNC), the Mississippi Republican Party (MSGOP), James Perry, and Matthew Lamb— filed this lawsuit to challenge Mississippi's post-election deadline for mail ballots. When it comes to the rules governing elections, the RNC and MSGOP have much at stake. Both organizations work to elect Republicans to federal and state office and to turn out Republicans to vote in federal and state elections. ROA1166-68. They pursue that core mission through a variety of on-the-ground election activities, including ballot-chase programs to boost mail-voter turnout, and poll-watching efforts to ensure fair and accurate elections. ROA.1167. Mississippi's post-election deadline harms those efforts by making them less effective and more expensive. ROA.1167-68. And it further harms the RNC and MSGOP's mission by requiring them to divert resources away from other activities such as in-person turnout initiatives and voter education. ROA.1167-68.

The RNC and MSGOP are joined by James Perry and Matthew Lamb. Both are Mississippi residents who plan to vote in the upcoming federal election in November. ROA.1161. Mr. Perry is the former chairman of the Hinds County Republican Party, a member of the Mississippi Republican Party executive committee, and a member of the Hinds County Republican Executive Committee. ROA.1161. Mr. Lamb is the District 4 Commissioner for the George County Election Commission. ROA.1161. He is responsible for running the County's general and special elections, which includes preparing and printing ballots, hiring and training poll workers, compiling precinct

results on election day, and certifying election results. ROA.630. Right now, Mr. Lamb is in the impossible position of having to choose between following the federal election-day deadline or Mississippi's post-election deadline. ROA.630. Both Mr. Perry and Mr. Lamb fear that Mississippi's post-election deadline will dilute their votes with untimely ballots and decrease confidence in the election. ROA.627, 630.

The Republican Plaintiffs filed their complaint in January 2024. ROA.23. They allege that Mississippi's law requiring election officials to count mail ballots received after election day violates the federal election-day statutes. ROA.1160-61. They request declaratory and injunctive relief preventing the Mississippi Secretary of State and the election commissioners of Harrison County from enforcing Mississippi's post-election receipt of absentee ballots. ROA.61-62. About a week later, the Libertarian Party of Mississippi filed a similar lawsuit in the same court. ROA.1281.

Several sets of interest groups moved to intervene in the cases. The district court largely denied the motions, but it granted intervention to the Vet Voice Foundation and the Mississippi Alliance for Retired Americans. ROA.1162. The parties agreed to consolidate the cases and resolve the case on cross-motions for summary judgment. ROA.1162. The parties completed summary-judgment briefing on April 16. ROA.19. The district court held a hearing on the motions on July 9 and took the motions under advisement. ROA.21.

On July 28, the district court issued its summary-judgment decision. ROA.1160. The court rejected the Defendants' arguments that the Plaintiffs lacked standing—both sets of Plaintiffs "have a direct stake in the outcome of this lawsuit." ROA.1171. The court held that the Republican Plaintiffs provided sufficient evidence that the post-

election deadline "impedes the Republican Party's mission of 'representing the interests of the Republican Party and securing the election of Republican candidates for state and federal office in Mississippi." ROA.1168 (cleaned up) (quoting *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 45 (S.D.N.Y. 2022). The court credited undisputed testimony from RNC and MSGOP directors that "the Mississippi statute" requires "more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day." ROA.1168. Those efforts "cause [the RNC and MSGOP] to curtail and divert resources away from specific activities and projects—registration of Republican voters and efforts to increase in-person turnout." ROA.1168. Because the organizations must run a "[separate, parallel get-out-the-vote effort supported by training, voter education, and voter outreach," the post-election deadline disrupts more than their "routine activities." ROA.1168-69.

The district court held that these injuries established both "economic injury as well as diversion of resources." ROA.1170-71. That is, "[a] political party's 'need to raise and expend additional funds and resources' satisfies the injury-in-fact requirement of organizational standing because 'economic injury is a quintessential injury upon which to base standing.'" ROA.1164 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)). The "diversion of 'significant resources to counteract the defendant's conduct'" also demonstrated standing, ROA.1164 (quoting *Vote.org v. Callanen*, 89 F.4th 459, 470 (5th Cir. 2023)), because the "required diversion of resources 'directly harms the RNC's mission.'" ROA.1167 (quoting RNC declaration). And these injuries are "imminent" because "the statute currently requires five more business days

for receipt, processing, and counting of absentee ballots following the next election in November." ROA.1170. Applying the same reasoning, the district court found that the Libertarian Party also has organizational standing. ROA.1170-71.

On the merits, the district court granted summary judgment in Defendants' favor. The court recognized that "Congress enacted three statutes establishing a single election day for federal elections." ROA.1172 (citing 3 U.S.C. §1; 2 U.S.C. §§1, 7). And it agreed that it "must interpret the word 'election' 'consistent with its ordinary meaning at the time Congress enacted the statutes.'" ROA.1176 (cleaned up) (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018)).

The district court then turned to caselaw. It reasoned that the Supreme Court's decision in *Foster v. Love*, 522 U.S. 67 (1997), did not bear on Mississippi's post-election deadline. ROA.1177-78. And it rejected *Maddox v. Board of State Canvassers*, 149 P.2d 112 (Mont. 1944)—a case holding that the federal election-day statutes prohibit post-election receipt of ballots—with no explanation. ROA.1178. Instead, the court relied on several district court decisions. ROA.1178-81. Following *Bost*, 684 F. Supp. 3d 720, the district court concluded that Congress "implicitly allows post-election receipt of overseas ballots mailed by election day" in the Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA). ROA.1179. The district court also pointed to the federal government's failure to file lawsuits challenging post-election receipt of ballots, reasoning that this prosecutorial acquiescence "'lends further support to the notion that Congress did not intend 3 U.S.C. §1.'" ROA.1180 (quoting *Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd*, 235 F.3d 578 (11th Cir. 2000)). Finally, the district court thought that enjoining Mississippi's post-

election deadline would "'have the effect of impeding citizens in exercising their right to vote.'" ROA.1181 (quoting *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 777 (5th Cir. 2000)).

