# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; MATTHEW LAMB,

*Plaintiffs – Appellants*

v.

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; TONI JO DIAZ, in their official capacities as members of the Harrison County Election Commission; BECKY PAYNE, in their official capacities as members of the Harrison County Election Commission; BARBARA KIMBALL, in their official capacities as members of the Harrison County Election Commission; CHRISTENE BRICE, in their official capacities as members of the Harrison County Election Commission; CAROLYN HANDLER, in their official capacities as members of the Harrison County Election Commission; MICHAEL WATSON, in his official capacity as the Secretary of State of Mississippi,

*Defendants – Appellees*

VET VOICE FOUNDATION; MISSISSIPPI ALLIANCE OF RETIRED AMERICANS,

*Intervenor Defendants – Appellees*

LIBERTARIAN PARTY OF MISSISSIPPI,

*Plaintiff – Appellant*

v.

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; TONI JO DIAZ, in their official capacities as members of the Harrison County Election Commission; BECKY PAYNE, in their official capacities as members of the Harrison County Election Commission; BARBARA KIMBALL, in their official capacities as members of the Harrison County Election Commission; CHRISTENE BRICE, in their official capacities as members of the Harrison County Election Commission; CAROLYN HANDLER, in their official capacities as members of the Harrison County Election Commission; MICHAEL WATSON, in his official capacity as the Secretary of State of Mississippi,

*Defendants – Appellees.*

On Appeal from the United States District Court for the Southern District of Mississippi, Nos. 1:24-cv-25 and 1:24-cv-37 (Guirola, J.)

_____

## BRIEF OF APPELLANT LIBERTARIAN PARTY OF MISSISSIPPI

_____

T. Russell Nobile
   *Counsel of Record*
**JUDICIAL WATCH, INC**
P.O. Box 6592
Gulfport, MS 39506
(202) 527-9866

Eric W. Lee
Robert D. Popper
**JUDICIAL WATCH, INC**
425 Third Street SW, Suite 800
Washington, D.C. 20024

August 16, 2024

*Counsel for Plaintiff-Appellant*
*Libertarian Party of Mississippi*

# <u>CERTIFICATE OF INTERESTED PARTIES</u>

Case No. No. 24-60395

Undersigned counsel certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants Libertarian Party of Mississippi, Republican National Committee, the Mississippi Republican Party, James Perry, and Matthew Lamb.

2. Defendants-Appellees Justin Wetzel, Toni Jo Diaz, Becky Payne, Barbara Kimball, Christene Brice, and Carolyn Handler, in their official capacities as members of the Harrison County Election Commission, and Secretary of State Michael Watson, in his official capacity.

3. Intervenor-Defendants Vet Voice Foundation and Mississippi Alliance for Retired Americans.

4. Amicus Curiae Disability Rights Mississippi, League of Women Voters of Mississippi, and Democratic National Committee.

5. T. Russell Nobile, Robert Popper, Eric W. Lee, Spencer Mark Ritchie, Tim C. Holleman, Rex M. Shannon, III, Wilson D. Minor, Christopher D. Dodge, Elizabeth C. Frost, Michael Brandon Jones, Paloma Wu, Richard

Alexander Medina, Robert B. McDuff, Tina Meng Morrison, Greta K.

Martin, Joshua F. Tom, and David W. Baria.


August 16, 2024                                    _s/ Russ Nobile_____
                                                   T. Russell Nobile

## STATEMENT REGARDING ORAL ARGUMENT

Federal and state regulatory authority over Congressional and Presidential elections is set forth in the Elections and Electors Clauses of the U.S. Constitution. The boundaries of this authority are not always clear, but unquestionably Congress has final and plenary authority over the timing of federal elections.

The issue in this case is whether Congress, in exercising its authority over the timing of federal elections, preempted Mississippi's law extending its Ballot Receipt deadline with respect to federal elections. Stated differently, when Congress enacted the federal Election Day statutes, did it "necessarily displace" Mississippi's authority to extend its absentee ballot Receipt Deadline to fall after Election Day, and is Mississippi's Receipt deadline "inconsistent with" the federal Election Day statutes. Oral argument would aid in expounding the legal issues raised here.

## CORPORATE DISCLOSURE STATEMENT

The Libertarian Party of Mississippi has no parent corporation, and no corporation owns 10% or more of their stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*s/ Russ Nobile*
T. Russell Nobile

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iv

JURISDICTIONAL STATEMENT........................................................................1

STATEMENT OF THE ISSUES .............................................................................1

STATEMENT OF THE CASE .................................................................................2

A.    Legal Background ......................................................................................2

B.    Plaintiff Libertarian Party's Lawsuit......................................................4

C.    Procedural Background.............................................................................6

D.    The District Court's Memorandum Opinion and Order.................................8

SUMMARY OF ARGUMENT ...............................................................................9

STANDARD OF REVIEW ...................................................................................11

ARGUMENT ........................................................................................................11

I.    When Congress Enacts a Timing Regulation It "Necessarily Displaces" State Authority to Regulate the Timing of Federal Elections......................11

    A.    Following *Inter Tribal*, State Law Need Only Be "Inconsistent With" Federal Law to be Preempted ............................................................13

    B.    Mississippi's Receipt Deadline Is Preempted Under the Elections and Electors Clauses................................................................................18

II.    Under Either Preemption Standard, Mississippi's Receipt Deadline Alters the Time for "the Election" Mandated by Congress .....................................22

    A.    "The Election" Requires on Election Day the "Combined Actions" That Are "Meant to Make a Final Selection" .....................................23

B.      Congress Intended to Remedy Several Evils When It Adopted The Day of "Final Selection"..................................................................28

C.      The Ordinary Public Meaning of Election Day Is the Date by Which All Ballots Must Be Received by Election Officials ..............29

         1.      There Was No Common Law Right to Vote Absentee ............31

         2.      The Public Understood That Election Day Required The Receipt of All Ballots to Consummate An Election.................33

         3.      The Development of Absentee Voting In Times of War Adhered to the Public Understanding that Election Day Required Ballot Receipt By Election Officials .......................35

         4.      Purported Congressional Tolerance Should be Afforded Minimal, if Any, Weight ...........................................................38

         5.      Other Federal Statutes Do Not Support Finding Non-Preemption ......................................................................44

III.      Mississippi's Receipt Deadline Violates Plaintiff's First and Fourteenth Amendment Rights ......................................................47

CONCLUSION ......................................................................................49

# TABLE OF AUTHORITIES

**CASES**            **PAGE**

*Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1 (2013) ...........................*passim*

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*,
    576 U.S. 787 (2015)............................................................................11

*Baker v. Carr*, 369 U.S. 186 (1962) .......................................................42

*Beck v. Somerset Techs., Inc.*, 882 F.2d 993 (5th Cir. 1989) ..................20

*Bob Jones University v. United States*, 461 U.S. 574 (1982).................42

*Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020) .............26, 27

*Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. 2023)...........26, 38

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ....................................29

*Burns v. Alcala*, 420 U.S. 575 (1975) ...................................................30

*Burson v. Freeman*, 504 U.S. 191 (1992) ...........................30, 32, 34, 35

*Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) ....38

*Chase v. Miller*, 41 Pa. 403 (1862) ................................................35, 43

*Cook v. Gralike*, 531 U.S. 510 (2001)....................................................13

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 (2020)................42, 43

*Doe v. Reed*, 561 U.S. 186 (2010)..........................................................32

*Ex parte Siebold*, 100 U.S. 371 (1879) ..............................................3, 14

*Ex parte Yarbrough*, 110 U.S. 651 (1884) ...........................................28

*Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294 (5th Cir. 2017)...................11

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ...............................................*passim*

*Foster v. Love*, 522 U.S. 67 (1997) ...................................................*passim*

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) .............................12, 13, 15, 17

*Goodell v. Judith Basin County*, 224 P. 1110 (Mont. 1924) ..................................37

*Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003)........................................11

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) .................................13

*Harris v. Florida Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) ...................45

*Harris v. Florida Elections Canvassing Comm'n,*
    122 F. Supp. 2d 1317 (N.D. Fla. 2000)........................................45

*Hughey v. United States*, 495 U.S. 411 (1990) ....................................29

*Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011)...............41

*Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173 (1979).................47

*Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860 (7th Cir. 2016)..............................29

*K Mart Corp. v. Cartier*, 486 U.S. 281 (1988)........................................29

*Keller Founds., Inc. v. Wausau Underwriters Ins. Co.,*
    626 F.3d 871 (5th Cir. 2010).........................................................11

*Lynch v. Malley*, 74 N.E. 723 (Ill. 1905)........................................24, 32

*Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944) ....................24, 35

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001)................................26, 28, 41

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ....................................30

*Moore v. Harper*, 600 U.S. 1 (2023) ....................................................27

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ........................................48

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ...................................40

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) ........................................................47

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) ...................................................30

*Newberry v. United States*, 256 U.S. 232 (1921) ....................................................25

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) .....................................38

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990) .........................42

*Perrin v. United States*, 444 U.S. 37 (1979) ..........................................................29

*Pond v. United States*, 69 F.4th 155 (4th Cir. 2023) ..............................................20

*Rapanos v. United States*, 547 U.S. 715 (2006) .....................................................44

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) .........................................................43

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) ............................................30, 36

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................................2

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .............................35

*U.S. v. Classic*, 313 U.S. 299 (1941) ......................................................................16

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995) ..........................................2, 13

*United States v. Craft*, 535 U.S. 274 (2002) ..........................................................38

*United States v. Price*, 361 U.S. 304 (1960) ..........................................................38

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ..................................17

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000) ............*passim*

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001) .......*passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4 ....................................................*passim*

U.S. Const. art. II, § 1 ...................................................*passim*

**FEDERAL STATUTES**

2 U.S.C. § 1 ..............................................................*passim*

2 U.S.C. § 7 ..............................................................*passim*

2 U.S.C. § 8 ...............................................................46, 47

3 U.S.C. § 1 ..............................................................*passim*

3 U.S.C. § 21 ..................................................3, 9, 23, 28, 29

26 U.S.C. § 7502 ...............................................................20

28 U.S.C. § 1291 ................................................................1

28 U.S.C. § 1331 ................................................................1

42 U.S.C. § 1983 ..............................................................1, 5

52 U.S.C. § 20302 ...........................................................44, 45

52 U.S.C. § 20304 ...........................................................45, 46

52 U.S.C. § 20307 ..............................................................45

52 U.S.C. § 21082 ..............................................................41

**FEDERAL RULES**

FED. R. APP. P. 4(a)(1)(A) .....................................................1

FED. R. CIV. P. 56(a)...........................................................................11

**STATE STATUTES**

10 ILCS 5/19-8 ................................................................................39

25 Pa. Cons. Stat. § 3511 .................................................................39

Ala. Code § 17-11-18 .......................................................................39