The district court thus held that "case authority as well as the legislative history, combined with the Framers' intention in drafting the Elections and Electors Clauses, Supreme Court precedent, and Congress's enactment of UOCAVA support a finding that Mississippi's statute … does not conflict with the Electors Clause or the election-day statutes." ROA.1181. Because the Plaintiffs' §1983 claims "stand or fall on whether the Mississippi absentee-ballots statute conflicts with federal law," the district court granted summary judgment to the Defendants on those claims. ROA.1181-82. The Court issued final judgment the next day, ROA.1181-85, and the Plaintiffs in both cases filed timely notices of appeal, ROA.1186-90.

## SUMMARY OF ARGUMENT

**I.** Congress preempted state laws that extend the election beyond "the day for the election." 2 U.S.C. §7. Whether a state law conflicts with the election-day statutes boils down to whether the state law is "inconsistent with" the original understanding of those statutes. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013). For several reasons, Mississippi's post-election receipt of mail ballots is "inconsistent with" the uniform federal election day.

First, the statutory text prohibits including ballots that are received after "the day for the election" is over. Dictionary definitions of "election" confirm that Congress meant a single day for the election, not multiple days. And early cases applying the election-day statutes concluded that the plain meaning of "election" prohibits post-

election receipt of mail ballots. As the Montana Supreme Court explained, "[i]t is not the marking but the depositing of the ballot in the custody of the election officials which constitutes casting the ballot or vote." *Maddox*, 149 P.2d at 115. That transfer of custody to the election officials is the fundamental act of the "election."

Second, history supports that intuitive reading. For decades, States did not count mail ballots received after election day. It was not a practice at the time Congress enacted the election-day statutes, and it remained unheard of for many decades after. A few instances of post-election receipt popped up in the 20th century, but those rare and mostly short-lived laws do not establish a universal, longstanding practice that could overcome the historical understanding of the election-day statutes.

Third, precedent supports a national receipt deadline. In *Foster v. Love*, the Supreme Court held that Louisiana's open-primary system conflicted with the election-day statutes. 522 U.S. at 69. That was true even though the election-day statutes said nothing about open primaries. What mattered was that Louisiana's system consummated the election during the primary, which conflicted with the meaning of "the day for the election." *Id.* Mississippi's *post*-election consummation similarly conflicts. This Court and other courts have held that absentee and early voting do not present those problems, largely due to the historical pedigree of those practices. But post-election receipt of ballots has no pedigree to save it.

Fourth, legislative history confirms that Congress sought to curb a variety of evils posed by multiple voting days. Before the election-day statutes, States appointed presidential electors during a month-long window in November. Congress instituted a

national election day to curb the chaos inflamed by a dawning era of instant communications. But we have now returned to the chaos of election month.

Fifth, other federal statutes confirm that Congress understands ballot receipt as the definitive election-day act. Congress has created limited exceptions to the single election day in the past. When Congress has provided for absentee voting in limited contexts, it sets an election-day deadline. And—contrary to the district court's conclusion—Congress has never explicitly or implicitly permitted post-election receipt of ballots. No federal statute sanctions that practice, and inferring that Congress acquiesced to relatively new state practices cannot overcome the original meaning of the election-day statutes.

**II.** Counting ballots that are received after election day violates the rights of candidates and voters. The district court dismissed the Plaintiffs' §1983 claims after concluding that Mississippi's law did not violate the election-day statutes. That was generally correct, insofar as the §1983 claims "stand or fall on whether the Mississippi absentee-ballots statute conflicts with federal law." ROA.1182. But the district court erred in ruling that the election-day statutes don't preempt the Mississippi law. Section 1983 claims are the regular cause of action for violation of the election-day statutes. This Court should thus reverse on the merits of the preemption claim and hold that enforcing Mississippi's post-election deadline in violation of federal law violates the rights of candidates and voters.

## ARGUMENT

This Court "'review[s] a district court's grant of summary judgment *de novo*, applying the same standards as the district court.'" *Earnest v. Palfinger Marine U S A, Inc.*,

90 F.4th 804, 808 (5th Cir. 2024) (citation omitted). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When parties file cross-motions for summary judgment," as in this case, the Court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Colony Ins. v. First Mercury Ins.*, 88 F.4th 1100, 1106-07 (5th Cir. 2023) (citation omitted).

Whether federal law preempts Mississippi's post-election deadline for mail ballots is a purely legal issue. The "straightforward textual question here is whether" the election-day statutes "conflict[] with" federal law. *Inter Tribal Council*, 570 U.S. at 9. Text, historical practice, precedent, and legislative history show that they do conflict. Starting with text, the election-day statutes establish "the day" for the "election"—and the "election" is complete only when officials receive the votes. Historical practice confirms that for well over a century virtually every State understood election-day as ballot-receipt day. Supreme Court precedent holds that the election-day statutes "refer to the combined actions of voters and officials meant to make a final selection of an officeholder," which means the transfer of the ballot into the hands of the election officials. *Foster*, 522 U.S. at 71. And legislative history shows that Congress was concerned about disruption, confusion, and fraud when it enacted the election-day statutes—concerns that election-day receipt addresses. The district court nevertheless disregarded these arguments in favor bad caselaw, inapplicable statutes, and weak inferences of congressional acquiescence. This Court should reverse.