Ark. Code. Ann. § 7-5-411 ...............................................................39

Cal. Elec. Code. § 3020 ...............................................................39, 40

D.C. Code § 1-10001.05 ...................................................................39

Fla. Stat. § 101.6952(5) ...................................................................39

Ga. Code Ann. § 21-2-386 ...............................................................39

Ind. Code § 3-12-1-17 ......................................................................39

Kan. Stat. Ann. § 25-1132 ...............................................................39

La. Rev. Stat. § 18:1311 ..................................................................46

Mass. Gen. Laws ch. 54, § 93 .........................................................39

Md. Code Regs. 33.11.03.08 ...........................................................39

Mich. Comp. Laws § 168.759a ........................................................39

Mo. Rev. Stat. § 115.920(1) ............................................................39

N.J. Stat. Ann. § 19:63-22 ...............................................................39

N.Y. Elec. Law § 8-412....................................................................39

Neb. Rev. Stat. Ann. § 32-950 .........................................................40

Nev. Rev. Stat. § 293.269921 ...................................................................39

Or. Rev. Stat. § 253.070(3) ....................................................................39

R.I. Gen Laws § 17-20-16 ......................................................................39

S.C. Code Ann. § 7-15-700 .....................................................................39

S.C. Code Ann. § 7-17-10 .......................................................................39

Tex. Elec. Code Ann. § 86.007 ...............................................................39

Utah Code Ann. § 20A-3a-204 ...............................................................39

Va. Code Ann. § 24.2-709........................................................................39

Miss. Code Ann. § 23-15-637 ...........................................................*passim*

**OTHER**

Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW,
    Vol. 11, No. 2 (May 1917)..............................................................37

Charles Stewart III, *How We Voted in 2020:*
    *A First Look at the Survey of the Performance of American Elections*,
    MIT Election Data + Science Lab, (Dec. 15, 2020) ....................40

Cong. Globe, 42 Cong., 2d Sess. 676 (1872)...........................................42

Cong. Globe, 95th Cong. (1977) ..............................................................42

Cortland F. Bishop,
    HISTORY OF ELECTIONS IN THE AMERICAN COLONIES (1893) ........32

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL
    CONSTITUTION (Jonathan Elliot ed., 1836) ...................................12

Donald A. Debats, HOW AMERICA VOTED: BY VOICE,
    Univ. of Virg. Inst. For Advanced Tech. in Humanities, (2016).................34

E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM IN THE
UNITED States (1917) ....................................................................34

THE FEDERALIST No. 59 (C. Rossiter ed. 1961) (A. Hamilton) ........................ 12, 33

George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS
(Henry L. McCune eds. 4th ed. 1897)............................................32

J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES (1934) .............. 35, 40

James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS (1912)....33

Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh,
CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING DATES FOR NATIONAL
OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM, Vol. 38, Issue 1, Winter
2008......................................................................................33, 34

John C. Fortier, ABSENTEE AND EARLY VOTING:
TRENDS, PROMISES, AND PERILS, AEI Press (2006) ......................................37

John C. Fortier & Norman J. Ornstein, *Symposium, Election Reform:
The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*,
36 U. Mich. J.L. Reform (2003) ..................................................41

Josiah Henry Benton, VOTING IN THE FIELD (1915)........................21, 35, 36, 40, 43

Kirk H. Porter, HISTORY OF SUFFRAGE IN THE UNITED STATES (1918)..................32

*Let Congress Do It: The Case for An Absolute Rule of Statutory State Decisis*,
88 Mich. L. Rev. 177, 186 ..........................................................39

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(Joseph E. Worcester, *et al*. eds. 1st ed. 1830).............................31

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(Joseph E. Worcester, *et al*. eds. 2nd ed. 1860) ...........................31

*The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on
Rules and Admin.*, 95th Cong. (1977)..........................................39

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW,
Vol. 12, No. 2 (May 1918)..............................................................37

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW,
Vol. 12, No. 3 (Aug. 1918) ....................................................37, 38

Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting:*
*The Uniformed and Overseas Citizens Absentee Voting Act* (2016) ...........44

Scott Rasmussen, "70% Want All Mail-In Ballots Received By Election Day,"
ScottRasmussen.com (July 13, 2021) ...........................................31

Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot,"
ScottRasmussen.com (Jan. 17, 2022)...........................................31

# JURISDICTIONAL STATEMENT

The complaint filed by Plaintiff-Appellant Libertarian Party of Mississippi ("Plaintiff" or "Libertarian Party") alleged constitutional and federal statutory claims arising under 42 U.S.C. § 1983. ROA.1281-94. The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1331. This appeal is from the district court's July 28, 2024 memorandum opinion and order ("Order") granting Defendants' motions and dismissing Plaintiff's claims with prejudice. ROA.1160-83. Plaintiff timely filed its notice of appeal on August 2, 2024. ROA.1186-87; FED. R. APP. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  What is the standard for preemption under the Elections and Electors Clauses after *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013).

2.  Whether Miss. Code Ann. § 23-15-637(1)(a) ("Receipt Deadline") is "inconsistent with" and preempted by the federal Election Day statutes under *Inter Tribal* and *Foster v. Love*, 522 U.S. 67 (1997).[1]

3.  Whether Mississippi's Ballot Receipt Deadline violates Plaintiff's rights under the U.S. Constitution and 42 U.S.C. § 1983.

---

[1] "Election Day" and "Election Day statutes" used herein refer to "election day" or "day of election" as used in 2 U.S.C. §§ 1, 7, and 3 U.S.C. § 1.

# STATEMENT OF THE CASE

## A.    Legal Background

The United States Congress is authorized under U.S. Const. art. I, § 4 cl. 1 ("Elections Clause") and art. II, § 1 cl. 4 ("Electors Clause") to establish the time for conducting federal elections.  Though the Elections Clause provides state Legislatures the power to regulate the times, places, and manner of holding Congressional elections, that power ceases when Congress "at any time by Law make[s] or alter[s] such Regulations[.]" *Id.*

> [T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932).  Similarly, the Electors Clause assigned Congress the power to determine the "Time of chusing" presidential and vice-presidential electors, which date shall be "uniform."[2]

These two clauses give "Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69 (citing *U.S. Term Limits v. Thornton*, 514 U.S. 779, 832-833 (1995)).

---

[2]    The text of the Elections and Electors Clauses is not identical. However, with respect to regulating the timing of federal elections, Congressional authority in both is treated the same. *Foster*, 522 U.S. at 69-70 (affirming that congressional time regulations are "paramount").

Federal election laws "are paramount to [election laws] made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879); and *Inter Tribal*, 570 U.S. at 7-18.

Congress exercised this authority over 175 years ago when it enacted the first of a trio of statutes that establish a uniform national Election Day. In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1.[3] Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections. In 1914, following the adoption of the Seventeenth Amendment, Congress aligned Senate elections with those in the House. 2 U.S.C. § 1. Together, those statutes designate the Tuesday after the first Monday in November in every even-numbered year as the uniform national Election Day for all federal elections. *See* 2 U.S.C. §§ 1 and 7, and 3 U.S.C. § 1.

In December 2022, Congress enacted the Electoral Count Reform Act ("ECRA"). 136 Stat. 5233, 525 (enacted as Div. P., Title I, § 102(b) of the Consolidated Appropriations Act, 2023, 117 Pub. L. No. 328, Dec. 29, 2022). Relevant here, the ECRA revised Title 3 dealing with Presidential elections, adding new 3 U.S.C. § 21, which provides in part:

---

[3] Originally codified as 5 Stat. 721, non-material wording changes occurred over the years before it was recodified as 3 U.S.C. § 1.

(1) "election day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

Prior to 2020, Mississippi required absentee ballots to be received by 5:00 p.m. on the day prior to Election Day to be counted. 2012 Miss. ALS 465, 2012 Miss. Gen. Laws 465, 2012 Miss. S.B. 2552. In 2020, Mississippi's Receipt Deadline was amended to allow absentee ballots to be received up to five business days after Election Day. 2020 Miss. H.B. 1521, 2020 Miss. Gen. Laws 472, 2020 Miss. ALS 472 25.

## B. Plaintiff Libertarian Party's Lawsuit

Plaintiff Libertarian Party of Mississippi challenged Mississippi law by filing a complaint for declaratory and injunctive relief related to the 2024 federal elections. ROA.1281-94. Plaintiff, a registered political party in Mississippi, sued Defendants Justin Wetzel, in his capacity as the clerk and registrar of the Circuit Clerk of Harrison County, all five members of the Harrison County Election Commission (Toni Jo Diaz, Becky Payne, Barbara Kimball, Christene Brice, and Carolyn Handler), in their official capacities, as well as Mississippi's Secretary of State Michael Watson in his official capacity. *Id*. The Libertarian Party sought a declaratory judgment that Mississippi's Receipt Deadline violated federal law and requested, among other

things, permanent injunctive relief enjoining the canvassing of ballots that arrived after Election Day. ROA.1290-93. The gravamen of Plaintiff's claims is that the receipt of all qualified ballots by election officials—*viz.*, the "combined actions of voters and officials meant to make a final selection of an officeholder" (*Foster*, 522 U.S. at 71)— must occur on or before Election Day. ROA.1288. To be clear, Plaintiff does not allege voter fraud; nor does it allege that ballots were *mailed* after Election Day contrary to Mississippi law. Rather, Plaintiff alleges that all ballots *received* after Election Day pursuant to Mississippi's Receipt Deadline are inconsistent with the text of the federal Election Day statutes and the Supreme Court's holding in *Foster*, and are, therefore, illegal and invalid. These ballots are as invalid as if they were received one year after Election Day, because they violate the federal Election Day statutes. ROA.1290.