## I. Congress preempted state laws that extend the election beyond "the day for the election."

Congress has the final say over the timing of congressional elections. The Elections Clause gives States initial authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. Where Congress has not acted, the clause "imposes the duty" on state legislatures to regulate congressional elections. *Inter Tribal Council*, 570 U.S. at 8. But "Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, §4. Through this superintendent power, Congress can "preempt state legislative choices" over the conduct of congressional elections. *Foster*, 522 U.S. at 69.

Congress also has the final say over the timing of presidential elections. The Electors Clause vests in "Congress" the power to "determine the Time of chusing the Electors" for the offices of President and Vice President. U.S. Const. art. II, §1. State legislatures have power only to "appoint" presidential electors "in such Manner" as they choose. *Id.* The Elections Clause and the Electors Clause are "counterpart[s]" that "regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Foster*, 522 U.S. at 69, 71-72.

Exercising these two constitutional powers, Congress has established a uniform federal election day. For members of the House of Representatives, "the day for the election" is the "Tuesday next after the 1st Monday in November" in "every even numbered year." 2 U.S.C. §7. Senatorial elections occur at the same time, and Senators are elected "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected." *Id.* §1. Finally, "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with

the laws of the State enacted prior to election day." 3 U.S.C. §1. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70.

The election-day statutes preempt state law. The district court discussed possible tension between the Supreme Court's preemption test and this Court's preemption test. ROA.1175-76. But any perceived tension is of Defendants' making, not this Court's. In *Inter Tribal Council*, the Supreme Court held that Congress preempts state laws "'which are inconsistent'" with federal laws passed under the Elections Clause power. 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880), *abrogated on other grounds by Glasgow v. Moyer*, 225 U.S. 420 (1912)). This Court used slightly different language when it said that Congress preempts state laws that "directly conflict with federal election laws on the subject." *Bomer*, 199 F.3d at 775. The Defendants would have this Court believe that *Bomer* raised the bar for Elections Clause preemption claims. It didn't. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (applying both tests from *Inter Tribal Council* and *Bomer*). And if it did, this Court would be bound to follow *Inter Tribal Council* anyway. *See Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) ("'[T]hree-judge panels … abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc.'").

In all events, the "straightforward textual question here is whether" the election-day statutes "conflict[] with" federal law. *Inter Tribal Council*, 570 U.S. at 9. And that "turns on the answer to the question: 'What is an election?'—particularly as it relates to the use of the term in the federal elections statutes." *Millsaps v. Thompson*, 259 F.3d 535,

543 (6th Cir. 2001). If the meaning of "the day for the election" says something about when ballots are due, then it "*necessarily* displaces" state ballot deadlines. *Inter Tribal Council*, 570 U.S. at 14 & n.6 ("[A]ll action under the Elections Clause displaces some element of a pre-existing state regulatory regime, because the text of the Clause confers the power to do exactly (and only) that."). And if Mississippi's post-election deadline is "'inconsistent with'" the original understanding of the election-day statutes, it is "void" and "cease[s] to have effect." *Ex parte Siebold*, 100 U.S. at 397.

## A. The statutory text prohibits receiving ballots after "the day for the election" is over.

A post-election receipt deadline for mail ballots necessarily extends "the election" beyond the single "day" chosen by Congress. That conclusion follows from the plain meaning of "the day for the election." 2 U.S.C. §7. Courts must interpret those words "consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent.*, 585 U.S. at 277 (cleaned up). The district court acknowledged as much. *See* ROA.1176. But it failed to heed the most relevant sources of contemporary meaning.

Dictionaries are a good starting point. They don't directly address ballot receipt, but they confirm that "election" means a final, public selection of officers. *See Paresky v. United States*, 995 F.3d 1281, 1285 (11th Cir. 2021) ("When examining the plain and ordinary meaning of a statute, one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment." (cleaned up)). Congress codified "the day for the election" in 1872. *See* Act of Feb. 2, 1872, ch. 11, §3, 17 Stat. 28. At that time, "election" meant "[t]he act or process of choosing a person or persons

for office by vote." *Election*, III The Century Dictionary and Cyclopedia 1866 (1901), perma.cc/ZE3U-X8U6. The term "was formerly limited to 'the act of choosing a person to fill an office,'" but in the late 19th century the term took on a "new sense" that meant "a voting at the polls to ratify or reject a proposed measure." *Id.* More specifically, an "election" was "[t]he day of a public choice of officers." *Election*, Webster's Dictionary, *supra*. Similarly, the Supreme Court has said that "election," as the Constitution uses the word, "has the same general significance as it did when the Constitution came into existence—final choice of an officer by the duly qualified electors." *Newberry*, 256 U.S. at 250. These definitions indicate that ballots must be given to election officials by election day. Only then has a final, public selection been made.