Plaintiff alleged three claims. First, Plaintiff claimed that ballots received by state election officials *after* Election Day are invalid and that counting such ballots violates its supporters' right to vote under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983. ROA.1290-93. Second, for similar reasons, Plaintiff claimed these invalid ballots violated its federal candidates' right to stand for office under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983. *Id.* Third, Plaintiff claimed the Receipt Deadline violates both the Elections and Electors Clauses in violation of 42 U.S.C. § 1983. *Id.*

## C.    Procedural Background

This appeal comes from a consolidation of two cases. Plaintiffs Republican National Committee, Mississippi Republican Party, James Perry, and Matthew Lamb (hereinafter "RNC Plaintiffs") filed case no. 1:24-cv-25 on January 26, 2024. ROA.23-36.  Plaintiff Libertarian Party of Mississippi filed case no. 1:24-cv-37 on February 5, 2024.  ROA.1281-94.  Both raise similar claims against the same Defendants.  On March 1, 2024, the district court consolidated these cases, making case no. 1:24-cv-25 the lead case.  ROA.307.  On March 4, 2024, the court granted the motion of Vet Voice Foundation and Mississippi Alliance for Retired Americans (hereinafter "Vet Voice") to intervene as defendants.[4]  ROA.13.  On March 5, 2024, the district court granted the parties' joint motion to set a scheduling order for cross-motions for summary judgment.  ROA.312.

During the period from March 26 through April 16, 2024, the parties briefed the following cross motions for summary judgment: 1) Secretary Watson's Motion for Summary Judgment against the RNC Plaintiffs, ROA.431-34 ; 2) Secretary Watson's Motion for Summary Judgment against the Libertarian Party, ROA.476-79 ; 3) the Libertarian Party's Motion for Summary Judgment, ROA.527-28 ; 4) the RNC's Motion for Summary Judgment, ROA.611-13 ; 5) Vet Voice's Motion for

---

[4]    Other third parties moved to intervene.  ROA.181-85 and ROA.340-428.  On March 7, 2024, the district court denied these additional requests, allowing them instead to participate as *amici*.  ROA.388-98.

Summary Judgment, ROA.654-56 ; 6) County Defendants' Motion for Summary Judgment against the RNC Plaintiffs, ROA.688-90 ; and 7) County Defendants' Motion for Summary Judgment against the Libertarian Party. ROA.691-93.[5] Plaintiff Libertarian Party moved for summary judgment on the grounds that Mississippi's receipt deadline violates federal law and is preempted based on the original public meaning of "day of election." ROA.555-80. Plaintiff's complaint set forth allegations of tangible concrete injuries caused by Mississippi's invalid Receipt Deadline, and submitted two undisputed factual declarations by a senior official within the state's Libertarian Party. ROA.1287-89 and ROA.545-47. Specifically, Plaintiff's undisputed evidence showed its ability to monitor election canvassing has been diminished because the costs and resources needed to monitor for five business days following Election Day have increased. As a result, the increased costs to a minor political party to participate in extended canvassing puts Plaintiff in a worse position relative to the other parties. ROA.546-57.

Defendants' and Vet Voices' motions, read together, primarily argued that summary judgment should be granted because Plaintiffs lacked standing under Article III and, alternatively, Plaintiffs' claims lack merit. The motions were fully briefed and submitted on April 16, 2024. The district court heard arguments on all motions on July 9, 2024. ROA.1138.

---

[5]     In substance, County Defendants joined State Defendants' Motions.

**D.    The District Court's Memorandum Opinion and Order**

On July 28, 2024, the district court entered its memorandum opinion and order denying the motions for summary judgment filed by both sets of Plaintiffs and granting Defendants' and Vet Voice's motions for summary judgment. ROA.1160-83. The court ruled that that although RNC Plaintiffs and the Libertarian Party had standing under Article III, Defendants were entitled to summary judgment on the merits. ROA.1160-61. With respect to standing, the district court held the record showed that the RNC Plaintiffs and the Libertarian Party had two tangible injuries, an economic injury and a diversion-of-resources injury. ROA.1170. The court, thus, concluded that RNC Plaintiffs and the Libertarian Party had organizational standing. ROA.1170-71.

With respect to the merits, the court agreed with all parties that there were no further material questions of fact to be resolved and all that remained was a "pure question of law." ROA.1171. The court noted that the Fifth Circuit had not yet considered whether ballots received after Election Day may be counted. ROA.1174. The court rejected the Libertarian Party's argument that the Supreme Court adopted a more lenient preemption standard for Elections Clause preemption in *Inter Tribal*, 570 U.S. at 14-15, determining instead that the standard applied by the Supreme Court in *Inter Tribal* and by this Court in *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776-777 (5th Cir. 2000) "do not appear to be different standards under

Fifth Circuit precedent." ROA.1174-77 n.11. The court accepted Defendants' and Vet Voice's argument that Mississippi's Receipt Deadline was not preempted because "the federal statutes do not directly address whether ballots must be received on or before election day." ROA.1177-81.

Plaintiffs timely filed this appeal.

## SUMMARY OF ARGUMENT

Preemption under the Elections and Electors Clause is unique and the usual federalism concerns are weaker. *Inter Tribal*, 570 U.S. at 14-15. When Congress legislates under these Clauses, "it *necessarily* displaces some element of a pre-existing legal regime erected by the States" and preempts any state law that is "inconsistent with" federal law. *Id.* States cannot modify existing federal election laws for their own ends. *Fish v. Kobach*, 840 F.3d 710, 726 (10th Cir. 2016). Courts do not "finely parse the federal statute for gaps or silences into which state regulation might fit." *Id.* at 729. "If Congress intended to permit states to so alter or modify federal election statutes [...] it would have so indicated." *Id.* at 729. "Congress possess the power to alter existing state regulations—not the other way around." *Id.* at 726.

This case involves the question of whether the federal Election Day statutes preempt Mississippi's Receipt Deadline, Miss. Code Ann. § 23-15-637(1)(a). That question largely turns on the meaning of "the election" as used in the Election Day statutes and 3 U.S.C. § 21. "[T]he election" as used in these statutes "plainly refers

to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. The combined actions of voters and officials—not the unilateral actions of either. These actions must be intended to make a final selection of an officeholder, and must occur by Election Day. States do not have the power to extend these actions beyond the deadline set by Congress. But Mississippi, by extending its ballot Receipt Deadline, causes the combined action of voters and election officials to occur five business *after* Election Day. Accordingly, that Receipt Deadline is invalid because it is contrary to federal law.

History supports the Libertarian Party's interpretation. Congress enacted a uniform national election day in 1845 (presidential elections) and 1872 (congressional elections). A historical survey shows that the ordinary public meaning of Election Day at the time of these enactments was the day by which all qualified ballots must be received by election officials. Historical electoral practices under the common law and during Colonial, early Republic, Civil War, and Reconstruction eras show that the public would have understood this. Defendants', Vet Voice's, and *amici*'s arguments are attempts to "finely parse the federal statute for gaps or silences into which state regulation might fit." *See Fish*, 840 F.3d at 729. Preemption under the Elections and Electors Clauses "does not require Congress to expressly foreclose such modifications by the states." *Id.*

The Libertarian Party of Mississippi respectfully requests that this Court reverse the district court and enter an order granting summary judgment on its behalf. The case should be remanded back to the district court for remedial proceedings.

## STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Keller Founds., Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 873 (5th Cir. 2010). Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court's factual and legal conclusions are reviewed *de novo* when determining if there is a genuine issue of material fact. *See Guy v. Cockrell*, 343 F.3d 348, 351 (5th Cir. 2003). The evidence presented is viewed with any reasonable inferences drawn in the light most favorable to the non-moving party. *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017).

## <u>ARGUMENT</u>

## I. When Congress Enacts a Timing Regulation It "Necessarily Displaces" State Authority to Regulate the Timing of Federal Elections.

"The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules[.]" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814-15 (2015). The grant of complete Congressional power over the timing of federal elections "was the

Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Inter Tribal*, 570 U.S. at 8; *see also* THE FEDERALIST No. 59, at 362-63 (C. Rossiter ed. 1961) (A. Hamilton) (providing exclusive authority in state legislatures "would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs"). This "insurance" "enables Congress to alter such regulations as the states shall have made with respect to elections." *See* 4 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 68 (Jonathan Elliot ed., 1836).

Unquestionably, the Election Day statutes are valid exercises of Congress' power to establish the time for electing congressional representatives and electors, *see Foster*, 522 U.S. at 70, and no state regulation can alter, limit, or abridge these valid exercises of Congressional power. *Id.* at 71-72; *see also Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001) ("Without question, Congress has the authority to compel states to hold these elections on the dates it specifies."). To hold otherwise would allow state legislatures to "make or alter" congressional time regulations, contrary to the plain language of the Elections and Electors Clauses.

Preemption analysis under the Elections and Electors Clause "operates quite differently from the Supremacy Clause." *See Gonzalez v. Arizona*, 677 F.3d 383,

391 (9th Cir. 2012) (en banc), *aff'd sub nom. Inter Tribal,* 570 U.S. at 20. And "[t]here is good to reason for treating Elections Clause legislation differently[.]" *Id.* at 14. "[T]he regulation of congressional elections is not [...] traditionally the province of the states."[6] *Fish,* 840 F.3d at 727. Thus, the usual federalism concerns regarding state power are "somewhat weaker" in the Elections Clause context. *Inter Tribal,* 570 U.S. at 14. That is because "the power the Elections Clause confers [on Congress] is none other than the power to preempt[.]" *Id.* When Congress "legislates with respect to the 'Time, Place and Manner' of holding congressional elections, it *necessarily* displaces some element of pre-existing legal regime erected by the States" and preempts any state law that is "inconsistent with" federal law. *Id.* at 14-15.

A. **Following *Inter Tribal*, State Law Need Only Be "Inconsistent With" Federal Law to be Preempted.**

The Supreme Court's most recent Elections Clause preemption analysis was in *Inter Tribal*. There, the Court affirmed the Ninth Circuit's *en banc* decision in *Gonzalez* that an Arizona law requiring voters to provide documentary proof of citizenship ("DPOC") in order to register to vote using the Federal Form prescribed by the National Voter Registration Act of 1993 ("NVRA") was preempted.[7] Under the

---

[6]     State power to regulate federal elections is neither an inherent nor a reserved power. *Cook v. Gralike*, 531 U.S. 510, 522 (2001); and *U.S. Term Limits*, 514 U.S. at 800-06 (describing the nature of state power with respect to federal elections).