That 19th century dictionary definitions don't discuss ballot-receipt deadlines is unsurprising. At that time, "[n]othing short of the delivery of the ballot to the election officials for deposit in the ballot box constitute[d] casting the ballot." *Maddox*, 149 P.2d at 115. But the introduction of absentee ballots "has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word." *Id.* Whether voting absentee or in person, "[i]t is not the marking but the depositing of the ballot in the custody of the election officials which constitutes casting the ballot or vote." *Id.* For that reason, the Montana Supreme Court held that "in so far as [state law] purports to extend beyond the election day the time within which voters' ballots may be received by the election officials for the election of presidential electors, it is in conflict with the constitutional congressional Act which requires the electing to be done on election day." *Id.*

The district court dismissed *Maddox* as "a Montana state-court decision from 1944," with no explanation. ROA.1178. But *Maddox* is highly relevant: it held that the election-day statutes preempt post-election receipt of absentee ballots, it discerned the original meaning of the election-day statutes, and it is much closer in time to the statutes' enactment. Until the flawed district court opinions issued in the 2020 election cycle, *Maddox* was the only authority on this issue—and it held that state laws that "extend beyond the election day the time within which voters' ballots may be received by the election officials" violate the election-day statutes. *Maddox*, 149 P.2d at 115.

Statutory structure confirms the Montana Supreme Court's conclusion. From the beginning, Congress recognized the sweep of the single national election day by providing exceptions "for the filling of any vacancy" of electors and for runoff elections if the voters "fail to make a choice on the [election] day." Act of Jan. 23, 1845, ch. 1, 5 Stat. 721; Act of Feb. 2, 1872, ch. 11, §4, 17 Stat. 28 (providing exceptions for vacancies and runoffs for congressional elections). Those exceptions remain in the U.S. Code today: "Title 2 U.S.C. §8, which was enacted along with §7, provides that a State may hold a congressional election on a day other than the uniform federal election day," but only in narrow circumstances. *Foster*, 522 U.S. at 72 n.3. First, when a "vacancy is caused by a failure to elect at the time prescribed by law," States can hold runoff elections after the uniform federal election day. 2 U.S.C. §8(a). Second, when the vacancy is caused "by the death, resignation, or incapacity of a person elected," States can hold special elections to fill the vacancy. *Id.*; *see also Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 830 (N.D. Ga.) (holding that Georgia's statute mandating a runoff in the event that no

candidate achieves a majority vote does not violate 2 U.S.C. §8), *aff'd*, 992 F.2d 1548 (11th Cir. 1993).

These exceptions narrow the scope of the election-day rule, and they demonstrate what is not covered by the "day for the election." For example, Congress didn't need to carve out exceptions for post-election acts such as counting ballots or certifying results because those acts occur *after* the "election." But runoffs and vacancies renew the opportunity for a "final choice … by the duly qualified electors," *Newberry*, 256 U.S. at 250, which is why "section 8 creates an exception to section 7's absolute rule in [that] limited class of cases." *Busbee v. Smith*, 549 F. Supp. 494, 526 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). The Defendants fear that a ruling in Plaintiffs' favor would mean that canvassing, tallying, and certifying would have to be finished by election day. But Congress's careful exceptions quash that fear; they prove that the "day for the election" does not include back-end administrative processes to canvass, tally, and certify. Rather, the "election" refers to the receipt of *new ballots* that have not been included in the total. 2 U.S.C. §8(a). Unless an exception applies, that act must be completed by election day.

### B. History confirms that the election-day statutes set a ballot-receipt deadline.

Even if this Court declines to follow the Montana Supreme Court's plain-meaning approach, historical practice shows that an "election" means the moment when election officials receive the ballots. Historical practice "[a]t the time of the Act's adoption" is primary evidence of the original public meaning of a statute. *Wis. Cent.*, 585 U.S. at 276-77. That's why the Ninth Circuit consulted the history of absentee

voting when applying the election-day statutes. *See Keisling*, 259 F.3d at 1172-76. And "historical practice" is "particularly pertinent when it comes to the Elections and Electors Clauses." *Moore v. Harper*, 600 U.S. 1, 32 (2023). But like the district courts before it, the district court here did not consider history in determining the meaning of the election-day statutes.

History demonstrates that States did not count mail ballots received after election day. It was not a practice at the time Congress enacted the election-day statutes, and it remained unheard of for many decades after. As discussed in detail above, the election-day statutes roughly coincided with the advent of absentee voting in the late 19th century. *See supra* pp. 2-4. But States still required that ballots be received by election officials by election day. In fact, many States didn't require election-day receipt so much as assume it. Texas, for example, required election officials "to forward the absent voter's ballots to the precincts on the second day prior to election," implying that the ballots must be received before election day. Ray, *supra*, at 259. In fact, the "provision most commonly found in such laws" was that "the ballot envelopes may be opened at any time between the opening and the closing of the polls." *Id.* Election-day receipt of ballots was a necessary premise of "the day for the election."

In 1971—over a century after Congress established the uniform election day— all but two States still required election-day receipt of absentee ballots. *See Overseas Absentee Voting: Hearing on S. 703*, 95th Cong. at 33-34. In 1917, Washington began permitting voters to vote away from their home county by delivering their ballot to an election official by election day. *See* Ray, *supra*, at 253-54; An Act Relating to Elections, ch. 159, 1917 Wash. Sess. Laws 712. The election official would then mail the ballot to

the proper county. Ray, *supra*, at 253-54. It wasn't until 1963 that Washington allowed voters to mail ballots directly and would count ballots "postmarked or received (if not delivered by mail) not later than the primary or election day." Act of Apr. 17, 1963, ch. 23, §5, 1963 Wash. Laws 1454, 1458. Nebraska accepted ballots one day after the election, but it has since repealed that law and now requires absentee ballots to be "returned not later than the hour established for the closing of the polls." Neb. Rev. Stat. §32-950.