[7]     Like the Election Day statutes, Congress passed the NVRA pursuant to its Elections Clause powers. *See Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008).

NVRA, the Election Assistance Commission was required to create a universal voter registration form ("Federal Form"), which state voter registration systems are required to "accept and use[.]" *Id.* at 4. Arizona unquestionably *did* use the Federal Form required by the NVRA to register voters in federal elections. But in addition to the requirements to register to vote under the NVRA, Arizona enacted a DPOC requirement, which mandated that all registration applicants provide DPOC along with their Federal Form applications. *Id.* When advocacy groups sued, Arizona defended its law, arguing that it still accepted and used the Federal Form and, therefore, that its DPOC requirement "operate[d] harmoniously" with the NVRA's "accept and use" mandate.[8] *Id.* at 9.

Justice Scalia, writing for the majority, acknowledged that the "accept and use" language in the NVRA was "broad enough to encompass Arizona's preferred construction." *Id.* Notwithstanding that there was no direct textual conflict, the Court looked to the context supplied by other NVRA provisions before ultimately determining that Arizona's DPOC requirement was "'inconsistent with' the NVRA's mandate[.]" *Id.* at 15 (quoting *Ex Parte Siebold*, 100 U.S. at 397). In other

---

[8]    Like the Defendants and Vet Voice here, Arizona argued it could require DPOC because the NVRA's text did not expressly forbid it. *See* Petition for Writ of Certiorari at 44, 225 fn. 26, and 350, *Arizona, et al., v. Inter Tribal Council of Arizona, Inc., et al*., No. 12-71 (July 16, 2012), 2012 U.S. S. Ct. Briefs LEXIS 2980. "[T]the NVRA neither expressly authorizes nor expressly forbids the additional information being required of the applicant." *Id*. at 350; *see also* Brief of Petitioner at 42 and 57, *Arizona, et al., v. Inter Tribal Council of Arizona, Inc., et al.*, No. 12-71 (December 7, 2012), 2012 U.S. S. Ct. Briefs LEXIS 5183 (citing *expressio unius* canon of construction).

words, Congress displaced state authority to add requirements to register to vote that were "*inconsistent with*" the NVRA, even in cases where there was no "direct conflict" between state law and the NVRA.

Three years later, in another NVRA preemption case involving Kansas, the Tenth Circuit explained the substantive evolution of Elections Clause preemption following *Inter Tribal*. *See Fish*, 840 F.3d at 724-29. After noting that *Inter Tribal* "hew[ed]" to the Court's longstanding precedent in *Siebold* and *Foster*, the *Fish* Court discussed Congress' "presumptively preemptive power" and the "relationship" between states and the federal government under the Elections Clause. *Id.* at 725-26. The court rejected Kansas' argument that "states should be able modify existing federal election regulations, in order to repurpose an existing federal [law] for the states' own ends." *Id.* Such a finding, the court explained, "would invert the relationship that the Elections Clause establish[ed] […] because it would give the states—rather than Congress—the last word." *Id.* at 726. "Congress possesses the power to alter existing state regulations—not the other way around." *Id.*

In *Fish*, the Tenth Circuit next surveyed the "framework" and "scope of preemption" in caselaw leading up to *Inter Tribal*. *Id*. at 726-729 (describing the preemption analysis used in *Gonzalez*, *Inter Tribal*, *Siebold*, and *Foster*). It explained that the Ninth Circuit's holding in *Gonzalez*, which the Supreme Court affirmed, "construed *Siebold* and *Foster* as requiring courts to consider the relevant

congressional and state laws as part of a single statutory scheme but treating the congressional enactment as enacted later and thus superseding any conflicting state provision[.]" *Id.* at 726 (noting this framework was "supported by close readings" of *Siebold*, *Foster*, and *Inter Tribal*). Summarizing the scope of preemption following *Inter Tribal*, the Court explained:

> Guided by these cases, it is clear to us that the Elections Clause requires that we straightforwardly and naturally read the federal and state provisions in question as though part of a unitary system of federal election regulation but with federal law prevailing over state law where conflicts arise. *We do not finely parse the federal statute for gaps or silences into which state regulation might fit. We refrain from doing so because were states able to build on or fill gaps or silences in federal election statutes—as [Kansas suggests it] is permitted to do with respect to the NVRA—they could fundamentally alter the structure and effect of those statutes.* If Congress intended to permit states to so alter or modify federal election statutes, like the NVRA, it would have so indicated. The Elections Clause does not require Congress to expressly foreclose such modifications by the states.

*Id.* at 729 (emphasis added).

Turning to the law of this Circuit, prior to *Inter Tribal*, this Court rejected a challenge to Texas' early voting law, finding that the law did not "directly conflict" with the federal Election Day statutes and therefore was not preempted.[9] *Bomer*, 199 F.3d at 774. As the district court noted below, *Bomer* is still controlling precedent in this Circuit and there has only been one opportunity since *Inter Tribal* for

---

[9]     *Bomer*'s discussion of "direct[] conflict" cites *Foster* and *U.S. v. Classic*, 313 U.S. 299 (1941). 199 F.3d at 775. However, neither case used the "direct" language.

this Court to consider its impact on the law in this Circuit. ROA.1176, n.11. That opportunity occurred in *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), which was pending at the time *Inter Tribal* was decided.[10] Unlike *Fish*, the nature of the dispute in *Steen* did not require this Court to reconcile to what degree, if any, the "scope of preemption" changed after the Supreme Court's "inconsistent with" analysis in *Inter Tribal*. While the majority opinion and dissent in *Steen* cited *Inter Tribal*, both did so mostly in passing. *Id.* at 400, 407.

*Inter Tribal* altered the scope of preemption previously adopted in *Bomer*, showing that a "direct conflict" is not required.[11] The Court rejected Arizona's DPOC requirement even though it was not expressly forbidden by the NVRA and even though Arizona intended to continue accept and use the Federal Form. 570 U.S. at 10. The Court made no finding of a "direct conflict" and rejected Arizona's arguments to "finely parse the federal statute for gaps or silences into which state reg-

---

[10]     After *Inter Tribal* was decided, the parties in *Steen* filed Fed. R. App. 28(j) letters notifying the Court of supplemental authority. *Voting for Am., Inc. v. Steen*, No.12-40914, ECF No. 94 and 96. Neither addressed what effect, if any, *Inter Tribal* had on this Circuit's precedent.

[11]     The Supreme Court was aware of an emerging difference in the scope of preemption between this Court and the Ninth Circuit. *See* Petitioners' Supplemental Brief in Support of Petition for Writ of Certiorari, *Arizona, et al., v. Inter Tribal Council of Arizona, Inc., et al.*, at 1-5, No. 12-71 (July 16, 2012), 2012 U.S. S. Ct. Briefs LEXIS 4311 (comparing this Court's "directly conflict" analysis in *Bomer* to the Ninth Circuit's analysis in *Gonzalez*). While it did not acknowledge this apparent difference, *Inter Tribal* clearly affirmed *Gonzalez*.

ulation might fit." *See Fish*, 840 F.3d at 729.  Accordingly, insofar as *Bomer* required an express conflict in statutory language between state and federal law, that standard has been supplanted by the standard used in *Inter Tribal*.

**B.  Mississippi's Receipt Deadline Is Preempted Under the Elections and Electors Clauses.**

*Inter Tribal* established a more lenient standard for preemption than the "direct conflict" required under *Bomer*.  Under this standard, Mississippi is precluded from extending its Receipt Deadline for federal elections, for the same reasons that Arizona was precluded from adding a DPOC requirement to the Federal Form.  Mississippi's Receipt Deadline is "inconsistent with" the time regulations established by Congress in the Election Day statutes.

The Supreme Court unanimously held that "Election Day" means "the combined actions of voters and officials meant to make a final selection of an officeholder." [12]  *Foster*, 522 U.S. at 71-72.  "Election Day" can no more conclude five-business days *before* Election Day, as in *Foster*, than it can conclude five-business days *after* Election Day, as it does here in Mississippi.  The Election Day statutes established the time in which "the combined actions of voters and officials meant to make a final selection of an officeholder" must occur.  They necessarily displaced state authority to modify or alter (even slightly) Congress' deadline.

---

[12]     Like Arizona's law in *Inter Tribal*, the Supreme Court in *Foster* did not need to find Louisiana's open primary system was expressly forbidden to be preempted.

"At bottom," Defendants' and Vet Voice's arguments are that states can "fill gaps or silences" in federal law with their own time regulations so long as they are not expressly forbidden by federal law. *Fish*, 840 F.3d at 726 and 729. As the Tenth Circuit noted, this gets backwards the relationship between the states and federal government once Congress has exercised its paramount authority. Like Kansas in *Fish*, Mississippi cannot modify existing federal election regulations in order "to repurpose an existing federal [law] for the states' own ends." 840 F.3d at 726. "If Congress intended to permit states to so alter or modify federal election statutes […] it would have so indicated." *Id.* at 729. "The Elections Clause does not require Congress to expressly foreclose such modifications by the states." *Id.* "Congress possesses the power to alter existing state regulations—not the other way around." *Id.* at 726.

As discussed *infra*, an election is consummated when all qualified ballots are *received* by election officials. When the Election Day statutes were adopted in 1845 and 1872, the public understood it as the deadline for giving their ballot to election officials because that is what the electoral practices emphasized. The public would have understood that "Election Day" was when election officials must receive all qualified votes.

At least two *amici* below, including the United States, refer to Mississippi's Receipt Deadline as a "mailbox rule."[13]  ROA.591 and ROA.970.  This effort to rebrand the Receipt Deadline only adds more force to the preemption arguments.[14] First, other than pointing out that Congress did not expressly address it in the text of the Election Day statutes, proponents of this recharacterization offer no authority in support of this argument.  As *Inter Tribal*, *Foster*, and *Fish* all show, express displacement of state authority to create a "mailbox rule" is not necessary for such a rule to be preempted.  But *amici* contend that, many years following the passage of the Election Day statutes, states exercised some sort of dormant right to enact special electoral "mailbox rules" extending the deadline for ballot receipt to after Election Day.  Further, they contend mailbox rules do not alter or affect the timing of federal elections and that ballot receipt is not one of *Foster*'s "combined actions."  Like the state defendants in *Inter Tribal* and *Fish*, they attempt to read into federal law residual state authority that does not exist.