"The law remains the same today." *Keisling*, 259 F.3d at 1171. The few sporadic, recent changes do not overcome the original meaning of the election-day statutes. Those "late-in-time outliers" are far removed from the enactment of the election-day statutes and thus have little bearing on their original public meaning. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022). Compare the scattershot instances of post-election receipt with the longstanding history of absentee voting. "More than a century ago, some states began to allow absentee voting, and all states currently provide for it in some form." *Bomer*, 199 F.3d 776. This Court declined "to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware." *Id.*; *see also Keisling*, 259 F.3d at 1175. But post-election deadlines are neither universal nor longstanding. There is no "long history" of receiving ballots after election day in Mississippi or any other State. *Keisling*, 259 F.3d at 1175. And when Congress has "spoken on the issue," it has set election-day deadlines for absentee ballots. *Id.* This historical practice compels the conclusion that the original understanding of the election-day statutes required receipt of ballots by election day.

In other words, when Congress says, "the day for the election," 2 U.S.C. §7, Congress "says in [the] statute what it means and means in [the] statute what it says," *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Particularly in this context, "there is no compelling reason not to read Elections Clause legislation simply to mean what it says." *Inter Tribal Council*, 570 U.S. at 15. The Ninth Circuit thus held that the election-day statutes "may reasonably be construed to mean that all voting in federal elections should take place on a single day." *Keisling*, 259 F.3d at 1176. This Court disagreed, at least as applied to voting that occurs "before election day." *Bomer*, 199 F.3d 776; *see also id.* (the "plain language of the statute does not require all voting to occur on federal election day"). But what saved the absentee and early voting laws challenged in *Keisling* and *Bomer* was the "universal, longstanding practice" of absentee voting. *Id.* That saving construction is not possible here. Even today, less than half of the States permit post-election receipt of ballots. *See* Nat'l Conf. of State Legislatures, *supra*. And no State permitted post-election receipt at the time of the election-day statutes.

### C. Precedent indicates that the "election" occurs when election officials receive the ballots.

Text and history are enough to reverse the district court's judgment. But caselaw also supports Plaintiffs' interpretation of the election-day statutes. "When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the *combined actions* of voters and officials meant to make a final selection of an officeholder…." *Foster*, 522 U.S. at 71 (emphasis added). That is, the "final selection" requires the "combined actions" of voters and election officials. *Id.* A "final selection" does not occur when the voter merely marks the ballot or delivers the ballot to the post

office because those events do not involve an election official. Only once the ballot is in the custody of an election official has the "final selection" has occurred.

In *Foster*, the Supreme Court held that the election-day statutes preempted Louisiana's "open primary" law. *Id.* at 69-70. Under Louisiana's system, if a candidate received a straight majority in the open primary, the State didn't hold additional voting for the general election. *Id.* at 69-70. The Supreme Court held that closing the election before election day violates the statutes "establishing a particular day as 'the day' on which these actions must take place, … a matter on which the Constitution explicitly gives Congress the final say." *Id.* at 71-72. Although the Court did not address mail-in voting, "*Foster* is instructive on the meaning of 'election.'" *Bomer*, 199 F.3d at 775. And when the two acts of election—casting and receiving ballots—are "concluded as a matter of law before the federal election day," the system violates the federal election-day statutes. *Foster*, 522 U.S. at 72. By the same logic, extending either of those two acts *beyond* election day likewise violates those statutes.

In other words, the election must be "consummated" on election day. *Id.* at 72 n.4. Because consummation of the election requires the "combined actions of voters and officials," *id.* at 71, a ballot is cast not when it is marked, but only when it is actually deposited "in the custody of the election officials," *Maddox*, 149 P.2d at 115. "[V]oting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Id.* And just as the election "may not be consummated prior to federal election day," neither may it be "consummated" *after* election day. *Foster*, 522 U.S. at 72 n.4. After election day, election officials go about various duties: counting ballots, disqualifying

voters, hearing challenges, and certifying the election. These actions don't implicate the election-day statutes because they are not acts of consummation—they are not the "final selection" resulting from the "combined actions" of voters and election officials. *Id.* at 71. Election day is the final day for voters to vote *and* for election officials to receive those votes.

The district court refused to give the election-day statutes a "hyper-technical" meaning. ROA.1177-78. But there's nothing "hyper-technical" about a receipt rule. It's supported by text, history, and precedent. The district court went to pains to limit *Foster* to its facts. In *Foster*, the Supreme Court observed that "it is enough to resolve *this case* to say that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates §7." *Foster*, 522 U.S. at 72. The Court did not say that the election-day statutes mean only that and nothing else. So when the Supreme Court said that it was not "paring the term 'election' … down to the definitional bone," it was not absolving courts of the duty to apply the election-day statutes to new facts. *Id.*

*Bomer* confronted only half of the issue, and even then, its reasoning supports a prohibition of ballot-receipt after election day. In that case, this Court held that the election-day statutes do not prohibit early voting. The Court observed that the statutes simply require "that the election be held that day." *Bomer*, 199 F.3d at 776. And "[a]llowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day." *Id.* But *Bomer* did not address what actions can happen *after* election day.

No party in this case has disputed that a State would violate the election-day statutes by allowing voters to walk into the polls and vote on the Wednesday after election day. If the election-day statutes are to mean anything, they must prohibit post-election voting. *Bomer* and *Foster* explain why that is true: "*Foster* teaches us that "election" means "the combined actions of voters and officials meant to make a final selection of an office holder." *Id.* (quoting *Foster*, 522 U.S. at 71). And "the combined actions of voters and officials" occur only when the "voters" cast and the "officials" receive the ballots. The "final selection" cannot occur by one action without the other. So by *Foster*'s definition, post-election receipt of ballots violates the election-day statutes by permitting that "final selection" to take place after election day.