---

[13]  The "mailbox rule" is a common law contract doctrine where "proof that a letter properly directed was placed in a U.S. post office mail receptacle creates a presumption that it reached its destination in the usual time and was actually received by the person to whom it was addressed." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989).  On at least one occasion, Congress has provided a statutory "mailbox rule" that mirrors the common law rule for tax filings.  *See Pond v. United States*, 69 F.4th 155, 162 (4th Cir. 2023) (citing 26 U.S.C. § 7502).  Congress has *never* authorized such a rule for absentee ballots post-Election Day.

[14]  Because a "mailbox rule" creates a legal fiction about when something occurred, characterizing Mississippi's Receipt Deadline as a "mailbox rule" is a tacit admission that it affects the timing of federal elections.

Second, *amici* cannot cite to any historical record or practice from 1845 or 1872 that supports their position that states retained any authority to enact electoral mailbox rules. Indeed, the historical record confirms there was no common law right to vote absentee and, thus, no equivalent to an electoral mailbox rule. *See infra* part II.C. In fact, historical absentee practices, such as proxy voting and state-deputized military officials, *emphasized* Election Day receipt.[15] *See* Josiah Henry Benton, VOTING IN THE FIELD, 15-17, and 43 (1915), available at https://bit.ly/3p4OQaq (describing the practice of establishing poll sites in the field during the Civil War that were operated by servicemen deputized under oath as state election "constables, supervisors, etc."). *Amici*'s claim that states have the authority to create a mailbox rule for federal elections is exactly the kind of impermissible attempt to "fill gaps or silences" that is prohibited under the Elections Clause.

Before the trial court, neither Defendants nor Vet Voice offered a limiting principle on the maximum days states may allow post-Election Day receipt.[16] Stated differently, they offer no clear limit on state authority to extend receipt deadlines. The fact that they cannot do so illustrates that arguments in support of post-Election Day receipt are really attempts to "fill gaps or silences" in federal law. If ballot

---

[15] Today's practice of allowing post-Election Day receipt in Mississippi is nothing like the practice at remote Civil War poll sites operated by officers who were deputized under oath as state election officials. Those deputized officers were state actors ensuring timely receipt. "It was said that voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not military power." Benton at 17.

[16] ROA.1261:19-1263:16.

delivery to the U.S. Postal Service qualifies as *Foster*'s "combined actions of voters and officials meant to make a final selection," nothing would prevent a state from extending its receipt deadline for weeks or months after the election.

## II. Under Either Preemption Standard, Mississippi's Receipt Deadline Alters the Time for "the Election" Mandated by Congress.

Mississippi's receipt deadline is preempted under either *Inter Tribal* or *Bomer*. The question of whether Mississippi's Receipt Deadline either directly conflicts with or is inconsistent with the Election Day statutes depends on the meaning of "the election" in those statutes. Congress "mandate[d] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. The election "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Id.* at 71. The "combined actions of voters and officials" referenced in *Foster* includes ballot receipt by state election officials, which means that an election occurs when the final ballot is received by the proper state election official on Election Day. Mississippi's Receipt Deadline delays by five business days the "combined actions" and, ultimately, the occurrence of "the election."

Beyond the Election Day statutory text and precedent, historical practices under the common law and from the Colonial, early Republic, Civil War, and Reconstruction eras speak to that original public meaning of "the election" when Congress established a federal Election Day in 1845 and 1872. This history shows that ballot

receipt by election officials on Election Day is *the* final act of selection required by *Foster*. *Id.* at 73. *That is because the act of receipt by election officials transforms a ballot into a vote.* Whether "the election" is defined under *Foster*, by the original public meaning, or by 3 U.S.C. § 21, Mississippi's Receipt Deadline unquestionably alters the time for elections established by Congress and, therefore, is preempted.

A. **"The Election" Requires on Election Day the "Combined Actions" That Are "Meant to Make a Final Selection."**

"When [Election Day] statutes speak of 'the election' […], they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Foster*, 522 U.S. at 71. This "final act of selection," *id.* at 72, "means a 'consummation' of the process of selecting an official." *See Keisling*, 259 F.3d at 1175. Notably, the Court definition emphasized *combined*, not unilateral, actions of voters and officials. It is not the unilateral actions of voters, such as registering, requesting and marking ballots, or handing a ballot to the U.S. Postal Service for delivery. Nor is it the unilateral actions of officials such as registering voters, distributing ballots, canvassing and counting ballots, or certifying election results. Ballots in transit or sitting in the postal distribution center similarly are not combined actions. The only moment in an election that constitutes the "combined actions of voters and election officials" is the depositing and receipt of ballots into the custody of state election officials. When all qualified ballots are received by election officials, that is "the election."

One of the best explanations of this principle comes from the Montana Supreme Court. Voters' role in the "combined actions" includes not just marking a ballot but also "having it delivered to the election officials and deposited in the ballot box." *See, e.g., Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (citation omitted). This "consummation" does not occur until *ballots are received* by state election officials, at which point the voter's choice is made. The Montana Supreme Court described the combined actions by which a ballot is transformed into a vote:

> Nothing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot, which fact was unmistakable so long as the ballot continued to be, as originally, a ball or marble or other marker which was "cast" or deposited in an official receptacle or custody. The fact that the ballot has now become a sheet of paper upon which the voter's choices for the various offices are marked before it is deposited has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word.

*Id.* "It is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or vot[ing]."[17] *Id.* After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Id.* Stated differently, it is the *receipt of a qualified ballot by state election officials* that creates a vote, and these

---

[17] A "ballot originally consisted of a little ball, a bean or a grain of corn, a coin, or any other small article which could be concealed in the hand so that others might not know how the voter cast his ballot." *Lynch v. Malley*, 74 N.E. 723, 725 (Ill. 1905). Beans or grains of corn convey no meaning, certainly no electoral meaning, until the combined action of voters depositing them and election officials receiving them is complete.

repeated combined actions together constitute an election. Under Mississippi law, these "combined actions" do not occur until five business days *after* Election Day.

Mississippi's Receipt Deadline is invalid in the same way that Louisiana's open primary was in *Foster*. The Supreme Court did not need to find that Louisiana's open primary was expressly forbidden to be preempted in *Foster*. Rather, the Court said that "the combined actions of voters and officials meant to make a final selection of an officeholder" cannot occur "*prior* to federal election day." *Id*. at 71, 73 (emphasis added). Similarly, these "actions" cannot conclude *after* Election Day.

The Supreme Court considered the meaning of "the election" in the Constitution prior to *Foster*. In *Newberry v. United States*, 256 U.S. 232, 250 (1921) the Court ruled that ratification of the Seventeenth Amendment did not alter the original textual understanding of an "election" as the "final choice of an officer by the duly qualified electors." *Id.* (citation omitted). Reading *Foster*, *Newberry*, and the Election Day statutes together, "the election" requires both the final "combined actions of voters and officials" and that these "actions" are "meant to make a final selection," all of which must occur on Election Day.

As noted above, this Court previously considered and rejected claims that state early voting laws are preempted. *Bomer*, 199 F.3d at 776. Other circuits also

reviewed state early voting laws.[18]  *See Keisling*, 259 F.3d 1169; and *Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001).[19]  Like the Fifth Circuit, the Ninth Circuit ruled in *Keisling* that Oregon's early voting practices were not preempted because early voting did not "consummate" the election before Election Day.[20]  259 F.3d at 1175-76.  That is because, unlike Louisiana's open primary system, early voting has "the residual ritual of in person voting" that occurs on Election Day.  *Id.* at 1175.  Stated differently, early voting laws were not preempted because early voting is not "meant to make a final selection of officeholder" before Election Day.  That "final selection" still occurs on Election Day.  *Id.* at 1175-76; *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day.").  But in Mississippi, neither the "combined actions" nor the "final selection" occurs on Election Day, because state law allows it to occur *after* Election Day.[21]

---

[18]    Ballot receipt was not at issue in the early voting cases because not all qualified ballots were received before Election Day.  In *Foster*, however, receipt was implicitly part "combined action" because all ballots had been clearly received before Election Day.

[19]    Though the Libertarian Party cites *Millsaps*, it notes that the Sixth Circuit seemingly applied conflict preemption under the Supremacy Clause rather than Elections Clause preemption. 259 F.3d at 549.

[20]    The Seventh Circuit is currently considering an appeal from a preemption challenge to Illinois' Receipt Deadline.  *Bost v. Ill. State Bd. of Elections*, No. 23-644 (reviewing *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. 2023)).

[21]    The district court's order relied, in part, on *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020), *cert. granted, vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  ROA.1180.  The Libertarian Party previously summarized *Bognet*'s extensive

Mississippi's Receipt Deadline is preempted because it alters both the "combined actions of voters and officials" and what actions are "meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71-72. Because the "final selection" of candidates in Mississippi can never conclude on Election Day, it does not, in fact, take place on the date chosen by Congress. *Id.* All combined actions can no more conclude five business days before Election Day than five days after. As a matter of law, Mississippi's Receipt Deadline allows a "contested selection of candidates" to continue after Election Day. *Id.* at 72.

Like *Foster*, Mississippi's Receipt Deadline clearly "affect[s] the timing of federal elections." *Id*. at 73. Holding voting open five business days after Election Day in Mississippi necessarily requires "further act[s] in law or in fact" meaning further receipt of cast ballots before the election is over. *See id.* at 72. Like Louisiana's open primaries in *Foster*, Mississippi's Receipt Deadline contravenes Congress' "final say" about the time for federal elections and violates the Election Day statutes. *Id.* at 72.

---

appellate history. ROA.894-95. Even ignoring its vacatur, the claims in *Bognet* are categorically distinguishable from the claims here. "[T]he nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections." *Bognet*, 980 F.3d at 351. "Reduced to its essence, the Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ [*i.e.*, the state legislature] to issue the Deadline Extension." *Id.* at 355-56. *Bognet* did not involve preemption, but rather a challenge under the "legislature thereof" provisions of the Elections and Electors Clause, raising similar issues to *Moore v. Harper*, 600 U.S. 1 (2023).