The Montana Supreme Court applied these principles in *Maddox*, 149 P.2d at 115. *See supra* Section I.A. But the district court dismissed *Maddox* out of hand, ROA.1178. Instead, it turned to decisions that are now vacated or on appeal. In *Bognet*, for example, the Third Circuit held that the Pennsylvania Supreme Court's unilateral three-day extension to the ballot-receipt deadline during the 2020 election did not violate the election-day statutes. 980 F.3d at 344. Instead of applying the "inconsistent with" test under *ITCA*, or the "directly conflicts with" test of this Court, the Third Circuit followed the Ninth Circuit's earlier test in *Inter Tribal Council* before the Supreme Court took the case: "Congress exercises its power to 'alter' state election regulations only if the state regime cannot 'operate harmoniously' with federal election laws 'in a single procedural scheme.'" *Id.* at 353 (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. Inter Tribal Council*, 570 U.S. 1)). But the Supreme Court's opinion in that case—not the Ninth Circuit's opinion—sets the appropriate standard.

In any event, the Supreme Court vacated *Bognet* as moot. *Bognet v. Degraffenreid*, 141 S. Ct. 2508. "Vacated authority, of course, is no authority at all." *Hotze v. Hudspeth*, 16 F.4th 1121, 1126 (5th Cir. 2021) (Oldham, J., dissenting) (declining to follow *Bognet*). But the district court found *Bognet*'s alternate test "persuasive." ROA.1180.

Other district courts have ignored the historical practice, even though history is essential to understanding the election-day statutes' original meaning. The Northern District of Illinois, for example, ignored history in favor of a host of wrong arguments. *See Bost*, 684 F. Supp. 3d at 735-39. In that case, the district court dismissed the case for lack of jurisdiction but said in *dicta* that Illinois' 14-day post-election deadline for mail ballots was "facially compatible" with the election-day statutes. *Id.* at 736. It primarily relied on congressional acquiescence, a weak inference even under the best of circumstances. *See infra* Section I.E. That case is now on appeal, and the Seventh Circuit heard argument in March. *See* No. 23-2644 (7th Cir.).

The last case, *Harris*, addressed an argument not presented here. The plaintiffs argued that the election-day statutes "mean[] that every vote must be made by a voter and *counted by election officials* by midnight on [election] day." *Harris*, 122 F. Supp. 2d at 1324 (emphasis added). The Plaintiffs here don't argue that officials must *count* ballots by election day. That administrative task isn't part of "the *combined* actions of voters and officials." *Foster*, 522 U.S. at 71 (emphasis added). A ballot-counting rule wouldn't be consistent with the text, history, and the Supreme Court's holding that the "election" means the "final selection" by voters and officials. *Id.*

In sum, the district court's judgment replaces text and history with poor authority: vacated decisions, bad reasoning, and inapplicable cases. To date, the only

court that has addressed the historical context concluded that the election-day statutes "may reasonably be construed to mean that all voting in federal elections should take place on a single day." *Keisling*, 259 F.3d at 1176. This Court should follow that text and history, not the cases that ignore it.

### D. Legislative history indicates that the "election" occurs when election officials receive the ballots.

To the extent any ambiguity remains after considering the text and history, the legislative history confirms that Congress intended "the day for the election" to be the final day ballots are received by election officials. The district court elevated abstract congressional purposes over evidence of the statutes' meaning. And it ignored other purposes that the election-day statutes further, such as preventing fraud and confusion.

To start, Congress rejected amendments in both 1844 and 1872 that would have "allow[ed] multi-day voting to continue so long as states provided for it by law." *Keisling*, 259 F.3d at 1174. Supporters explained that a uniform national election day is a "check to frauds in elections, to double voting, [and] to the transmission of voters from one State to another." *Id.* (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872)). The convenience of multi-day voting also did not persuade Congress out of the national election day. *See id.* The Ninth Circuit thus concluded that "[b]ecause Congress considered and rejected an amendment to allow multi-day voting when they enacted the uniform election day for Representatives in 1872, it is a fair inference that the word 'the' in the statute was intended, after due consideration of multi-day voting, to reject it." *Id.* In fact, the reason multi-day voting *doesn't* violate the election day statutes is

because of its "universal, longstanding practice." *Bomer*, 199 F.3d at 776; *accord Keisling*, 259 F.3d at 1175.

The district court ignored this portion of the legislative history, which informs the meaning of the words Congress chose. Instead, the district court looked at broader "concerns" that Congress had in mind when it enacted the election-day statutes. ROA.1181. For example, Congress was at least in part "concerned both with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and with the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years." *Foster*, 522 U.S. at 73. And the "legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777. But those concerns are not exhaustive, let alone dispositive of any conflict with the election-day statutes. Congress was also concerned with "double voting" and the "transmission of voters from one State to another," *Keisling*, 259 F.3d at 1174, and it sought to "combat fraud by minimizing the opportunity for voters to cast ballots in more than one election," *Millsaps*, 259 F.3d at 541. The district court ignored those other congressional purposes.

In any event, election-day receipt furthers even the limited purposes the district court identified. "[A] single deadline" for the receipt of ballots "supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing." *Democratic Nat'l Comm. v. Wis. State Legislature,* 141 S. Ct. 28, 28 (2020) (Gorsuch, J., concurral). There are "important reasons" to "require absentee ballots to be received by election day, not just mailed by election day." *Id.* at 33 (Kavanaugh, J., concurral).

Among them, election-day receipt helps "avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election." *Id.* A uniform, national election day prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. And "[w]ithout question, Congress has the authority to compel states to hold these elections on the dates it specifies." *Keisling*, 259 F.3d at 1170.