**B. Congress Intended to Remedy Several Evils When It Adopted The Day of "Final Selection."**

By establishing a uniform date, Congress sought "to remedy more than one evil arising from the election of members of congress occurring at different times in the different states." *Millsaps*, 259 F.3d at 541 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884)). Indeed, the Ninth Circuit described how the Congressional debates in 1844 and 1871-1872 over the national Election Day legislation were animated by accusations by both political parties of various "great frauds."[22] *Keisling*, 259 F.3d at 1172-73; *see also Millsaps*, 259 F.3d at 540-4 (describing the various "evils," such as fraud, that Congress sought to remedy). That history further shows that Congress considered and rejected multi-day voting amendments in favor of a single national Election Day. *Keisling*, 259 F.3d at 1172-75; *see also Millsaps*, 259 F.3d at 540-43.

In 2022, Congress enacted the Electoral Count Reform Act ("ECRA"). The ECRA revised Title 3 dealing with Presidential elections, adding new 3 U.S.C. § 21, explaining that with respect to those elections:

> (1) "election day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary

---

[22] The Ninth Circuit also relied on the history of absentee voting and "express congressional approval of absentee balloting when it has spoken on the issue." *Keisling*, 259 F.3d at 1175. As discussed *infra*, Part II.C, the "history" of post-election receipt is short and recent.

and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

*Id.* While ECRA preserved the term "the election" as interpreted in *Foster*, Congress ceded back to the states specific, narrow authority related to Election Day. That is, in certain "force majeure events that are extraordinary and catastrophic[,]" not at issue here, states can modify the period for voting. 3 U.S.C. § 21. Any other state authority to modify "election day" necessarily remains displaced by the Election Day statutes. The text of this new *force majeure* exception underscores that, in the ordinary course, the "combined actions of voters and officials" referenced in *Foster* must still occur on Election Day.

### C. The Ordinary Public Meaning of Election Day Is the Date by Which All Ballots Must Be Received by Election Officials.

As with all questions of statutory interpretation, analysis starts with the text of the statute to ascertain its plain meaning. *Hughey v. United States*, 495 U.S. 411, 415 (1990); *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). "[T]he court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988) (citations omitted). A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-655 (2020); *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing

*Burns v. Alcala*, 420 U.S. 575, 580-581 (1975)). "[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citation omitted). This inquiry often looks to the development and evolution of the common law definition, *id.*, or refers to dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014).

From 1845 until circa 2004, the overwhelming national practice was that Election Day was the day by which all ballots must be received by the proper election officials.[23] Election Day was, in effect, ballot receipt day. Federal elections in Mississippi today are wholly unmoored from the ordinary public meaning of Election Day, pushing the day of final selection to five business days after Election Day.

To be sure, Election Day administration, especially in Mississippi, has improved since the 19th century. *See generally Minn. Voters All. v. Mansky*, 585 U.S. 1, 5-8 (2018) (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)). While society and

---

[23]    *See infra* part II.C.

election administration have benefited from these changes, the recent efforts to radically redefine Election Day by extending final selection for (sometimes) weeks after Election Day is contrary to the original public meaning of the term.[24]

Dictionaries published before and after 1845 define "election" as "[t]he *day of a public choice of officers*," emphasizing the temporal nature of this regulation. Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 288, (Joseph E. Worcester, *et al*. eds. 1st ed. 1830), available at https://bit.ly/3lNC9nG; and Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 383, (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860), available at https://bit.ly/3LK7ZMF (emphasis added). These contemporaneous dictionary definitions from around 1845 speak to the ordinary public meaning of the term "election." A historical survey of contemporaneous practices leaves little doubt that the original public meaning of election meant the final act of selection, which was the receipt of ballots by election officials.

### 1.     There Was No Common Law Right to Vote Absentee.

Colonial electoral practices can be grouped together depending on whether the colony followed Puritan, British royal, or some other proprietary rule. *See*

---

[24]     It also has decreased public confidence in elections. A recent national survey found that 76% of respondents want all ballots in by Election Day. Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot," ScottRasmussen.com (Jan. 17, 2022), https://bit.ly/3aupaFn. This finding was up 6% from a previous poll conducted less than a year before. Scott Rasmussen, "70% Want All Mail-In Ballots Received By Election Day," ScottRasmussen.com (July 13, 2021), https://bit.ly/3OYyJvd.

Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES, 98-99 (1893), available at https://bit.ly/3yso7xC; and Kirk H. Porter, HISTORY OF SUF-FRAGE IN THE UNITED STATES, 1-3 (1918), available at https://bit.ly/3RsJ9ES (explaining that colonies were essentially corporations and the right to vote was "much the same" as a stockholder's right to vote). Many of these practices lasted through the American Revolution and early republic. *See* Porter at 1-3; *see generally* Bishop at 1-45. Votes needed to be "personally given" at poll sites.[25] George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS, 132 (Henry L. McCune eds. 4th ed. 1897) available at https://bit.ly/3PlGMCa.[26]

 "During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands, as was the custom in most parts of Europe." *Burson*, 504 U.S. at 200; *see also Doe v. Reed*, 561 U.S. 186, 224-27 (2010) (Scalia, J., concurring in judgment) (describing historic voting practices). It was simply not physically possible during this time for votes—whether conducted *viva voce* or by electors dropping balls or beans in a bowl—to be received after Election Day.[27]

---

[25] Certain areas of colonial America did allow limited "proxy voting." *See* Bishop at 127-40. In its basic form, proxy voting allowed eligible voters to assign their vote to a qualified proxy who was required to appear in person on Election Day to cast the assigned vote. *Id.*

[26] Because there was no common law right to proxy voting and absentee voting was yet to be invented, the common law's mailbox rule for contracts would not have applied to voting.

[27] *See Lynch*, 74 N.E. at 725.

### 2. The Public Understood That Election Day Required The Receipt of All Ballots to Consummate An Election.

After the Constitution's ratification, concerns immediately arose about the federal government relying on states to fulfill their duties to conduct federal elections. *See* Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh, CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM, Vol. 38, Issue 1, Winter 2008, Pages 137–151. ROA.1071-86. In particular, Congress was unsure whether states would conduct timely elections, especially for the newly created office of the president, or, indeed, whether the states would appoint electors at all. *Id.* at ROA.1074-75.; *Inter Tribal*, 570 U.S. at 8 (discussing the Framers' purpose for adopting the Elections Clause out of concern "a State would refuse to provide for the election of representatives to the Federal Congress." (citing THE FEDERALIST NO. 59, pp. 362-363 (C. Rossiter ed. 1961) (A. Hamilton))). This concern led to a 1792 act wherein Congress provided a deadline, rather than a designated day, by which states must appoint electors. Act of March 1, 1792, Sess. I, Ch. 8; *see* Stonecash, et al., at 140-41. ROA.1074-75.[28] But further legislation was needed to resolve issues arising from the nation's diverse state electoral calendars, including the issue of electoral fraud. *Id.* This prompted

---

[28] This was Congress' first federal election regulation. Stonecash, *et al.*, at 140-41. ROA.1074-75. Save Election Day regulations, Congress used its election powers very rarely until after the Civil War. *See* James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS 239 (1912), available at https://bit.ly/3cceuvC.

Congress to establish a national Election Day for the appointment of presidential electors in 1845. *Id.* at 142; 3 U.S.C. § 1; ROA.1076. Within three years, all states had adopted the national Election Day for presidential elections. *Id.* at 141. ROA.1075

While Congress sought to create a more uniform national election calendar, new state electoral practices emerged, none of which facilitated or envisioned ballots being received after Election Day. In the 18th and early part of the 19th century, some states began adopting paper ballots, which quickly became the majority practice. E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM IN THE UNITED States, 11 (1917) (Evans); *Burson*, 504 U.S. at 200. This practice generally involved voters' handwriting their votes on personal paper, which they delivered to polling places on Election Day. *Id.* at 200. These "ballots" were only cast once marked and deposited in the ballot box or otherwise delivered to election officials on Election Day. *Id.*

*Viva voce* and handwritten ballots remained the majority practices until the advent of preprinted "ticket" ballots in 1829. Evans at 11-12. Ticket voting grew in popularity as newspapers, political parties, unions, and other private groups distributed tickets with advertisements or political messages. *Id.* at 12; and *Burson*,

504 U.S. at 201-03.  States abandoned *viva voce* voting as tickets grew more popular.[29]  *See* Donald A. Debats, HOW AMERICA VOTED: BY VOICE, 5, Univ. of Virg. Inst. For Advanced Tech. in Humanities, (2016), available at https://bit.ly/3sVOMRu.  Like handwritten ballots, tickets were simply privately created paper of no legal consequence until deposited (*i.e*., received by election officials) in a ballot box on Election Day.  *See Maddox*, 149 P.2d at 115.  Following "the 1888 presidential election, which was widely regarded as having been plagued by fraud," many States moved to the secret (Australian) ballot system we use today. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997); *see also* J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES, 153-54 (1934), available at https://bit.ly/3cdio7z.  By 1896, almost 90 percent of states had adopted that system. *Burson*, 504 U.S. at 203-205.

> **3.** **The Development of Absentee Voting In Times of War Adhered to the Public Understanding that Election Day Required Ballot Receipt By Election Officials.**

Historically, there have been two waves in which absentee voting was adopted in the United States.  It first arose primarily in response to the Civil War.  Benton at

---

[29]    Virginia (1867) and Kentucky (1890) were the last states to abandon it.  Evans at 17.

4-5. Prior to 1861, all states required that voting be exercised by the casting of ballots in person in one's election district.[30] *See id.* After war broke out, there was an effort to ensure Union soldiers could still exercise their franchise. *Id.* at 4-14. Thus, between 1861 and 1864 several states adopted one of two absentee voting methods to allow "voting in the field," both of which facilitated ballots being received by state election officials on Election Day. *Id.* at 4, 15. Some states enacted proxy voting whereby a soldier would mail his marked ballot to someone back home to deliver at his home precinct on Election Day.[31] *Id.* at 15, 265. Under the second method, states created actual poll sites near the battlefield, providing them with ballot boxes and deputizing servicemen as state election officials (*e.g.*, bailiffs) to receive ballots on Election Day. *Id.* at 15-17; *see also id.* at 43 (describing Missouri's field voting practices). After they were received by the deputized state election officials, the ballots would be counted in the field or sent back the servicemen's home states.[32] *Id.* at 317.