The district court also incorrectly assumed that enjoining Mississippi's post-election deadline would "'have the effect of impeding citizens in exercising their right to vote.'" ROA.1181 (quoting *Bomer*, 199 F.3d at 777). "[V]oting necessarily requires some effort and compliance with some rules." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). And "[t]o state the obvious, a State cannot conduct an election without deadlines." *Democratic Nat'l Comm.,* 141 S. Ct. at 33 (Kavanaugh, J., concurral). Deadlines do not "imped[e]" anyone from voting. ROA.1175. They are a necessary and normal part of the voting process, which is why Congress instituted a national election day. To the extent legislative history is relevant in this case, the district court's pick-and-choose approach does not accurately depict the scope of the election-day statutes.

### E. Congress has neither endorsed nor acquiesced to post-election receipt of mail ballots.

Other federal laws confirm that Congress understands ballot receipt as the definitive election-day act. For example, in 1872 Congress passed "a one-time exception" to the uniform election day. *Millsaps*, 259 F.3d at 542. To address the impracticalities of single-day voting in Reconstruction-era Texas, Congress amended 3

U.S.C. §1 to "to allow States to conduct balloting for presidential electors over more than one day in that year's presidential election." *Id.* (citing Act of May 23, 1872, ch. 198, 17 Stat. 157). That exception expired after that election.

In 1942, Congress passed a law to provide for absentee voting for members of the Armed Forces. *See* Act of Sept. 16, 1942, ch. 561, 56 Stat. 753. The law mandated that States permit members of the Armed Forces to vote absentee in federal elections in times of war, and it established certain required balloting procedures. Among other things, the voter was required to "subscribe the oath printed upon the official envelope" and mail the "war ballot" "to the secretary of state of the State of his residence." *Id.* §8. Although the law deferred to States on canvassing procedures, "no official war ballot shall be valid … if it is received by the appropriate election officials … after the hour of the closing of the polls on the date of the holding of the election." *Id.* §9.

Other federal statutes confirm Congress's understanding that election-day is a receipt deadline. In the 1970 amendments to the Voting Rights Act, Congress adopted uniform absentee-voting rules for presidential elections. Those absentee rules require States to "provide by law for the casting of absentee ballots" for presidential elections "by all duly qualified residents of such State who may be absent from their election district" on election day. 52 U.S.C. §10502(d). Ballots of qualified voters must be counted so long as the voters "return[] such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." *Id.* Congress could have adopted a postmark rule, or it could have allowed ballots to come in after election day. But it didn't. Instead, Congress remained consistent with its longstanding rule that the election is consummated on election day.

And that means ballots must be received by "the appropriate election official" by election day. *Id.*

The district court ignored these statutes in favor of the Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA)—a statute that says nothing about mail-ballot deadlines. Following in the footsteps of other district courts, the district court in this case reasoned that "Congress's enactment of UOCAVA … 'strongly suggest[s] that statutes like the one at issue here are compatible with the Elections Clause.'" ROA.1179 (quoting *Bost*, 684 F. Supp. 3d at 737). But UOCAVA doesn't set any ballot-receipt deadline. Instead, it requires a *federal official* to collect overseas ballots and deliver them to state election officials "not later than the date by which an absentee ballot must be received in order to be counted in the election." 52 U.S.C. §20304(b)(1). That federal official must collect the ballots from overseas voters no later than the "seventh day preceding the date of the regularly scheduled general election for Federal office." *Id.* §20304(b)(3)(A). In that regard, UOCAVA is not much different than the voting-in-the-field procedures of the Civil War.

UOCAVA doesn't adopt, incorporate, or approve of any state post-election deadlines—it just declines to set a deadline itself. And it did so in 1986, long before most States adopted their post-election mail-in deadlines. UOCAVA also requires States to send ballots to overseas voters "not later than 45 days before the election." *Id.* §20302(a)(8)(A). On occasion, States miss that deadline. When that happens, the Department of Justice has secured court-ordered extensions to the ballot-receipt deadline as an *equitable remedy* for the State's violation of UOCAVA. *E.g.*, *United States v.*

*West Virginia*, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). That practice says nothing about the original meaning of the election day statutes.

Worse still, the district court erred by "strongly presum[ing]" that Mississippi's law was not preempted. ROA.1179. The presumption against preemption doesn't apply in Elections Clause legislation such as the election-day statutes. "The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under [the Elections Clause], which empowers Congress to 'make or alter' state election regulations." *Inter Tribal Council*, 570 U.S. at 14. That's because "[w]hen Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* The district court defied that holding when it ruled that "courts must *strongly presume* that acts of Congress addressing the same topics are in harmony rather than one statute's impliedly repealing the other in whole or part." ROA.1179 (emphasis added). The district court relied on a non–Elections Clause case, but the presumption against preemption doesn't apply to Elections Clause legislation. *Inter Tribal Council*, 570 U.S. at 14. So even if the district court were correct that UOCAVA "allows post-election receipt of overseas ballots mailed by election day," it erred by concluding that the "similar Mississippi statute" must be "presumed not to offend against the election-day statutes." ROA.1179.

Moreover, even if UOCAVA had carved out an explicit post-election deadline for overseas ballots, it wouldn't save the district court's ruling. Where Congress has not acted, States have authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. But "Congress may

at any time by Law make or alter such Regulations." *Id.* Congress could permit post-election-day receipt of ballots if it wanted to. In fact, it has considered and rejected such proposals. *See Keisling*, 259 F.3d at 1171-74 (detailing the legislative history of the election-day statute). But even if Congress did carve out exceptions for UOCAVA ballots, that would not mean it had carved out an exception for all ballots in Mississippi and every other State.