---

[30] Technically, Pennsylvania had the first absentee law in 1813. *See* Benton at 17 and 189-203. That statute was later struck down, in part because ballots were not being received by deputized state officials at poll sites. *Id.* at 17 (discussing *Chase v. Miller*, 41 Pa. 403 (1862)). This decision is what led to the practice of deputizing servicemen as state officials. *Id.*

[31] "Under this method it was claimed that the voter's connection with his ballot *did not end until it was cast into the box at the home precinct*, and therefore that the soldier really did vote, not in the field, but in his precinct." Benton at 15 (emphasis added).

[32] Below, Vet Voice argued that Civil War ballots sometimes would take days to be delivered to a soldier's home county, which, it argued, is analogous to Mississippi's Receipt Deadline. ROA.1254:5-14. Indeed, ballots might not reach a soldier's home county until after Election Day, but the system of deputizing servicemen as state election officials was designed to ensure that these ballots were timely received. Benton at 15-17. Mississippi's Receipt Deadline would only be

Absentee voting largely disappeared after the Civil War, *id.* at 314, but reemerged in the early 20th century as a result of the changing economics and war.[33] Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 11, No. 2, 320-322 (May 1917), available at https://bit.ly/3z14deH; and *see also* John C. Fortier, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS, AEI Press, at 8-11 (2006), available at https://bit.ly/3P3HaFD.  While these new practices took different forms, they adhered to the original public meaning that Election Day meant receipt day.  *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 2, 251-261 (May 1918) (describing different state absentee voting procedures) available at https://bit.ly/3PjmtVS.  For example, some states required absentee voters to swear that they would return their ballots to election officials on or before Election Day.  *Id.* at 255.  Washington State required absentee voters to appear at any state poll site on Election Day to absentee vote.  *Id.* at 253.  "[T]he act of voting is not completed until the ballot is deposited in the ballot-box."  *Goodell v. Judith Basin County*, 224 P. 1110, 1111-14 (Mont. 1924) (collecting cases on absentee statutes).

---

analogous if it also claimed that postal employees are deputized state election officials, which no party has so far argued here.

[33] Because 20th century absentee practices were adopted almost seven decades after Congress enacted Election Day, they are hardly "contemporaneous to the enactment" or explain the "development and evolution of the common-law definition" of Election Day.  *See generally*, *Sandifer*, 571 U.S. at 228.  To the extent these practices assist in determining the original public meaning, they reinforce Plaintiff's view that Election Day meant receipt day.

Similarly, early 20th century military absentee laws adopted many of the voting practices from the Civil War that reflected the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 3, at 461-69 (Aug. 1918) (summarizing 20th century military absentee voting procedures), available at https://bit.ly/3auLHlv. These practices included proxy voting, express requirements that ballots be cast on or before Election Day, opening polling sites at a regiment's location, and deputizing service men to serve as state election officers in the field to receive ballots. *Id.* at 464-68.

### 4. Purported Congressional Tolerance Should be Afforded Minimal, if Any, Weight

Other than the fact that post-Election Day receipt is not expressly forbidden by the Election Day statutes, all defendants and *amici* argued to the district court that purported long Congressional tolerance weighs against preemption. The district court's decision on the merits relied, in part, on the fact that "Congress 'has never stepped in and altered the rules.'" ROA.1179 (quoting *Bost*, 684 F. Supp. 3d at 736). This is incorrect for several reasons.

First, Congressional inaction does not meaningfully aide the preemption analysis or the meaning of Election Day. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361

U.S. 304, 313 (1960); *United States v. Craft*, 535 U.S. 274, 287 (2002) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction.") (alteration in original) (quoting *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994)); *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) ("It does not follow . . . that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the Court's statutory interpretation." (citation omitted)); *see also Let Congress Do It: The Case for An Absolute Rule of Statutory Stare Decisis*, 88 Mich. L. Rev. 177, 186 ("The notion of silent acquiescence has long been condemned as based on unrealistic and irrelevant assumptions about the legislative process.").

Second, save a few short-lived exceptions, most state post-Election Day receipt statutes were enacted over the last fifteen years.[34]  Thus, compared to the his-

---

[34]    *See* Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legis., available at https://bit.ly/3vRBB5G;  *see, e.g.,* Cal. Elec. Code. § 3020 (2014); D.C. Code § 1-10001.05(a)(10A) (2019); 10 ILCS 5/19-8 (2005); Kan. Stat. Ann. § 25-1132 (2017); Md. Code Regs. 33.11.03.08 (2004); Mass. Gen. Laws ch. 54, § 93 (2021); Miss. Code. Ann. § 23-15-637 (2020); Nev. Rev. Stat. § 293.269921(2021); N.J. Stat. Ann. § 19:63-22 (2018); N.Y. Elec. Law § 8-412 (1994); Or. Rev. Stat. § 253.070(3) (2021); Tex. Elec. Code Ann. § 86.007 (1997); Utah Code Ann. § 20A-3a-204 2020); Va. Code Ann. § 24.2-709(B) (2010); W. Va. Code §§ 3-3-5(g)(2), 3-5-17(1993); Ala. Code § 17-11-18(b) (2014); Ark. Code. Ann. § 7-5-411(a)(1)(A) (2001); Ind. Code § 3-12-1-17(b) (2006); Fla. Stat. § 101.6952(5) (2013); Ga. Code

tory of absentee voting, the history surrounding post-Election Day receipt is negligible.  Prior to 2004, a *very* small number of jurisdictions experimented with and abandoned post-Election Day receipt practices.  For example, a 1971 absentee voting study by the Department of Defense reported that 52 of 54 U.S. jurisdictions required ballot receipt on or before Election Day.[35]  Washington and Nebraska were the lone outliers holding voting open for 15 and 1 day(s), respectively. Nebraska long ago abandoned this practice, and now requires Election Day receipt.[36]  Neb. Rev. Stat. Ann. § 32-950.  Washington state has probably experimented with this practice the longest, but its 1917 absentee statute required voters to appear at state poll sites to cast absentee ballots.[37]  Washington notwithstanding, these experiments were short lived and involved a very small number of ballots.[38]  But since the advent of all-mail

Ann. § 21-2-386(a)(1)(G) (2005); Mich. Comp. Laws § 168.759a (2012); Mo. Rev. Stat. § 115.920(1) (2013); 25 Pa. Cons. Stat. § 3511(a) (2012); R.I. Gen Laws § 17-20-16 (2019); and S.C. Code Ann. §§ 7-15-700(a), 7-17-10 (2015).

[35]  *See The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977), available at https://bit.ly/38z9zU9.

[36]  Similarly, a 1933 treatise reported that California allowed ballots to arrive to 15 days after Election Day.  Harris at 291.  Like Nebraska, however, California abandoned the practice.  As recently as 2015 California required Election Day receipt.  Cal. Elec. Code § 3020 and 2014 Cal ALS 618, 2014 Cal SB 29, 2014 Cal Stats. ch. 618.

[37]  Assuming, *arguendo*, that Washington has maintained this practice since it joined the Union in 1889, it would provide little guidance regarding the original public meaning of statutes enacted in 1845 and 1872.  Indeed, a "few late-in-time outliers" from territories do not provide much insight into historical meaning, especially if it contradicts the overwhelming weight of other, contemporaneous historical evidence.  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 64-70 (2022) (finding that one-off, localized firearm regulations affecting "miniscule territorial populations" do not outweigh more contemporaneous historical evidence).

[38]  Another brief state "experimentation" comes from the 1864 Maryland presidential election.  Seven days before that election, Maryland amended its constitution to allow its Union soldiers to mark their ballots as many as five days *after* Election Day.  Benton at 223.  These votes were vital

balloting in some states and the increased use of mail balloting during the COVID-19 pandemic in 2020, that is no longer the case.[39]

Indeed, a straight line can be drawn connecting recent state adoption of post-Election Day receipt statutes to the adoption of provisional ballot requirements under § 302 of the Help America Vote Act ("HAVA") of 2002, which followed the controversial 2000 election.[40] Voting advocates viewed the new federally-mandated period for provisional ballots as an opportunity to lobby states to allow post-Election Day receipt.[41] Accordingly, Defendants', Vet Voices', and *amici*'s arguments about Congressional tolerance are based on statutes that, in most cases, have existed for 15 years or less. This does not constitute long Congressional tolerance, certainly not

---

to keeping secessionists from office, which would have forced Maryland to secede and left Washington, D.C. surrounded. *Id.*

[39] From 1920-30, absentee ballots were estimated to account for less than .5% of total votes. Harris at 293. Thus, only a fraction of that .5% might be affected, for example, by California's brief experiment with post-election receipt. In 2000, 10% of voters nationwide voted by mail. *See* Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the Performance of American Elections*, MIT Election Data + Science Lab, (Dec. 15, 2020), available at https://bit.ly/39WCp0H. That number doubled to 21% by 2016 before doubling yet again to **46%** in 2020. Vote by mail is now the predominant voting method over early voting and Election Day voting.

[40] In its most basic form, provisional voting allows voters who appear at a polling place to cast a ballot if there is a question about the voter's eligibility. 52 U.S.C. § 21082(a); *see also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 222 (6th Cir. 2011). In this scenario, a voter marks her ballot, which is provisionally "received" by poll workers on Election Day subject to a later determination of the voter's eligibility. This process ensures a vote is timely received on Election Day while allowing the voter and election officials time after Election Day to resolve any eligibility questions. 52 U.S.C. § 21082(a)(4).

[41] From that controversy, two competing election reform visions arose. *See* John C. Fortier & Norman J. Ornstein, *Symposium, Election Reform: The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*, 36 U. Mich. J.L. Reform 483, 484 (2003) (explaining how one view sought to improve poll sites while the other believed that poll sites discouraged voting and sought to promote voting by mail).

compared to the long history of absentee voting cited in early voting cases. *See Keisling*, 259 F.3d at 1175; and *Millsaps*, 259 F.3d at 544.

Moreover, Congress' failure to pass legislation expressly forbidding one-off state experiments with post-Election Day receipt does not show it acquiesced and must be kept in context. Congress "tolerated" Louisiana's open primary for nearly 20 years and Tennessee's malapportionment for 94 years before the Supreme Court put an end to those practices. *See Foster*, 522 U.S. at 70; and *Baker v. Carr*, 369 U.S. 186 (1962). Mississippi's Receipt Deadline was enacted in 2020.