With no federal law directly supporting its ruling, the district court concluded that the *lack* of federal legislation on mail-ballot deadlines required dismissing the case. ROA.1178-79. But congressional acquiescence is a weak inference here for several reasons. First, it generally refers to the idea that "Congress has acquiesced to an agency or judicial interpretation," not a *state practice. Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019); *see also CFTFC v. Schor*, 478 U.S. 833, 846-47 (1986). Second, the Supreme Court has "reasserted in no uncertain terms [its] oft-expressed skepticism toward reading the tea leaves of congressional inaction," because courts "have no idea" whether Congress's inaction is merely its "failure to express any opinion." *Rapanos v. United States*, 547 U.S. 715, 749-50 (2006) (plurality op.). Third, even if it applied here, the proponent of congressional acquiescence "bears the burden of showing 'abundant evidence that Congress both contemplated and authorized' the previous noncongressional interpretation in which it now acquiesces." *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1438 (10th Cir. 1996) (quoting *Schor*, 478 U.S. at 847). Defendants have not carried that heavy burden.

In any event, Congress has not acquiesced. To the contrary, history shows that for decades after Congress enacted the election-day statutes, States did not count mail-

in ballots received after election day. The handful of laws in the late 20th century and the very recent surge of laws due to COVID are not evidence that Congress has approved the practice of accepting ballots after election day. *Foster* itself, after all, invalidated a nearly quarter-century-old state primary system. *Foster*, 522 U.S. at 70.

If congressional acquiescence can't overcome the original meaning of the election-day statutes, then *prosecutorial* acquiescence is even further afield. Nevertheless, the district court found it persuasive that "the federal government was surely aware that several states had similar practices of accepting ballots received after election day, but it had not sued any state to challenge that practice." ROA.1180 (citing *Harris*, 122 F. Supp. 2d at 1325). But "the views of the government as litigator are simply not binding on the issue of Congressional intent. Indeed, the Supreme Court has repeatedly rejected the government's litigation views in construing Congressional statutes." *SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1352 (Fed. Cir. 2009) (citing *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 646-47 (2005); *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 223-24 (1996)). Weaker still are inferences about congressional intent from the *executive* branch's decision not to file lawsuits. Many factors influence those decisions, including resource constraints, priorities, and— relevant here—the availability of a private remedy. The district court erred in elevating the executive branch's inaction over Congress's plain words.

## II. Post-election receipt of mail ballots violates the rights of candidates and voters.

The Plaintiffs asserted three claims in their complaint: violation of the election-day statutes by state officers in their official capacity (Count I); violation of the rights

of candidates to run for office under 42 U.S.C. §1983 (Count II); and violation of the rights of voters under 42 U.S.C. §1983 (Count III). *See* ROA.33-35. The district court observed that the §1983 claims "stand or fall on whether the Mississippi absentee-ballots statute conflicts with federal law, in which case Plaintiffs say their rights would be violated." ROA.1182. That observation is essentially correct. The district court erred in ruling that the Mississippi statute *doesn't* conflict with federal law, as Section I explains. But under the district court's reasoning, a reversal on the merits of the preemption claim would mean that Plaintiffs' rights are being violated.

To the extent the Defendants challenge the district court's reasoning on §1983, this Court should follow its own precedent. Plaintiffs here, just like the plaintiffs who prevailed in *Foster*, seek "declaratory and injunctive relief … under 42 U.S.C. §1983." *Love v. Foster*, 90 F.3d 1026, 1028 (5th Cir. 1996), *aff'd*, 522 U.S. 67. *Bomer* was also a §1983 case. *Voting Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600 (S.D. Tex. 1999), *aff'd*, 199 F.3d 773 (5th Cir. 2000). So was *Keisling*. 259 F.3d at 1170 n.2. And *Millsaps*. 259 F.3d at 542. That path makes sense: when Congress legislates under the Elections Clause, it protects "the fundamental right [to vote] involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The election day statutes are thus judicially enforceable in suits brought under 42 U.S.C. §1983. Candidates, voters, and political organizations are the ones most injured when votes are counted in violation of law. *See Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) (candidate suffers injury when votes are counted in violation of the "the Electors Clause"); *Anderson v. United States*, 417 U.S. 211, 226 (1974) ("The right to an honest (count) is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured

in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States.").

In any event, no party has challenged the Plaintiffs' cause of action to enjoin state officials for violations of federal law (Count I in the complaint). So this Court must reach the merits of the preemption claim even if it were to reconsider the Circuit's allowance of §1983 actions to enforce the election-day statutes. *Ex parte Young* permits suits for prospective relief against state officials acting in violation of federal law. *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc). Plaintiffs named the state officials responsible for enforcing the election-day statutes in their official capacities; they allege an ongoing violation of federal law; and they seek prospective relief. *Id. Ex parte Young* thus permits this suit, and no party has argued otherwise.

## CONCLUSION

This Court should reverse the District Court's judgment.

*/s/ Thomas R. McCarthy*

Spencer M. Ritchie
Forman Watkins & Krutz LLP
210 East Capitol Street, Ste. 2200
Jackson, MS 39201
(601) 960-3172
spencer.ritchie@formanwatkins.com

Dated: August 16, 2024

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellants Republican National Committee,*
*Mississippi Republican Party, James Perry, and Matthew Lamb*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 11,048 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: August 16, 2024       */s/ Thomas R. McCarthy*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: August 16, 2024       */s/ Thomas R. McCarthy*