Of course, Congressional inaction is in the eye of the beholder, which is why interpreting it is discouraged. Here, it also supports preemption argument, for example, based on Congress' repeated refusal to make Election Day a multiday event or extend it beyond the first Tuesday after the first Monday in November.[42] *See Keisling*, 259 F.3d at 1172-74; Cong. Globe, 42 Cong., 2d Sess. 676 (1872); and 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) (rejecting requests to extend ballot receipt deadlines for overseas voters). If Congress understood that states were free to extend ballot receipt deadlines past Election Day, why would such legislation need to be proposed?

---

[42] In general, the Supreme Court has cautioned against drawing inferences from failed attempts to pass legislation. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Notwithstanding this reticence, the Court has on occasion drawn inferences from the failure to enact a bill where the sheer number of legislative attempts to pass it and the clarity of the issue presented make such inferences reasonable. *Bob Jones University v. United States*, 461 U.S. 574 (1982).

Vet Voice argued below that Plaintiff's reading of the federal Election Day statutes "would disenfranchise large numbers of Mississippians." ROA.684. They never explain how. "[R]easonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay related to challenge to Wisconsin's Election Day deadline for absentee ballots). "This Court has long explained that a State's election deadline does not disenfranchise voters who are capable of meeting the deadline but fail to do so." *Id.* (citing *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)).

Below, Vet Voice and *amicus* DNC claim that, during the Civil War, sometimes a soldier's ballots would not arrive to their home county until after Election Day, which they contend supports post-Election Day receipt.[43] ROA.601 and ROA1253-55. Their argument, however, completely ignores that states mandated that deputized servicemen set up poll sites in the field to receive soldier's ballots on or before Election Day. Benton at 15-17 and 43. That is a completely different practice than the one in question here. To be clear, the post-Election Day receipt

---

[43] DNC also cites 19th Century statutes from New Jersey and Pennsylvania. ROA.601. The Pennsylvania statute was later struck down and gave rise to the practice of deputizing servicemen as election officials. Benton at 14-17 and 189-193 (describing Pennsylvania's practice that was later struck down); *see also Chase*, 41 Pa. 403. Both statutes ultimately required remote poll sites to be operated by servicemen deputized as state election officials. *See* Benton 14-17 and 189-93; and 269-70 (discussing New Jersey practice, which was repealed in 1818).

examples they refer to involve timely receipt by servicemen acting as civilly deputized poll workers, which is fully consistent with Plaintiff's historical arguments. Nothing in the record suggests that U.S. Postal employees are deputized by Mississippi as election officials. The fact that state-deputized servicemen received ballots on Election Day under those statutes supports, rather than undermines, Plaintiff's argument. *See* Benton at 17.

5. **Other Federal Statutes Do Not Support Finding Non-Preemption**

Defendants, Vet Voice, and *amici* below discussed other federal statutes either in support of their arguments against preemption or to bolster purported long congressional tolerance of state post-Election Day receipt laws. ROA.786; ROA.938-39; ROA.946-47. and ROA.598. In most instances, these discussions posit inferences that the statutory text cannot possibly support and do not meaningfully advance the preemption analysis. Reading the tea leaves related to perceived Congressional action, inaction, tolerance, or "acquiescence" raises more questions than answers, *see Rapanos v. United States*, 547 U.S. 715, 749-50 (2006), and attenuated readings muddle more than clarify.

For example, the *entire* discussion regarding an alleged threat this lawsuit poses to UOCAVA voters is a strawman.[44] ROA.1063-64; ROA.786; ROA.945-48; and ROA.975-79. When initially enacted, UOCAVA updated federal regulations regarding state duties to timely transmit absentee ballots to military and overseas voters.[45] In the 2009 amendments, Congress updated these regulations again, mandating a hard 45-day deadline for states to transmit timely-requested UOCAVA ballots. 52 U.S.C. § 20302(a)(8). UOCAVA did not modify ballot receipt deadlines or grant states authority to do the same. Plaintiff agrees that *federal courts* can order receipt deadline extensions as *remedies* for UOCAVA violations if the state failed to mail ballots within the 45-day deadline.[46] In situations where a state fails to timely transmit ballots, the United States often obtains court-ordered relief extending receipt deadlines to ensure UOCAVA voters get the benefit of the full 45-day period to receive and return their ballots. *See* ROA.980 n.9 and ROA.948 n.8. But this

---

[44] Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301 to 20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111 84, Subtitle H, §§ 575 589, 123 Stat. 2190, 2318 2335 ("MOVE Act").

[45] *See generally* Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed and Overseas Citizens Absentee Voting Act*, (2016) at pp. 1-3 (available at https://bit.ly/3QapF67).

[46] Congress gave federal courts remedial authority under UOCAVA. 52 U.S.C. § 20307. The United States' citation below to *Harris v. Florida Elections Comm'n*, 235 F.3d 578, 579 (11th Cir. 2000), *aff'g Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324–25 (N.D. Fla. 2000), which the district court unfortunately adopted, is inapposite. ROA.1180; ROA.966. That admittedly convoluted case was ultimately about a "federally ordered mandate" (*i.e.*, consent decree) to extend ballot receipt deadlines for a violation of UOCAVA. 122 F. Supp. 2d at 14-15. Whether a *federal* court acting under a *federal* statute has authority to extend ballot receipt deadlines has no bearing on Election Clause preemption.

case is about Election Clause preemption of *state* authority to extend receipt dead-lines, not that of *Congress* or the *federal judiciary*. It goes without saying that Congress has authority to pass a law that contemplates such relief—as it could repeal or amend the Election Days statutes to allow late ballot receipt in any other circumstances, or even at the unfettered discretion of the states. But Congress has not done so.

Simply put, UOCAVA is a statute designed for a set of circumstances that have no bearing here. A textual analysis of its provisions does not shed any light on the preemption question. At the district court level, Vet Voice pointed to 52 U.S.C. § 20304(b)(1). ROA.946. While 52 U.S.C. § 20302(a) sets forth *state* UOCAVA responsibilities, 52 U.S.C. § 20304 sets forth the *Secretary of Defense* responsibilities, including to "implement procedures that facilitate" the timely delivery of military ballots, including the collection of certain military ballots seven days before Election Day for delivery "not later than the date by which an absentee ballot must be received in order to be counted in the election." 52 U.S.C. § 20304(a)-(b). According to Vet Voice, it made "no sense" for Congress to include this language if it considered state authority preempted. ROA.946. The defect in their reasoning is the fact that some states require that absentee ballots arrive *before* Election Day. S*ee, e.g.,* Miss. Code Ann. § 23-15-637 (amended 2020); and La. Rev. Stat. § 18:1311. If 52 U.S.C. § 20304 provided instead "not later than Election Day,"

UOCAVA ballots for voters from these states could arrive too late to be counted under state law.

Likewise, federal statutes concerning special elections do not meaningfully further the preemption analysis.[47] First, the timing of *special* federal elections is not covered by the Election Day statutes. *See* 2 U.S.C. § 8 ("the time for holding [special] elections […] may be prescribed by the laws of the several States and Territories respectively"); *see id.* at § 8(b) (specifying special rules for "extraordinary circumstances").[48] For any of a number of possible reasons, Congress has decided not to establish a national special election day, relying instead on states to regulate the timing of special elections. Beyond that, little else can be extracted from the text of 2 U.S.C. § 8, other than to note that in a 2005 amendment Congress established the first 45-day deadline for UOCAVA voters. 2 U.S.C. § 8(b)(5)(B). As enacted, it provides that regardless of state time regulations, states must accept UOCAVA ballots if returned within 45 days of transmission. Mandating that states "accept" such

---

[47] Unlike *Inter Tribal*, where the Supreme Court used the "surroundings" and "neighboring provisions" *within* the NVRA to discern the meaning of "accept and use," opponents of preemption here reach for whatever they can find in the federal code, which they then fashion into Congressional intent or tolerance. Many of the provisions cited to the district court were not part of the original acts codifying Election Day. *See* Presidential Election Day Act, 28 Cong. Ch. 1, 5 Stat. 721; and 42 Cong. Ch. 11, 17 Stat. 28, 42 Cong. Ch. 11.

[48] *See Foster*, 522 U.S. at 71 n.3 (discussing 2 U.S.C. § 8's use of "by a failure to elect at the time prescribed by law" and what happens "if no candidate receives a majority vote on *federal election day*" (emphasis added)).

ballots is necessary to enforce the 45-day deadline since Congress again deferred to the states on the timing of special elections in extraordinary circumstances.

## III. Mississippi's Receipt Deadline Violates Plaintiff's First and Fourteenth Amendment Rights.

Plaintiff's members and candidates' constitutional rights to vote and run for office are burdened by Mississippi's enforcement of its unlawful Receipt Deadline. Courts have routinely found that a burden on a candidate's rights is also a burden on a voter's right to freely associate and express political preferences. *See e.g.*, *Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004) ("the right to stand for office is to some extent derivative from the right of the people to express their opinions by voting" (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)).

The district court wrongly assumed that since there was no violation of federal law, there was no burden on Plaintiff's constitutional rights. ROA.1182. But as stated in Part II *supra*, the Mississippi Receipt Deadline is inconsistent with the text of the Election Day statutes and the scope of the Elections and Electors Clauses. Plaintiff's constitutional rights are violated for the simple reason that its members and candidates must abide by a preempted and unconstitutional state timing regulation to run for office. States have no interest, much less a legitimate one, in enforcing a state time regulation that violates the timeline required by federal law.

**CONCLUSION**

Plaintiff respectfully requests this Court reverse the district court order granting summary judgment for Defendants and enter an order granting summary judgment for Plaintiff.  This matter should be remanded to the district court for further remedial proceedings.

August 16, 2024

_____*s/ Russ Nobile*_____
T. Russell Nobile (MS Bar 100682)
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
Rnobile@judicialwatch.org

Robert D. Popper
Eric W. Lee
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
rpopper@judicialwatch.org
elee@judicialwatch.org

## CERTIFICATE OF SERVICE

I, <u>T. Russell  Nobile</u>, certify that I electronically filed this brief with the Clerk

of the Court, using the electronic filing system, which sent notification of such filing

to all counsel of record.


August 16, 2024                                <u>s/ Russ Nobile     </u>
                                               T. Russell Nobile

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 12,858 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Version 16.88, in 14-point Times New Roman font and 12-point Times New Roman font for footnotes.

August 16, 2024                              */s/ Russ Nobile*
                                             T. Russell Nobile