No. 24-60395

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Republican National Committee, Mississippi Republican Party, James Perry, Matthew Lamb,

*Plaintiffs – Appellants,*

v.

Justin Wetzel, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; Toni Jo Diaz, in their official capacities as members of the Harrison County Election Commission; Becky Payne, in their official capacities as members of the Harrison County Election Commission; Barbara Kimball, in their official capacities as members of the Harrison County Election Commission; Christene Brice, in their official capacities as members of the Harrison County Election Commission; Carolyn Handler, in their official capacities as members of the Harrison County Election Commission; Michael Watson, in his official capacity as the Secretary of State of Mississippi,

*Defendants – Appellees,*

Vet Voice Foundation; Mississippi Alliance for Retired Americans,

*Intervenor Defendants – Appellees*

Libertarian Party of Mississippi,

*Plaintiff – Appellant,*

v.

Justin Wetzel, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; Toni Jo Diaz, in their official capacities as members of the Harrison County Election Commission; Becky Payne, in their official capacities as members of the Harrison County Election Commission; Barbara Kimball, in their official capacities as members of the Harrison County Election Commission; Cristene Brice, in their official capacities as members of the Harrison County

Election Commission; Carolyn Handler, in their official capacities as members of the Harrison County Election Commission; Michael Watson, in his official capacity as the Secretary of State of Mississippi,

*Defendants – Appellees*

On Appeal from the United States District Court
for the Southern District of Mississippi
Hon. Louis Guirola, Jr.

Case Nos. 1:24-cv-25-LG-RPM; 1:24-cv-37-LG-RPM

**BRIEF OF INTERVENOR DEFENDANTS – APPELLEES
VET VOICE FOUNDATION AND THE
MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS**

Robert B. McDuff
Paloma Wu
**MISSISSIPPI CENTER FOR
 JUSTICE**
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
Telephone: (601) 259-8484
Facsimile: (601) 352-4769
rmcduff@mscenterforjustice.org
pwu@mscenterforjustice.org

Elisabeth C. Frost
Christopher D. Dodge
Richard A. Medina
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
efrost@elias.law
cdodge@elias.law
rmedina@elias.law

*Attorneys for Intervenor Defendants–
Appellees*

## CERTIFICATE OF INTERESTED PERSONS

No. 24-60395, *Republican National Committee et al. v. Wetzel et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**A.    Plaintiffs–Appellants:**

    1.    Republican National Committee

    2.    Mississippi Republican Party

    3.    James Perry

    4.    Matthew Lamb

    5.    Libertarian Party of Mississippi

**B.    Counsel for Plaintiff–Appellant Libertarian Party of Mississippi:**

    1.    T. Russell Nobile

    2.    Eric W. Lee

    3.    Judicial Watch, Incorporated

**C.    Counsel for Plaintiffs–Appellants Republican National Committee; Mississippi Republican Party; James Perry; Matthew Lamb:**

    1.    Thomas McCarthy

    2.    Gilbert C. Dickey

    3.    Conor Woodfin

4.      Consovoy McCarthy, P.L.L.C.

5.      Spencer M. Ritchie

6.      Forman Watkins & Krutz, L.L.P.

**D.      Defendants–Appellees:**

1.      Justin Wetzel, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County

2.      Toni Jo Diaz, in her official capacity as member of the Harrison County Election Commission

3.      Becky Payne, in her official capacity as member of the Harrison County Election Commission

4.      Barbara Kimball, in her official capacity as member of the Harrison County Election Commission

5.      Cristene Brice, in her official capacity as member of the Harrison County Election Commission

6.      Carolyn Handler, in her official capacity as member of the Harrison County Election Commission

7.      Michael Watson, in his official capacity as the Secretary of State of Mississippi

**E.      Counsel to Defendants–Appellees Wetzel, Diaz, Payne, Kimball, Brice, and Handler:**

1.      Tim C. Holleman

2.      Boyce Holleman & Associates

**F.      Counsel to Defendant–Appellee Michael Watson, in his official capacity as the Secretary of State of Mississippi:**

1.      Scott G. Stewart

2.      Justin Lee Matheny

3.     Rex Morris Shannon, III

4.     Wilson D. Minor

5.     Mississippi Attorney General's Office

**G.     Intervenor Defendants–Appellees:**

1.     Vet Voice Foundation

2.     Mississippi Alliance for Retired Americans

**H.     Counsel for Intervenor Defendants–Appellees:**

1.     Elisabeth C. Frost

2.     Christopher D. Dodge

3.     Richard Alexander Medina

4.     Tina Meng Morrison

5.     Michael B. Jones

6.     Elias Law Group, LLP

7.     Robert B. McDuff

8.     Paloma Wu

9.     Mississippi Center for Justice

**I.     Other Interested Parties:**

1.     Democratic National Committee

2.     Public Interest Legal Foundation

3.     Disability Rights Mississippi

4.      League of Women Voters of Mississippi

5.      United States of America

**J.      Counsel for Democratic National Committee:**

1.      Donald B. Verrilli, Jr.

2.      Ginger D. Anders

3.      J. Kain Day

4.      Munger, Tolles & Olson LLP

5.      David W. Baria

6.      Cosmich, Simmons & Brown, LLC

**K.      Counsel for Public Interest Legal Foundation:**

1.      Joseph M. Nixon

2.      Public Interest Legal Foundation, Incorporated

**L.      Counsel for Disability Rights Mississippi and League of Women Voters of Mississippi**

1.      Jacob van Leer

2.      Davin Rosborough

3.      Sophia Lin Lakin

4.      American Civil Liberties Union Foundation

5.      Joshua Tom

6.      American Civil Liberties Union Foundation of Mississippi

7.      Neil Steiner

8.      Christopher J. Merken

9.      Julia Markham-Cameron

10.     Angela M. Liu

11.     Dechert LLP

12.     Greta K. Martin

**M.     Counsel for United States of America**

1.      Kristen Clarke

2.      R. Tamar Hagler

3.      Timothy F. Mellett

4.      Janie Allison Sitton

5.      Sejal Jhaveri

6.      Todd W. Gee

7.      Angela Givens Williams

8.      Mitzi Dease Paige

9.      United States Department of Justice

/s/ *Elisabeth C. Frost*
Elisabeth C. Frost

*Counsel for Intervenor Defendants–*
*Appellees*

## RULE 26.1 DISCLOSURE STATEMENT

Vet Voice Foundation and the Mississippi Alliance for Retired Americans have no parent corporation, and no corporation owns 10 percent or more of their stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## ORAL ARGUMENT STATEMENT

The case is scheduled for oral argument on Tuesday, September 24.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................... i

Rule 26.1 Disclosure Statement ............................................................... vi

Oral Argument Statement ........................................................................ vi

Table of Authorities .............................................................................. viii

Introduction ............................................................................................. 1

Jurisdictional Statement .......................................................................... 3

Statement of Issues .................................................................................. 3

Statement of the Case .............................................................................. 3

    I.      Mississippi's Ballot Receipt Deadline ................................... 3

    II.     These Lawsuits ...................................................................... 6

    III.    Prior Failed Challenges to Mail Ballot Receipt Deadlines .... 9

Summary of Argument ........................................................................... 12

Standard of Review ................................................................................ 15

Argument ............................................................................................... 15

    I.      Mississippi's Ballot Receipt Deadline does not directly conflict with federal law. ............................................... 15

          A.    The Ballot Receipt Deadline is consistent with the plain text of the Election Day Statutes. ......................... 17

          B.    The Ballot Receipt Deadline is consistent with the purpose and legislative history of the Election Day Statutes. ...................... 22

          C.    Cases interpreting the term "election" confirm its plain meaning. ............................................................... 26

          D.    Historical practice and congressional action demonstrate that the Ballot Receipt Deadline is consistent with the Election Day Statutes. ................. 32

    II.     Mississippi's Ballot Receipt Deadline does not burden Appellants' constitutional rights. ........................................ 44

    III.    The *Purcell* principle bars relief. ...................................... 47

Conclusion ............................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Silverman*,
  899 F.3d 395 (5th Cir. 2018) ...........................................................22

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013)................................................................16, 17, 32

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983).......................................................................40

*Bognet v. Sec'y Commonwealth of Pa.*,
  980 F.3d 336 (3d Cir. 2020) ...............................................10, 17, 31

Compl., *Bognet v. Boockvar*,
  No. 3:20-cv-215, 2020 WL 6323121 (W.D. Pa. Oct. 28, 2020) .......10

*Bost v. Ill. State Bd. of Elections*,
  --- F.4th ----, No. 23-2644, 2024 WL 3882901 (7th Cir. Aug. 21, 2024) ....11, 31

*Bost v. Illinois State Board of Elections*,
  684 F. Supp. 3d 720 (N.D. Ill. 2023)................................11, 18, 31, 40

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)........................................................................33

*Busbee v. Smith*,
  549 F. Supp. 494 (D.D.C. 1982).......................................................22

Stipulation & Consent Order, *Democratic Party of Va. v. Veal*,
  No. 3:21-cv-671-MHL (E.D. Va. Oct. 28, 2021), ECF No. 27 .........25

*Donald J. Trump for President, Inc. v. Way*,
  492 F. Supp. 3d 354 (D.N.J. 2020)..........................................9, 18, 30

*Donald J. Trump for President, Inc. v. Way*,
  No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477 (D.N.J. Oct. 22, 2020)..........9

*Elliott v. Hogan*,
  315 S.W.2d 840 (Mo. App. 1958) ....................................................39

*Fennell v. Marion Ind. Sch. Dist.*,
    804 F.3d 398 (5th Cir. 2015) ...................................................................45

*Foster v. Love*,
    522 U.S. 67 (1997)............................................ 18, 21, 22, 26, 27, 29

*Goodell v. Judith Basin Cnty.*,
    224 P. 1110 (Mont. 1924)......................................................................20

*Hammond v. Hickel*,
    588 P.2d 256 (Alaska 1978) .................................................................39

*Hankins v. Wheeler*,
    109 F.4th 839 (5th Cir. 2024) ..............................................................15

*INS v. Pangilinan*,
    486 U.S. 875 (1988).............................................................................42

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005)..............................................................................38

*Maddox v. Board of State Canvassers*,
    149 P.2d 112 (Mont. 1944).....................................................19, 20, 21

*Melot v. Bergami*,
    970 F.3d 596 (5th Cir. 2020) ...............................................................10

*Millsaps v. Thompson*,
    259 F.3d 535 (6th Cir. 2001) .........................................................27, 29

*NAACP v. U.S. Postal Serv.*,
    No. 20-cv-2295 (EGS), 2020 WL 6469845 (D.D.C. Nov. 1, 2020) .................25

*Newberry v. United States*,
    256 U.S. 232 (1921)..............................................................................18

*In re Opinion of the Justices*,
    113 A. 293 (N.H. 1921) ........................................................................20

*Pa. Democratic Party v. Boockvar*,
    238 A.3d 345 (Pa. 2020) .......................................................................10

*Perkins v. City of Chi. Heights,*
  47 F.3d 212 (7th Cir. 1995) ................................................................43

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ...............................................................................47

*Republican Nat'l Comm. v. Burgess,*
  No. 24-5071 (9th Cir. Aug. 19, 2024) ................................................12

*Republican Nat'l Comm. v. Burgess,*
  No. 3:24-cv-00198-MMD-CLB, 2024 WL 3445254 (D. Nev.
  July 17, 2024)......................................................................................12

*Riddell v. Nat'l Democratic Party,*
  508 F.2d 770 (5th Cir. 1975) ..............................................................46

*Ross v. Blake,*
  578 U.S. 632 (2016).............................................................................17

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ..............................................................46

*Splonskowski v. White,*
  No. 1:23-cv-00123, 2024 WL 402629 (D.N.D. Feb. 2, 2024) ...........11

*Tex. All. for Retired Ams. v. Hughs,*
  976 F.3d 564 (5th Cir. 2020) ..............................................................48

*Tex. Indep. Party v. Kirk,*
  84 F.3d 178 (5th Cir. 1996) ................................................................45

*Tex. League of United Latin Am. Citizens v. Hughs,*
  978 F.3d 136 (5th Cir. 2020) ..............................................................45

*U.S. v. Classic,*
  313 U.S. 299 (1941).......................................................................15, 32

*United States v. Munsingwear, Inc.,*
  340 U.S. 36 (1950)...............................................................................10

*Utah Republican Party v. Cox,*
  892 F.3d 1066 (10th Cir. 2018) ..........................................................46

*Veasey v. Perry*,
    769 F.3d 890 (5th Cir. 2014) ................................................................48

*Voting for America, Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ...............................................................17

*Voting Integrity Project, Inc. v. Bomer*,
    199 F.3d 773 (5th Cir. 2000) ................................ 15, 16, 22-24, 26, 39

*Voting Integrity Project v. Kiesling*,
    259 F.3d 1169 (9th Cir. 2001) .............................................................24

**Constitutional Provisions**

U.S. Const., art. I, § 4, cl.1 ...............................................................4, 15

U.S. Const., art. II, § 1, cl. 2 ...................................................................4

U.S. Const., art. II, § 1, cl. 4 ...................................................................4

**Federal Statutes**

2 U.S.C. § 1 ...............................................................................2, 3, 17

2 U.S.C. § 7 ......................................................................... 2-4, 17, 18

2 U.S.C. § 8 .........................................................................................21

3 U.S.C. § 1 ......................................................................... 2-4, 17, 18

3 U.S.C. § 21 .........................................................................................4

3 U.S.C. § 21(1) ...................................................................................17

28 U.S.C. § 1291 ....................................................................................3

52 U.S.C. § 10502(g) ...........................................................................44

52 U.S.C. § 20303(b)(3) .......................................................................41

52 U.S.C. § 20304(b)(1) .......................................................................42

52 U.S.C. § 20307 .................................................................................43

Act of Sept. 16, 1942, ch. 561, 56 Stat. 753, § 9 ....................................38

Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459 (2022) .................. 40

Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190 .................. 42

5 Stat. 721 (1845) .................. 18

17 Stat. 28 (1872) .................. 18

**State Statutes**

10 Ill. Comp. Stat. 5/18A-15 .................. 6

10 Ill. Comp. Stat. 5/19-8 .................. 6

25 Pa. Cons. Stat. § 3511(a) .................. 6

2020 Miss. H.B. 1521, 2020 Miss. Gen. Laws 472, 2020 Miss. ALS 472.25 .................. 48

Ala. Code § 17-11-18(b) .................. 6

Alaska Stat. § 15.20.081 .................. 6

Ark. Code § 7-5-411(a)(1)(A)(ii) .................. 6

Cal. Elec. Code § 3020(b) .................. 6

Cal. Political Code § 1360 (James H. Derring ed. 1924) .................. 35

D.C. Code § 1-1001.05(a)(10B) .................. 6

Fla. Stat. § 101.6952(5) .................. 6

Ga. Code § 21-2-386(a)(1)(G) .................. 6

Ind. Code § 3-12-1-17(b) .................. 6

Kan. Stat. 25-1132(b) .................. 6

Kans. Rev. Stat. § 25-1106 (Chester I. Long, et al., eds. 1923) .................. 35

Mass. Gen. Laws ch. 54 § 93 .................. 6

Md. Code Regs. 33.11.03.08(B)(4) .................. 6

Mich. Comp. Laws § 168.759a(18) ................................................6

Miss. Code § 23-15-1, *et seq.* ................................................5

Miss. Code § 23-15-625 ................................................28

Miss. Code § 23-15-631(1)(c) ................................................47

Miss. Code § 23-15-637(1)(a) ................................................1, 3, 4, 6

Miss. Code § 23-15-649 ................................................28, 47

Miss. Code § 23-15-673 ................................................5

Miss. Code § 23-15-713 ................................................5

Miss. Code § 23-15-907 ................................................5

Mo. Rev. Stat. § 115.920(1) ................................................6

Mont. Code § 13-21-226(1) ................................................21

N.D. Cent. Code § 16.1-07-09 ................................................6

N.J. Stat. § 19:63-22(a) ................................................6

N.Y. Elec. Law § 8-412(1) ................................................6

Neb. Rev. Stat. § 32-838 (1943) ................................................37

Nev. Rev. Stat. § 293.269921(1)(b) ................................................6

Nev. Rev. Stat. § 293.269921(2) ................................................6

Ohio Rev. Code § 3509.05(D)(2)(a) ................................................6

Or. Rev. Stat. § 254.470(6)(e)(B) ................................................6

R.I. Gen. Laws § 17-20-16 ................................................6

S.C. Code § 7-15-700(A) ................................................6

Tex. Elec. Code § 86.007(a)(2) ................................................6

Utah Code § 20A-3a-204(2)(a) ................................................6

Va. Code § 24.2-709(B) ..................................................................6

W. Va. Code § 3-3-5(g)(2) .............................................................6

Wash. Rev. Code § 29A.40.091 .....................................................6

**Legislative Materials**

116 Cong. Rec. 6996 (1970) .........................................................39

*Bill to Amend the Act of September 16, 1942: Hearing on H.R. 3436*
*Before the H. Comm. on Election of President, Vice President, and*
*Representatives in Congress*, 78th Cong. 100 (Oct. 26, 1943) ..................36, 37

Cong. Globe, 28th Cong., 1st Sess. 679 (1844) ........................22

Cong. Globe, 42d Cong., 2d Sess. 141 (1871) ..........................22

*Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm. on*
*Rules and Admin.*, 95th Cong. 33-34 (1977) ......................39

Roll Call Vote, H.B. 1521, Miss. H.R., 2020 Reg. Sess. (Mar. 10,
2020), perma.cc/56WK-5HYE ........................................5

Roll Call Vote, H.B. 1521, Miss. State S., 2020 Reg. Sess. (June 15,
2020), perma.cc/2CZR-7MQX ........................................5

*Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R.*
*4393* 99 Cong. 21 (Feb. 6, 1986) (Statement of Henry Valentino,
Director, Federal Voting Assistance Program) ..................40

**Other Authorities**

*Cases Raising Claims Under the Uniformed and Overseas Citizen*
*Absentee Voting Act*, Dep't of Just. (Mar. 24, 2022),
perma.cc/J8AS-X3K6 ....................................................42

Joseph P. Harris, *Election Administration in the United States* (1934)..................35

Josiah Henry Benton, *Voting in the Field* 317-18 (1915)..................33, 34

P. Orman Ray, *Absent Voters*, 8 Am. Pol. Sci. Rev. 442 (1914)..................34

P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251
(May 1918) .......................................................................................35

P. Orman Ray, *Military Absent-Voting Laws*, 12 Am. Pol. Sci.
Rev. 461 (1918) ................................................................................36

*Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots*,
Nat'l Conf. of State Legs. (June 12, 2024), perma.cc/H9ZG-P92W ...................6

# INTRODUCTION

In 2020, the Mississippi Legislature voted nearly unanimously to enact a commonsense measure to help protect lawful voters who timely cast their ballots by mail, ensuring such ballots would not be rejected due to common mail delays. The law provides that mail ballots received within "five (5) business days [of] the election," shall be counted, provided that they "*must* be postmarked on or before the date of the election." Miss. Code § 23-15-637(1)(a) (emphasis added). With the enactment of this law, Mississippi joined the ranks of nearly thirty states and territories with similar laws, which help ensure that the results of elections reflect the choices of the voters who participate in them. While these laws can protect any voter who casts their ballot by mail, they are particularly necessary to guard against the disenfranchisement of servicemembers, veterans, and older voters—who may have no choice but to vote by mail and are particularly susceptible to having their right to vote put at risk by election-day receipt deadlines.[1] These are the communities served by Intervenor Defendants-Appellees Vet Voice Foundation and the Mississippi Alliance for Retired Americans ("Intervenors"), and they intervened in this action to protect the rights of those voters.

Despite the widespread adoption of similar laws, and their critical importance

---

[1] A substantial number of states have passed laws that allow election officials to count ballots received after election day for servicemembers exclusively.

to servicemembers and older voters, Appellants insist that any law that allows election officials to count mail ballots received after election day conflicts with federal statutes, namely 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 (the "Election Day Statutes"). Appellants are wrong, though not for lack of trying. This is at least the *seventh* case in which this preemption theory has been raised—all have failed. The courts to reach the merits have rejected Appellants' theory root and branch, while the remainder have dismissed the cases on standing grounds.

Appellants have not discovered some winning argument that all the litigants before them missed. Appellants' theory finds not a shred of support in the text, structure, legislative history, or purpose of the Election Day Statutes. Other federal statutes—most notably the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA")—further show that Congress has never understood the Election Day Statutes to displace state ballot receipt deadlines. As a result, Appellants are left to grasp at straws. They place astonishing reliance on a single eight-decade old Montana state court decision that resolved a question of *state* law, ignoring that other state courts came out differently on the very same issue at that time. They squint at the Supreme Court's decision in *Foster v. Love* to divine a construction of the term "election" that the Court expressly declined to provide. And they attempt to sweep under the rug historical evidence showing that state ballot receipt deadlines have been common—and never displaced by Congress—for over a century. This

historical record shows not only that such laws operate harmoniously with the Election Day Statutes, but also that they have proven critical to enfranchising servicemembers, particularly during times of conflict. Yet Appellants would sweep away all such laws based on a recently invented preemption claim.

This Court should reject that effort and affirm the district court's well-reasoned summary judgment order as to the merits of Appellants' claim.

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction because Appellants appeal from a final judgment under 28 U.S.C. § 1291; *see also* ROA.1184 (final judgment). Both the Mississippi Secretary of State and the Intervenors challenged Plaintiffs standing under Article III below. ROA.442, 497, 657. No party has cross-appealed the district court's finding of standing here.

## STATEMENT OF ISSUES

Whether Miss. Code § 23-15-637(1)(a), which provides that absentee ballots "postmarked on or before the date of the election" shall be counted if they are received by election officials within five business days after election day, conflicts with 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 or violates the U.S. Constitution.

## STATEMENT OF THE CASE

### I.    Mississippi's Ballot Receipt Deadline

The Elections Clause grants states the principal power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," but

reserves the right of Congress to, "at any time by Law make or alter such Regulations." U.S. Const., art. I, § 4, cl.1. Similarly, Article II, Section 1, Clause 4 provides that "Congress may determine the Time of ch[oo]sing the [presidential] Electors, and the Day on which they shall give their Votes," *id.*, art. II, § 1, cl. 4, while the Electors Clause reserves to the states the power to choose the "Manner" of appointing electors, *id.* § 1, cl. 2.

Consistent with this authority, Congress enacted the Election Day Statutes, which set the time for the general election for congressional races as "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," 2 U.S.C. § 7, and the presidential election as "the Tuesday next after the first Monday in November, in every fourth year," 3 U.S.C. §§ 1, 21. And, exercising its constitutional authority to set the Manner for these elections, the Mississippi Legislature enacted Mississippi Code § 23-15-637(1)(a) (the "Ballot Receipt Deadline"), which provides for the counting of absentee mail ballots that are cast by qualified voters by election day, "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."

The Ballot Receipt Deadline is just one part of a comprehensive code enacted by the Legislature to govern the administration of elections in Mississippi. That code sets forth how voters may cast their ballots, where they may cast them, and the procedures for counting them. This includes provisions that allow certain voters to

cast their ballots absentee. *See* Miss. Code § 23-15-1, *et seq.* Unlike many other states, Mississippi has elected to keep absentee voting strictly limited; only voters who fall into certain categories may cast their votes absentee. These include voters 65 years or older; voters with temporary or permanent physical disabilities; voters away from their county of residence on election day; and enlisted or commissioned members of the Armed Services. *See id.* §§ 23-15-713, 23-15-673. There are no drop boxes available to voters to return their ballots to election officials in Mississippi, and the law reflects the Legislature's general expectation that absentee ballots are ordinarily returned through the mail. *See id.* § 23-15-907 (limiting who may return absentee ballots beyond employees of the U.S. Postal Service and other common carriers).

The Ballot Receipt Deadline passed out of both houses of the Mississippi Legislature with broad bipartisan margins—with only one vote against it in the House and a unanimous vote in favor in the Senate—in 2020.[2] It ensures that ballots shown by postmark to be cast on or before election day are not rejected simply because of minor mail delivery delays. But even then, the Mississippi Legislature strictly limited the rule's application: a ballot that is postmarked on or before election day "shall not be counted" if it is received more than five business days after the

---

[2] *See* Roll Call Vote, H.B. 1521, Miss. H.R., 2020 Reg. Sess. (Mar. 10, 2020), perma.cc/56WK-5HYE; Roll Call Vote, H.B. 1521, Miss. State S., 2020 Reg. Sess. (June 15, 2020), perma.cc/2CZR-7MQX.

election. *Id.* § 23-15-637(1)(a).

Nearly two dozen other U.S. states and territories have similar laws, accepting timely-cast ballots that are received by election officials within some designated window after election day. And even more have similar laws that apply to military servicemembers specifically. In total, at least 28 states, the District of Columbia, and several U.S. territories permit timely cast ballots to arrive after election day for at least some voters.[3] With its five-day deadline, Mississippi is firmly on the conservative side of these laws—some accept ballots that arrive up to two weeks after the election, or any time before the official canvass.[4]

## II.    These Lawsuits

In early 2024, nearly four years after the Ballot Receipt Deadline was enacted, the Republican National Committee, the Mississippi Republican Party, an individual

---

[3] See Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081; Ark. Code § 7-5-411(a)(1)(A)(ii); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Ind. Code § 3-12-1-17(b); Kan. Stat. 25-1132(b); Mass. Gen. Laws ch. 54 § 93; Md. Code Regs. 33.11.03.08(B)(4); Mich. Comp. Laws § 168.759a(18); Miss. Code § 23-15-637(1)(a); Mo. Rev. Stat. § 115.920(1); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.D. Cent. Code § 16.1-07-09; Ohio Rev. Code § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code § 7-15-700(A); Tex. Elec. Code § 86.007(a)(2); Utah Code § 20A-3a-204(2)(a); Va. Code § 24.2-709(B); Wash. Rev. Code § 29A.40.091; W. Va. Code § 3-3-5(g)(2).

[4] *Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legs. (June 12, 2024), perma.cc/H9ZG-P92W.

Mississippi voter, and a Commissioner for the George County Election Commission (collectively, the "RNC") sued to enjoin Mississippi officials from counting ballots that arrive after election day even if postmarked on or before election day as required by Mississippi law.

The RNC's primary allegation is that Mississippi's Ballot Receipt Deadline is preempted by the Election Day Statutes. *See* RNC Compl. ¶¶ 62–69, ROA.33-34. Although its complaint also alleges two constitutional claims, both are derivative of the preemption claim. Count II—styled as a claim for the "Violation of the Right to Stand for Office"—relies on the assumption that any ballots cast in accordance with the Ballot Receipt Deadline "are not valid" "[u]nder federal law." *Id.* ¶ 71, ROA.34; *see also id*. ¶ 72, ROA.34 (alleging RNC Plaintiffs' "right to stand for office" is injured because they must "spend money, devote time, and otherwise injuriously rely on *unlawful provisions of state law* in organizing, funding, and running their campaigns" (emphasis added)). Similarly Count III, which is titled "Violation of the Right to Vote," relies on the premise that the Ballot Receipt Deadline requires counties to count ballots that "[u]nder federal law . . . are not valid." *Id*. ¶ 76, ROA.35; *see also id*. ¶ 78, ROA.35 ("Mississippi's voting system permits illegitimate votes and therefore violates the Fourteenth Amendment.").

Several weeks after the RNC filed suit, the Libertarian Party of Mississippi filed its own complaint bringing nearly identical claims. The primary difference is

in the Libertarian Party's Count III, which alleges that the Ballot Receipt Deadline conflicts not only with the Election Day Statutes (as the RNC alleges), but also with provisions of the U.S. Constitution granting Congress the power to set the time of elections. *See* Libertarian Party Compl. ¶¶ 69–81, ROA.1291-93. Like the RNC, the Libertarian Party's two other claims are derivative of this primary claim: it, too, alleges that the Ballot Receipt Deadline is a "Violation of the Right to Vote" based on the premise that the Ballot Receipt Deadline "conflicts with [the Election Day Statutes] and is invalid," *id.* ¶ 61, ROA.1290 (Count I), and that it violates the Libertarian Party's "Right to Stand for Office," *id.* ¶ 66, ROA.1291 (Count II), premised again on the assertion that the Ballot Receipt Deadline is an "unlawful provision[]," *id.*

Both the RNC and the Libertarian Party sought an injunction prohibiting Defendants from counting *any* absentee ballots received by mail after election day in all future congressional and presidential elections in Mississippi, as well as a declaration that the Ballot Receipt Deadline deprives them of rights secured by the Constitution and Acts of Congress. *See* ROA.36; ROA.1293.

The district court correctly disposed of Appellants' claims on the merits and granted summary judgment to Defendants and Intervenors. The court held that precedent, legislative history, statutory purpose, and historical practice all show that the Ballot Receipt Deadline "operates consistently with and does not conflict

with the Electors Clause or the election-day statutes." ROA.1181.

### III.    Prior Failed Challenges to Mail Ballot Receipt Deadlines

This is not the first case to raise Appellants' preemption theory in an attempt to challenge a state's ballot receipt deadline. The RNC's and Libertarian Party's latest efforts are two of *seven* similar recent attempts—all brought in the last four years—to challenge post-election day ballot receipt deadlines in federal court under similar theories. The RNC was or is a plaintiff in three of those cases. None has succeeded. Most were dismissed on standing grounds, but the courts that opined on the merits have also uniformly rejected Appellants' preemption theories.

In the first such case, *Donald J. Trump for President, Inc. v. Way*, the RNC, the Trump campaign, and the New Jersey Republican Party alleged that a New Jersey law allowing officials to canvass ballots received within two days of election day was preempted by the Election Day Statutes. *See* 492 F. Supp. 3d 354, 369 (D.N.J. 2020) ("*Way I*"). The district court rejected the plaintiffs' motion for a preliminary injunction, finding they were unlikely to succeed on the merits. *Id.* at 373. It later dismissed the action in its entirety for lack of standing. *Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) ("*Way II*").

Next, a Pennsylvania congressional candidate and voters brought a similarly-reasoned suit challenging the Pennsylvania Supreme Court's decision that

Pennsylvania's constitution required a three-day post-election receipt deadline. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 345–46 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).[5] The plaintiffs argued the deadline violated the Fourteenth Amendment's Equal Protection Clause, because (1) it "treated them," as in-person voters, "in an arbitrary and disparate way by elevating mail-in voters to a 'preferred class of voters,'" and (2) unlawfully "dilute[d]" their votes. *Id.* (quoting *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020)). Those plaintiffs further alleged violations of the Elections Clause, the Electors Clause, and the Election Day Statutes. *See* Compl. at 20–25, *Bognet v. Boockvar*, No. 3:20-cv-215 (W.D. Pa. Oct. 22, 2020), ECF No. 1. The district court declined to issue injunctive relief and the Third Circuit affirmed, finding the plaintiffs lacked standing. *Bognet*, 980 F.3d at 364–65.[6]

---

[5] In the underlying state court action, the Respondents (including the RNC) pointed to the Election Day Statutes as a bar to counting timely cast ballots received after election day. *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 (Pa. 2020). The Pennsylvania Supreme Court was unpersuaded, noting the Election Day Statutes were consistent with "federal and state law allowing for the tabulation of military and overseas ballots received after Election Day." *Id.* at 368 n.23.

[6] The Supreme Court's vacatur of *Bognet* as moot was not based on the merits but rather in keeping with its practice of vacating opinions that become moot on appeal. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). The vacated decision remains persuasive. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding persuasive a "thoughtful opinion" that was "vacated as moot on rehearing").

The third case, *Bost v. Illinois State Board of Elections*, was filed in May 2022 by a congressman and voters who had previously served as presidential electors. *See* 684 F. Supp. 3d 720, 726 (N.D. Ill. 2023). The plaintiffs asserted nearly identical challenges to Illinois' 14-day ballot-receipt deadline as here, alleging a "Violation of the Right to Vote," "Violation of the Right to Stand for Office," and "Violation of [the Election Day Statutes]." Compl. at 7–10, *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754 (N.D. Ill. May 25, 2022), ECF No. 1. The district court dismissed, holding both that the plaintiffs lacked standing and that they had not stated a claim upon which relief may be granted. 684 F. Supp. 3d at 739. Just a few weeks ago, the Seventh Circuit affirmed on standing grounds. *Bost v. Ill. State Bd. of Elections*, --- F.4th ----, No. 23-2644, 2024 WL 3882901 (7th Cir. Aug. 21, 2024).

In July 2023, a county elections administrator brought a fourth case in federal court challenging a North Dakota statute that permits mail ballots to be counted if postmarked by the day before election day and received within 13 days of the election. *See Splonskowski v. White*, No. 1:23-cv-00123, 2024 WL 402629, at *1 (D.N.D. Feb. 2, 2024). That plaintiff alleged the North Dakota law conflicts with the Election Day Statutes. *See* Compl. at 8–9, *Splonskowski v. White*, No. 1:23-cv-00123-DMT-CRH (D.N.D. July 5, 2023), ECF No. 1. The district court dismissed the case for lack of standing. *Id.* at *2.

Most recently, on May 3, 2024, the RNC, the Nevada Republican Party, Donald J. Trump for President 2024, Inc., and a Nevada voter brought an almost identical challenge to this one against Nevada's similar deadline. *See* Compl, *Republican Nat'l Comm. v. Burgess*, No. 3:24-cv-00198 (D. Nev. May 3, 2024), ECF No. 1. That case was dismissed for lack of standing on July 17 and is currently on appeal to the Ninth Circuit. *Republican Nat'l Comm. v. Burgess*, No. 3:24-cv-00198-MMD-CLB, 2024 WL 3445254 (D. Nev. July 17, 2024); *Republican Nat'l Comm. v. Burgess*, No. 24-5071 (9th Cir. Aug. 19, 2024) (appeal filed).

## SUMMARY OF ARGUMENT

The district court's order should be affirmed. Each of the causes of action asserted in the two complaints rests on the same flawed premise: that the federal statutes designating the Tuesday after the first Monday in November as the day of the "election" require that all absentee ballots be received, as opposed to merely cast, by that day. A straightforward application of traditional tools of statutory construction demonstrates why that is wrong. The text, history, purpose, and structure of the Election Day Statutes all show that voters must *cast* their ballots by election day, but ministerial acts such as receipt, signature matching, counting, and canvassing may—and by necessity do—occur after election day.

The plain text of the Election Day Statutes requires only that the voters' "choice" is made by election day. As the RNC points out, both contemporaneous

dictionary definitions and Supreme Court case law describe the day of the "election" as the day of the public's "choice." The Ballot Receipt Deadline is entirely consistent with that definition—it requires voters to make their final choice on or before election day. Mississippi ensures this by requiring that all ballots be postmarked by that day. Once the voter mails their ballot, there is no opportunity for the voter to change his or her mind after election day—the vote has been cast and is out of the voter's control.

The legislative history relating to statutory purpose confirms that this is all the Election Day Statutes require. As courts have noted, the Election Day Statutes were meant to prevent (1) early federal election results in one state from influencing later voting in other states and (2) the burden on citizens forced to turn out on multiple days for multiple elections. Requiring voters to make a "final choice" by election day is consistent with these goals, while requiring election day receipt deadlines would do nothing to further them.

Cases interpreting the Election Day Statutes have uniformly come to the same conclusion. Ignoring this precedent, Appellants rely instead, first, on a decades-old state court decision that plainly is not controlling here (and has never been cited as persuasive authority on the meaning of the Election Day Statutes). They next rely on a strained interpretation of an out-of-context sentence from the Supreme Court's decision in *Foster v. Love* to argue that the "combined actions of voters and officials"

must be completed on election day. But that interpretation runs headlong into the Supreme Court's explicit cabining of its holding in *Foster* and would produce absurd results. As both sets of Appellants acknowledge, official actions to finalize election results after the federal election day—including processing, counting, and certification—are commonplace. Appellants offer no reasoned explanation why these necessary administrative actions for finalizing a vote tally may occur after election day, but ballot receipt—a similar ministerial act of elections officials—may not.

Historical practice also supports the Ballot Receipt Deadline. Post-election-day receipt deadlines have been a feature of American elections for over 150 years. Yet at no point has Congress indicated that the Election Day Statutes preempt these state laws. In fact, history shows that when Congress *does* want to require election-day ballot receipt, it has done so explicitly, as it did when it enacted the 1942 Soldier Voting Act. And in the modern era, far from expressing an intent to preempt state law ballot receipt deadlines, Congress has incorporated them by reference in statutes governing voting for military and overseas voters.

All of this is reason enough to reject Appellants' claims out of hand. But even if the Court were inclined to entertain their theory, Appellants are at the very least barred from obtaining relief in advance of the 2024 general election. Appellants have hardly acted with dispatch in bringing this litigation—they filed their complaints

nearly four years after the challenged statute was enacted. And oral argument in this case is now scheduled for the day *after* Mississippi officials are required to print and make available absentee ballots—with instructions explaining that ballots must be postmarked by election day and received within five business days thereafter. Upending the settled expectations of Mississippi voters—as well as the expectations of millions of voters casting ballots under similar state laws—at this late date would lead to significant voter confusion and clearly run afoul of the so-called *Purcell* principle.

## STANDARD OF REVIEW

This court reviews the district court's grant of a motion for summary judgment de novo. *Hankins v. Wheeler*, 109 F.4th 839, 844 (5th Cir. 2024).

## ARGUMENT

### I.   Mississippi's Ballot Receipt Deadline does not directly conflict with federal law.

Appellants face a high bar in showing that the Election Day Statutes preempt Mississippi's Ballot Receipt Deadline. "The Elections Clause of the United States Constitution, Art. I, § 4, cl. 1, gives states the responsibility for establishing the time, place, and manner of holding congressional elections, unless Congress acts to preempt state choices." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). States have "wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *U.S. v. Classic*, 313 U.S. 299,

311 (1941). "Thus, a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Bomer*, 199 F.3d at 775.

Congress's power to regulate the "Times, Places, and Manner" of congressional elections supersede "inconsistent" State laws "so far as it is exercised, *and no farther*." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)) (emphasis added). When Congress exercises this power, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* at 14. Thus, Courts should "read Elections Clause legislation simply to mean what it says." *Id.* at 15. In this case, much must be read into the Election Day Statutes for Appellants to prevail: those laws simply do not say what Appellants claim.

The Libertarian Party attempts to make its uphill battle a tiny bit less demanding, by arguing that the Supreme Court has abrogated *Bomer*'s "direct conflict" standard and established a more "lenient" standard for federal preemption of state laws under the Elections Clause. Lib. Br. at 18. But that is not correct. As the RNC acknowledges, there is no meaningful daylight between *Bomer* and *Inter Tribal*'s articulation of the standard—they simply use "slightly different language." RNC Br. at 17. As the district court observed, this Court has since cited both

articulations of the standard with approval. *See Voting for America, Inc. v. Steen*, 732 F.3d 382, 399, 400 (5th Cir. 2013). And in *Inter Tribal* itself, the Supreme Court said that the "straightforward textual question" presented in Elections Clause cases is whether the state statute "conflicts with" federal law. 570 U.S. at 9.

However the question is articulated, the answer is straightforward. None of the federal statutes at issue—2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1—speaks to when ballots must be received to be counted, much less requires the rejection of timely-cast ballots or otherwise conflicts with the Ballot Receipt Deadline. Appellants reach their preferred result through an impossibly broad interpretation of the statutory term "election." But the plain meaning of that term requires only that ballots be *cast* by election day—precisely what Mississippi's Ballot Receipt Deadline requires. Appellants' contrary view—that "election" means "casting *and receipt*" of ballots—finds no support in the text, structure, or history of the Election Day Statutes.

### A.    The Ballot Receipt Deadline is consistent with the plain text of the Election Day Statutes.

Statutory interpretation begins (and ends) with the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). The Election Day Statutes simply designate when the "election" must occur. 2 U.S.C. §§ 1, 7; 3 U.S.C. §§ 1, 21(1). Nothing in their text says anything about procedures for transmission, receipt, processing, or counting of ballots. Those decisions are therefore left to the states. *See Bognet*, 980 F.3d at 353 ("Federal law does not provide for *when* or *how* ballot counting occurs."); *Way I*,

492 F. Supp. 3d at 372   (the Election Day Statutes "are silent on methods of determining the timeliness of ballots"); *Bost*, 684 F. Supp. 3d at 736 (holding Illinois' post-election-day receipt deadline "operates harmoniously with the federal statutes that set the timing for federal elections").

As Appellants all apparently agree, RNC Br. at 18, Lib. Br. at 31, the relevant text is the word "election" in the Election Day Statutes. Congress first enacted the Election Day Statutes in the mid-nineteenth century. *See* 5 Stat. 721 (1845) (predecessor to 3 U.S.C. § 1); 17 Stat. 28 (1872) (predecessor to 2 U.S.C. § 7). As the RNC notes, contemporaneous dictionaries defined "election" as "[t]he day of a public choice of officers" or "[t]he act or process of choosing a person or persons for office by vote." RNC Br. 18-19; *see also Foster v. Love*, 522 U.S. 67, 71 (1997) (defining an "election" as the voters' "act of choosing a person to fill an office" (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869))); *Newberry v. United States*, 256 U.S. 232, 250 (1921) (defining "election" as the "final choice of an officer by the duly qualified electors"). That is, "election" day is the day by which voters must make their "choice."

Mississippi's Ballot Receipt Deadline is entirely consistent with that definition. When the voter places a marked absentee ballot in the mail, they have made their final choice. At that point, the ballot is beyond the voter's custody and

control—the voter has no opportunity to change their vote between the time the ballot is deposited in the mail and the time it is received, processed, and canvassed by election officials. And, consistent with the Election Day Statutes, Mississippi law requires that final choice to be made on or before election day. It does not, as the Libertarian Party asserts, "hold[] voting open" after election day. Lib. Br. at 27.

The only authority Appellants can muster for their textual argument that "election day" must instead be read to mean "ballot receipt day" is an 80-year-old Montana Supreme Court decision interpreting a now-defunct provision of Montana state law. In *Maddox v. Board of State Canvassers*, 149 P.2d 112 (Mont. 1944), the Montana Supreme Court did *not*, as the RNC claims, "h[o]ld that the election-day statutes preempt post-election receipt of absentee ballots," nor did it "discern[] the original meaning of the election day statutes." RNC Br. at 20. As a matter of *federal* law, the court said only that the Montana legislature may not "extend beyond [election day] the time when the presidential electors shall be appointed or elected by the ballots of the voters." 149 P.2d at 114. The court then observed that, as a matter of *Montana* law, "voting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Id.* at 115. That conclusion flowed not from any interpretation of the Election Day Statutes, or from the original meaning of the word "election," but from Montana statute. *See id.* (reviewing Montana statutes).

The court concluded: "The federal and state laws must be read together; and *since the state law* provides for voting by ballots deposited with the election officials, that act must be completed on the day designated by state and federal laws." *Id.* (emphasis added). In other words, because Montana law specified that a ballot was not "cast" until it was "deposit[ed] in the ballot box," that act needed to be completed by the federal election day—the day by which voters must cast their votes. *Id.*

The Montana Supreme Court recognized that different states had different rules for determining when a voter has "voted" and a vote has been cast. *Maddox* cited *Goodell v. Judith Basin Cnty.*, 224 P. 1110 (Mont. 1924), for the proposition that Montana law considers a ballot cast only when it is delivered. 149 P.2d at 115. In *Goodell*, the Montana Supreme Court distinguished Montana law from that of New Hampshire, which provided that "the elector parts with all control over his ballot and *has in fact voted* when the ballot is marked and deposited in the mail addressed to the proper election officer." *Id.* at 1113 (citing *In re Opinion of the Justices*, 113 A. 293 (N.H. 1921)) (emphasis added). That is, under New Hampshire law at that time, unlike Montana law, a voter had "voted" once "the voter [] part[ed] with all control over his vote." 113 A. at 299. The situation today is the same as it was a century ago—some states require ballots to be received by election day, while others deem ballots cast when put in the mail. That is each state's choice. The Montana Supreme Court's opinion in *Maddox* cannot be read as a statement of the

original meaning of the Election Day Statutes—or some widely understood meaning of the term "election"—as even it recognized that at least one other state had a contrary understanding of when a voter has "voted" and a ballot has been "cast."[7]

The RNC next points to federal statutes allowing for special elections to fill vacancies in federal office, or for runoff elections. RNC Br. at 20. These statutes provide exceptions to the general rule that "election day" is the Tuesday after the first Monday in November. But they say nothing about the statutory meaning of the term "election." Nor do they shed any light on what official actions, if any, must occur on or before "election day." They simply allow states to designate a different "election day" for special elections under narrow circumstances. *See Foster*, 522 U.S. at 71 n.3 (explaining that 2 U.S.C. § 8 "provides that a State may hold a congressional election on a day other than the uniform federal election day"). The RNC *insists* that they somehow serve to exempt some administrative tasks— canvassing, tallying, and certification—from the definition of "election," but not

---

[7] Notably, Montana's state law has since been changed—at least in part. Montana law no longer provides that "when the ballot has been placed in the box, one of the judges must write the word 'Voted' opposite the number of the person on the checklist for the precinct." *Maddox*, 149 P. at 115. Over a decade ago, Montana amended its law to allow for military-overseas ballots to be counted if transmitted electronically by 8 p.m. on election day and received by elections officials no later 5 p.m. on the day *after* election day. *See* Mont. Code § 13-21-226(1). Montana's choice to amend its state law illustrates precisely why Appellants are wrong here— no *federal* law presently displaces the constitutional prerogative states retain to choose when ballots must be received.

others (*i.e.*, receiving the ballot). But they offer nothing more than their bare say-so in support of this claim, rather than any coherent definition of the term "election" that supports the self-serving distinction the RNC wishes to draw.[8]

**B.    The Ballot Receipt Deadline is consistent with the purpose and legislative history of the Election Day Statutes.**

Though the Court need not inquire beyond the statute's clear text, *see Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018), the purpose and legislative history of the Election Day Statutes confirm that "election day" is the day by which voters must make their "choice." The legislative history shows that the Election Day Statutes were enacted to prevent (1) "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States" and (2) the "burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Bomer*, 199 F.3d at 777; *see also Foster*, 522 U.S. at 73–74; Cong. Globe, 42d Cong., 2d Sess. 141 (1871). Congress also wished to prevent a situation where voters could travel "from one part of the Union to another[] in order to vote" in multiple states. Cong. Globe, 28th Cong., 1st Sess. 679 (1844). Mississippi's Ballot Receipt Deadline is entirely consistent with these purposes. It requires voters to

---

[8] *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), which the RNC cites, has no bearing on this case. It merely stands for the unremarkable proposition that Section 8 creates an exception to the requirement that federal elections be held on the federal election day. *Id.* at 526. It sheds no light on the meaning of "election."

make their final selection of candidates on or before election day, so there is no risk of "distortion" from early results in other states. It does not force citizens to turn out on multiple days. And it does not allow or encourage voters to vote in other states.

None of the additional legislative history that the Appellants cite has any bearing on the interpretive question presented here. Congress's rejection of statutes that would have allowed "multi-day voting," RNC Br. at 29; Lib. Br. at 42, simply confirms what the Election Day Statutes already clearly say—that there is a single "election day." It does not shed any light on the meaning of "election" or whether ballots must be received—rather than simply cast—by "election day." That argument assumes the premise—that allowing ballots to be received after election day constitutes post-election-day "voting." And this Court has already held that "the plain language of the statute does not require all voting to occur on federal election day"—rendering Congress's rejection of "multi-day voting" irrelevant. *Bomer*, 199 F.3d at 776.[9] The RNC further argues that the district court ignored that Congress

---

[9] *Bomer*'s holding was not, as the RNC erroneously suggests, based solely on the "universal, longstanding practice" of absentee voting. RNC Br. at 29-30 (quoting *Bomer*, 199 F.3d at 776). The Court first determined that the plain "language" of the Election Day Statutes gave a "clear signal" that "some acts associated with the election may be conducted before the federal election day without violating the federal election statutes." *Bomer*, 199 F.3d at 776. So too here. *See supra* § I.A. And in any event, as described further below, post-election-day ballot receipt deadlines also have a longstanding pedigree in American elections. Similarly, the Ninth Circuit's dicta in *Voting Integrity Project v. Kiesling* that the Election Day Statutes "may reasonably be construed to mean that all voting in federal elections should take

was also concerned about "double voting," the "transmission of voters from one State to another," and "combat[ting] fraud by minimizing the opportunity for voters to cast ballots in more than one election." RNC Br. at 30 (citations omitted). The RNC makes no attempt to explain how the Ballot Receipt Deadline in any way implicates those concerns. It does not.

Finally, as this Court said in *Bomer*, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)). Yet, Appellants ask that this Court interpret those statutes to require Mississippi to reject the ballots of lawful, qualified Mississippi voters. Both sets of Appellants feign ignorance about "how" their reading of the Election Day Statutes would impede voters from accessing the franchise. Lib. Br. at 43; RNC Br. at 31. But the consequences of their view are as obvious as they are severe. Indeed, the RNC's *stated purpose* in bringing this lawsuit is to prevent the counting of otherwise lawful ballots that they believe are more likely to be cast for their opponents. They have argued that they will suffer

---

place on a single day," 259 F.3d 1169, 1176 (9th Cir. 2001), was not, as the RNC suggests, the holding of that case. RNC Br. at 24. The Ninth Circuit, like this Court in *Bomer*, *rejected* that reading of the Election Day Statutes. 259 F.3d at 1176.

injury to their electoral prospects because such ballots will "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," RNC Compl. ¶¶ 56–57, ROA.32. Nowhere does either Appellant dispute the obvious fact that their ruling would lead some number of otherwise qualified electors to have their ballots rejected, perhaps for no other reason than a delay in mail delivery.

While "deadlines" may be a necessary component of elections, RNC Br. at 31, deadlines for voters must be concrete and clear, and meeting them must be within the voter's control. The Ballot Receipt Deadline sets a clear deadline for voters: they must mail their ballots on or before election day, and if voters comply with that deadline, they are reasonably assured that their ballot will be counted. Without that rule, voters are left to guess at how long the U.S. Postal Service may take to deliver their ballots and will be forced to mail their ballots far in advance of election day without any assurance that the ballot will be counted. In recent years, mail delays have meant that even voters who mail their ballots well in advance of election day may find themselves disenfranchised as the result of postal service delays that are entirely outside of their control. The Postal Service has even settled litigation stemming from delays in delivery of ballots. *See* Stipulation & Consent Order, *Democratic Party of Va. v. Veal*, No. 3:21-cv-671-MHL (E.D. Va. Oct. 28, 2021), ECF No. 27; *NAACP v. U.S. Postal Serv.*, No. 20-cv-2295 (EGS), 2020 WL 6469845 (D.D.C. Nov. 1, 2020) (ordering USPS to take steps to ensure the timely delivery of

- 25 -

mail-in ballots). The Ballot Receipt Deadline helps protect these voters, who no one contends failed to cast their ballots by election day. Adopting Appellants' interpretation of the Election Day Statutes would therefore undoubtedly "have the effect of impeding citizens in exercising their right to vote." *Bomer*, 199 F.3d at 777.

### C. Cases interpreting the term "election" confirm its plain meaning.

Appellants' main interpretive argument arises not from the text of the Election Day Statutes, but instead from a strained, overly literal interpretation of the Supreme Court's statement in *Foster v. Love* that "[w]hen the federal [election] statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder . . . ." 522 U.S. at 71. Based on this language, the RNC reasons that "final selection" "does not occur when the voter merely marks the ballot or delivers the ballot to the post office because those events do not involve an election official." RNC Br. at 24-25. That understanding of *Foster* is wrong for at least three reasons.

First, and most importantly, the Supreme Court expressly declined to offer any opinion regarding the meaning of the term "election" in the Election Day Statutes beyond its narrow holding that an election that "is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates § 7." *Foster*, 522 U.S. at 72. The Court explicitly cautioned that its decision should not be read to "par[e] the term 'election'

- 26 -

in § 7 down to the definitional bone." *Id.* It recognized "room for argument about just what may constitute the final act of selection within the meaning of the law," and emphasized that "our decision does not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute." *Id.*

Just as important as what the Court *did* decide in *Foster* is what it expressly *did not* decide: "This case thus does not present the question whether a state must always employ the conventional mechanics of an election. We hold today *only* that if an election does take place, it may not be consummated prior to federal election day." *Id.* at 72 n.4. Plainly, the Ballot Receipt Deadline does not violate that rule because it does not cause an election to "conclude[] as a matter of law before the federal election day." *Id.* at 72. Appellants ask this Court to ignore the Supreme Court's admonition and broaden *Foster* to control a question that it expressly declined to decide. *See Millsaps v. Thompson*, 259 F.3d 535, 545 (6th Cir. 2001) (noting "the Supreme Court's silence in *Foster* as to which acts a State must take on federal election day"). The Supreme Court—not, as the RNC says, the district court—"went to pains to limit *Foster* to its facts," RNC Br. at 26. The district court here appropriately heeded that warning.

Second, Appellants' argument ignores that, even accepting Appellants' hyper-literal interpretation, the mailing of ballots on or before election day *does* require

several actions of election officials. Before a voter can mark and return an absentee ballot, election officials must disburse applications for absentee ballots, process the application, prepare and print the ballot, and mail the ballot to the elector. Miss. Code §§ 23-15-625; 23-15-649. It is then up to the voter to mark, seal, and mail the absentee ballot. At that point, the voter's engagement with the process ends, and with it the "combined actions" of voters and election officials. Appellants nowhere explain how that fails to comply with *Foster's* holding.

Finally, grafting Appellants' highly literal interpretation of this passage from *Foster* into the text of the Election Day Statutes would lead to absurd and catastrophic results. As Appellants understand *Foster*, the "combined actions of voters and officials meant to make a final selection of an officeholder" must all occur *on* election day. That cannot be right. As the RNC acknowledges: "After election day, election officials go about various duties: counting ballots, disqualifying voters, hearing challenges, and certifying the election." RNC Br. at 25-26. Under Appellants' hyper-literal reading of *Foster*, however, all these activities—the "combined actions of voters *and officials*" must occur *on election day*. That would require officials to arbitrarily stop counting ballots at the stroke of midnight on election day, upending election administration in all fifty states.

Not so, the RNC responds, because the only "official action" that needs to occur on election day under *Foster* is "receipt." All these other "official acts," are

not part of the "combined" actions of voters and election officials. RNC Br. at 28. But this is a limitation created entirely in Appellants' own imagination, with no basis in either *Foster*, the statutory text, or even the definition that Appellants graft onto both. There is simply no reason to conclude that by "combined actions of voters and officials meant to make a *final selection* of an officeholder," 522 U.S. at 71 (emphasis added), the *Foster* Court meant mere receipt of the ballots. The Sixth Circuit properly rejected this exact interpretation in *Millsaps*, explaining that "'final selection' of an officeholder requires more than mere receipt of ballots cast by voters." 259 F.3d at 545-46. It then detailed the various administrative tasks necessary to conclude the election, including counting ballots, certification, and formal announcement of the results. *Id.* at 546. As the Sixth Circuit put it, a "focus on the single act of receiving a ballot from a voter presents an unnatural and stilted conception of the actions taken by election officials." *Id*. That is precisely the arbitrary and self-serving dividing line Appellants urge here. But their view "loses sight of the fact that an official's mere receipt of a ballot without more is not an act meant to make a final selection." *Id.*

There is a far simpler, and less disruptive, answer to what the "the combined actions of voters and officials" refers to. The Supreme Court itself supplied the answer in *Foster*: the "combined actions of voters and officials" "may not be *consummated prior* to federal election day." 522 U.S. at 71, 72 n.4 (emphasis added).

*Foster* pointedly says nothing more, and certainly did not encourage courts to traipse through the interpretive thicket that Appellants have constructed.

Several recent decisions have universally come to the conclusion that the Election Day Statutes address when ballots must be *cast*—not when they must be *received*. In *Way I*, the district court rejected the RNC's (and others') challenge to a New Jersey law that allowed for the counting of non-postmarked ballots received after election day. 492 F. Supp. 3d at 369. All parties agreed that ballots must be cast by Election Day to be valid. *Id.* at 371. The specific question presented was "whether the Federal Election Day Statutes preempt New Jersey's method of determining whether a ballot received without a postmark . . . was cast on or before Election Day." *Id.* at 371–72. The court "f[ound] that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted . . . because the Federal Election Day Statutes *are silent on methods of determining the timeliness of ballots.*" *Id.* at 372 (emphasis added); *see also id.* ("New Jersey law prohibits canvassing ballots *cast* after Election Day, *in accordance with the Federal Election Day Statutes.*" (emphasis added)). Thus, a ballot is "timely" when it is "cast" by Election Day.

The Third Circuit in *Bognet* also treated the "receipt" of ballots as akin to routine post-election actions—like counting and canvassing—distinct from casting or voting a ballot. *Bognet* addressed a challenge to Pennsylvania's extended ballot

receipt deadline during the COVID-19 pandemic. 980 F.3d at 345–46. Although the Third Circuit's decision addressed only standing, the court explained that the "concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures." *Id.* at 353. In that context, the court explained that "Federal law does not provide for *when* or *how* ballot counting occurs," and thus "the Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously." *Id.* at 353–54. Accordingly, the plaintiffs had alleged only a violation of *state*—not federal—law. *Id.* at 354–55.

Relying in part on these precedents as well as the plain text of the Election Day Statutes, a court in the Northern District of Illinois recently rejected the merits of an identical preemption challenge to Illinois' ballot receipt deadline. *Bost*, 684 F. Supp. 3d at 736. As that court succinctly explained: "There is a notable lack of federal law governing the timeliness of mail-in ballots." *Id.* But "[b]y counting only th[o]se ballots that are postmarked no later than Election Day, the Statute complies with federal law that set[s] the date for Election Day." *Id.* at 736-37. The statute therefore "does not facially conflict with the federal election law." *Id.* at 737.[10]

Appellants' only response is to wave away these cases, claiming that they

---

[10] Because the Seventh Circuit affirmed dismissal of this case on standing grounds, 2024 WL 3882901, at *1, it did not reach the merits.

"ignored the historical practice" and over-relied on "congressional acquiescence." RNC Br. at 28. But that argument mischaracterizes both the courts' analysis and the relevant history, as explained below.

**D.    Historical practice and congressional action demonstrate that the Ballot Receipt Deadline is consistent with the Election Day Statutes.**

Appellants' insistence that "historical practice" at the time the Election Day Statutes were originally enacted supports their position is without merit. According to Appellants, because states did not have post-election ballot receipt deadlines in 1872, they are prohibited from enacting them now. That remarkable proposition would turn the Elections Clause on its head. Congress's power under that clause preempts state laws only "so far as it is exercised, and no farther." *Inter Tribal*, 570 U.S. at 9. Congress did not, in passing the Election Day Statutes, freeze state election practices in time. If that were the case, states would essentially be prohibited from modernizing their elections by adopting new practices not contemplated in 1872. That rigid view would virtually eliminate states' "wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *Classic*, 313 U.S. at 311.

Appellants offer no evidence at all—in the form of legislative history or otherwise—that the drafters of the Election Day Statutes intended to prohibit states from counting mail ballots received after election day, or that legislators (at any point in history) understood the Election Day Statutes that way. They simply draw

inferences from their contention that post-election ballot receipt deadlines were not widely in place at the time the Election Day Statutes were enacted. But because voting by mail is, by Appellants' own account, a relatively recent innovation, it follows that the Congress that passed the Election Day Statutes would have no view at all on the subject. Indeed, the Libertarian Party asserts that for much of this history it was "not physically possible" for ballots to be received after election day. Lib. Br. at 32. Putting aside whether that assertion is historically accurate, it makes little sense to say that the Election Day Statutes were "originally" understood to prohibit a practice that was unknown at the time they were enacted. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654–55 (2020) ("ordinary public meaning" refers to the statute's meaning "at the time of enactment").

More importantly, however, Appellants badly misread the historical record to suggest that post-election ballot receipt deadlines are an entirely recent innovation. In fact, post-election ballot receipt deadlines have been a feature of American elections for well over a century.

During the Civil War, many states adopted laws to permit service members to vote in the field. Oftentimes these soldiers cast their ballots in the field on election day, typically before their own officers. But their votes were not added to the full count until conveyed back to their home states for a canvass. *See* Josiah Henry Benton, *Voting in the Field* 317-18 (1915). Many states, in both the North and South,

extended their canvassing deadlines to accommodate this. *Id.* This was necessary because of "the difficulty of getting the votes home to the various States in season to be counted with the other votes." *Id.* at 316. Under these systems, election officials would not receive the results of these in-the-field elections until well after election day. *Id.* at 318. The Libertarian Party attempts to distinguish these practices by noting that these statutes "deputized" servicemembers as election officials. Lib. Br. at 43-44. That is a distinction without a difference. Those ballots could not be counted and added to the official tally until those tallies were transmitted to election officials in the voters' home states—often after election day.[11]

As absentee voting proliferated in the late 19th and early 20th centuries, states experimented with a variety of different models—consistent with the federalist structure enshrined in the Elections Clause. For example, five states permitted an absent voter to cast a ballot elsewhere within the state on election day, and then have that ballot mailed back to election officials in the person's home precinct after election day to be added into the count. P. Orman Ray, *Absent Voters*, 8 Am. Pol.

---

[11] In the 1864 presidential election, for instance "Vermont soldiers voted in the field, but there was a delay in transmitting the votes to be counted in the State," resulting in a miniscule tally of votes from Vermont's servicemembers. Benton, *Voting in the Field* 89. The point is clear—mere receipt by election officials in the field was not enough. Actual transmission, tallying, and certification of such votes are every bit as much a part of the process as "receipt," despite Appellants' efforts to draw an arbitrary line in the sand at that point.

Sci. Rev. 442, 442-43 (1914) (Kansas, Missouri); P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918) (Washington); Joseph P. Harris, *Election Administration in the United States* 287-288 (1934) (Oregon, Florida). In Washington, for example, voters who were unable to vote in their home counties could cast a ballot in another county which would then be "sealed and returned to the voter's home county." Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. at 253. "In order to be counted the ballot must have been received by the [home] county auditor *within six days from the date of the election or primary*." *Id.* at 253-54 (emphasis added). That is materially indistinguishable from the Ballot Receipt Deadline, which requires voters to transmit their ballots by election day but allows for those ballots to be counted as long as they are received by the relevant election official within five days thereafter. Handing a ballot to a county election official who is not empowered to count or process it, for delivery to the correct county election official, is no different from handing the ballot to a postal worker.

At least as early as 1924, California law required that all absentee ballots must be received "within fourteen days after the date of the election in which such ballots are to be counted." Cal. Political Code § 1360 (James H. Derring ed. 1924). In response to World War I, other states enacted similar laws specifically for military voters. In Kansas, as early as 1923, military ballots had to be "return[ed]" "before the tenth day following [the] election." Kans. Rev. Stat. § 25-1106 (Chester I. Long,

et al., eds. 1923) (emphasis added). New York and Minnesota had similar laws. *See* P. Orman Ray, *Military Absent-Voting Laws*, 12 Am. Pol. Sci. Rev. 461, 464, 468-69 (1918).

By 1942, with the United States' entry into World War II, post-election day receipt deadlines were ubiquitous. An advisory memorandum prepared by the Office of War Information for soldiers in the field advised soldiers how to vote based on their state absentee voting laws, with a table including a column for the "Last day for receipt of ballot by election officials." *Bill to Amend the Act of September 16, 1942: Hearing on H.R. 3436 Before the H. Comm. on Election of President, Vice President, and Representatives in Congress*, 78th Cong. 100, 102 (Oct. 26, 1943) (reproducing publication inserted into record).[12] This circular, distributed to active servicemembers in 1942 for a general election held on November 3, reflects that post-election day ballot receipt deadlines at this time were far from unheard of—they were common:

---

[12] This compilation, issued in 1942, was later entered into the congressional record by Representative Rankin of Mississippi, during hearings in October and November of 1943 by the House Committee on Election of President, Vice President, and Representatives in Congress. It was presented to and considered by the district court at the summary judgment hearing. ROA.1256-57.

## 102 SOLDIER VOTING

*Elections covered and ballot schedules*

| | Absentee voting permitted | | | | | | Ballot application period | | Last day for receipt of ballot by election officials |
|---|---|---|---|---|---|---|---|---|---|
| | General election | Primary election | Special election | Federal officers | State officers | Local officers | Begins | Ends | |
| Alabama | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 14 | Oct. 29 | Nov. 3. |
| Arizona | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 1 | Oct. 30 | Do. |
| Arkansas | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 24 | Nov. 2 | Do. |
| California | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 14 | Oct. 29 | Nov. 9. |
| Colorado | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 12 | Oct. 31 | Oct. 31. |
| Connecticut | Yes | No | Yes | Yes | Yes | No[1] | Aug. 3 | do | Do. |
| Delaware | No | No | No | No | No | No | None | None | None. |
| Florida[2] | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 19 | Oct. 31 | Nov. 3. |
| Georgia | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 2 | Oct. 24 | Nov. 2. |
| Idaho | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Nov. 2 | Do. |
| Illinois | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Oct. 29 | Nov. 3. |
| Indiana | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Nov. 2 | Do. |
| Iowa | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | do | Nov. 2. |
| Kansas | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Oct. 24 | Nov. 13. |
| Kentucky | No | No | No | No | No | No | None | None | None. |
| Louisiana | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Nov. 2 | Nov. 2. |
| Maine | Yes | Yes | Yes | Yes | Yes | Yes | Aug. 14 | Sept. 12 | Sept. 12. |
| Maryland | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 19 | Oct. 27 | Nov. 10. |
| Massachusetts | Yes | No | No | Yes | Yes | Yes | Any time | Nov. 3 | Nov. 3. |
| Michigan | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Nov. 1 | Do. |
| Minnesota | Yes | Yes | Yes | Yes | Yes | Yes | do | Nov. 2 | Do. |
| Mississippi | No | Yes | No | Yes | Yes | Yes | Primaries only. | Primaries only. | Primaries only. |
| Missouri[3] | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Oct. 29 | Nov. 4. |
| Montana | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Oct. 3 | Nov. 3. |
| Nebraska | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Nov. 1 | Do. |
| Nevada | Yes | Yes | Yes | Yes | Yes | Yes | do | Oct. 31 | Oct. 31. |
| N. Hampshire[4] | Yes | No | No | Yes | No | No | Any time | Nov. 2 | Nov. 3. |
| New Jersey | Yes | Yes | Yes | Yes | Yes | Yes | do | Oct. 9 | Do. |
| New Mexico | No | No | No | No | No | No | None | None | None. |
| New York | Yes | No | No | Yes | Yes | Yes | Differs | Differs | Oct. 30.[5] |
| North Carolina | Yes | No[6] | No | Yes | Yes | Yes | Oct. 4 | Nov. 1 | Nov. 3. |
| North Dakota | Yes | Yes | No | Yes | Yes | Yes | do | Nov. 2 | Do. |
| Ohio | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Oct. 29 | Oct. 30. |
| Oklahoma | Yes | Yes | Yes | Yes | Yes | Yes | do | do | Nov. 3. |
| Oregon | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | do | Oct. 29. |
| Pennsylvania | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 10 | Oct. 4 | Nov.13. |
| Rhode Island | Yes | No | Yes | Yes | Yes | No | Any time | do | Nov. 16. |
| South Carolina | No | Yes | No | Yes | Yes | Yes | Primaries only. | Primaries only. | Primaries only. |
| South Dakota | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 19 | Nov. 2 | Nov. 3. |
| Tennessee | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4[7] | Oct. 24 | Do. |
| Texas | Yes | Yes | Yes | Yes | Yes | Yes | Any time | Oct. 30 | Oct. 31. |
| Utah | Yes | Yes | Yes | Yes | Yes | Yes | do | Nov. 2 | Nov. 3. |
| Vermont | Yes | Yes | Yes | Yes | Yes | Yes | do | Oct. 30 | Do. |
| Virginia | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 4[8] | Oct. 29 | Do. |
| Washington | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 19 | Nov. 2 | Nov. 9. |
| West Virginia | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Oct. 24 | Nov. 3. |
| Wisconsin | Yes | Yes | Yes | Yes | Yes | Yes | Sept. 4 | Oct. 31 | Do. |
| Wyoming | Yes | Yes | Yes | Yes | Yes | Yes | Oct. 4 | Nov. 2 | Do. |

As set forth in this table, at least *seven* states—California, Kansas, Maryland, Missouri, Pennsylvania, Rhode Island, and Washington—had post-election ballot receipt deadlines, either for civilians, servicemembers, or both. *Id.* at 101. Nebraska soon followed in 1943. Neb. Rev. Stat. § 32-838 (1943) (requiring acceptance of mail-in ballots received "not later than 10:00 a.m. on the second day following election day").

Against this background, Congress passed the Soldier Voting Act, which allowed servicemembers to vote absentee in federal elections using a new federal "war ballot," notwithstanding any contrary state laws. The Act explicitly specified that "no official war ballot shall be valid . . . if it is received by the appropriate election officials . . . after the hour of closing the polls on the date of the holding of the election." Act of Sept. 16, 1942, ch. 561, 56 Stat. 753, § 9 (the "1942 Act"). The 1942 Act is significant for two reasons. First, it shows that, when Congress wishes to set election day as a categorical deadline for receipt of ballots, it knows how to clearly do so. Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). Second, if, as Appellants contend, it was widely understood that the Election Day Statutes require an election day receipt deadline, then there would have been no need for Congress to specify election day as the receipt deadline for military absentee ballots—the Election Day Statutes would have already provided such a deadline. In other words, under Appellants' interpretation of the Election Day Statutes, the 1942 Act's explicit election day receipt deadline was entirely superfluous.

In the post-World War II era, states continued to accept absentee ballots after

election day. In Missouri in 1958, ballots needed to be "postmarked the day of the election and reach the election official the day next succeeding the election." *Elliott v. Hogan*, 315 S.W.2d 840, 848 (Mo. App. 1958) (citing Mo. Stat. § 112.050). In Alaska in 1978, ballots were required to be returned by the "most expeditious mail service, postmarked not later than the day of the election, to the election supervisor in [the voter's] district." *Hammond v. Hickel*, 588 P.2d 256, 268 (Alaska 1978) (citing Alaska Stat. § 15.20.150). As Appellants acknowledge, RNC Br. at 22-23, Nebraska and Washington also allowed post-election ballot receipt for at least part of the 20th century. *See Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977) (Statement of John C. Broger, Deputy Coordinator of the Federal Voting Assistance Program, Department of Defense). And the congressional record shows that Congress was well aware of these practices. *See id*; 116 Cong. Rec. 6996 (1970) (Statement of Sen. Goldwater describing states that permit "absentee ballots of certain categories of their voters to be returned as late as the day of the election or *even later*." (emphasis added)).

In short, post-election-day ballot receipt deadlines are nothing new. "[Y]et Congress has taken no action to curb this established practice." *Bomer*, 199 F.3d at 776. As this Court explained in the related context of absentee voting: "We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware." *Id.*

"Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Bost*, 684 F. Supp. 3d at 736. That acquiescence is not a product of mere congressional inattention. Against the backdrop of these longstanding state election laws, Congress has amended the Election Day Statutes several times without addressing ballot receipt deadlines— including most recently in December 2022. *See* Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5233 (2022). *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (finding "unusually strong case of legislative acquiescence" where Congress was "constantly reminded" and "aware[]" of the issue "when enacting other and related legislation").

There is more. Congress has not just "acquiesced" in longstanding post-election ballot receipt deadlines, but has in fact affirmatively acknowledged in other federal statutes that ballot receipt deadlines are left up to the states. In 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). The Congressional record once again shows that Congress, at the time it enacted UOCAVA, was well aware that many states had post-election-day receipt deadlines. By the mid-1980s, for at least some voters, "[t]welve [states] ha[d] extended the deadline for the receipt of voted ballots to a specific number of days after the election." *Uniformed and Overseas Citizens Absentee Voting: Hearing on*

*H.R. 4393* 99 Cong. 21 (Feb. 6, 1986) (Statement of Henry Valentino, Director, Federal Voting Assistance Program). With that testimony at hand, Congress enacted 52 U.S.C. § 20303(b)(3), which provides that an alternative federal write-in ballot for military and overseas voters shall not count "if a State absentee ballot of the absent uniformed services voter or overseas voter is received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot *under State law*." (emphasis added). So Congress, aware that several states had post-election-day receipt deadlines, explicitly incorporated those deadlines by reference into a key provision of UOCAVA.

The Libertarian Party dismisses this observation as a "strawman," because UOCAVA "did not modify ballot receipt deadlines or grant states authority to do the same." Lib. Br. at 45; *see also* RNC Br. at 33-34. But that is precisely the point— UOCAVA did not need to do so because neither the Election Day Statutes nor any other federal law displaces state authority to enact such deadlines. And the text of UOCAVA acknowledges that ballot receipt deadlines are a matter of "State law." 52 U.S.C. § 20303(b)(3).

Next, in 2009, Congress passed the MOVE Act, which updated key provisions of UOCAVA. As relevant here, the MOVE Act requires military officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered "to the appropriate election officials" "not later than

*the date by which an absentee ballot must be received in order to be counted in the election*." 52 U.S.C. § 20304(b)(1) (emphasis added); Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190. The MOVE Act thus explicitly incorporates state-law ballot receipt deadlines into the federal statutory scheme. This language makes no sense if the Election Day Statutes categorically preempted long-existing post-election-day receipt deadlines. Congress could have just as easily required that such ballots be delivered to election officials "by election day." Instead, it again deferred to the states' constitutional prerogative to set this deadline. This is not a case of congressional *in*action, but rather a case where Congress has repeatedly demonstrated its understanding that ballot receipt deadlines are a question of state, not federal law.

Finally, Appellants' position is inconsistent with the longstanding practice of federal courts remedying UOCAVA violations. Courts frequently extend ballot receipt deadlines to remedy such violations. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just. (Mar. 24, 2022), perma.cc/J8AS-X3K6. Appellants agree that federal courts may do so "as an equitable remedy," RNC Br. at 33; Lib. Br. at 45, but ignore that their reading of the Election Day Statutes, if correct, would preclude that equitable remedy for a violation of a different federal statute such as UOCAVA. *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (explaining that even courts of equity cannot "disregard

statutory [] requirements" or "create a remedy in violation of law"); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 217–18 & n.4 (7th Cir. 1995) (recognizing that judicially-imposed consent decree to remedy a violation of a federal statute must comply with federal law). And no Plaintiff points to any statutory provision that would authorize federal courts to order an exception to the purported election-day receipt requirement.[13] There is no such provision, because there is no such requirement.[14]

The RNC asks the Court to ignore UOCAVA and instead look to the to the 1970 amendments to the Voting Rights Act, which require state officials to count the ballots of qualified absentee voters so long as the voters "return such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." RNC Br. at 32-33. (quoting 52 U.S.C. § 10502(d)). That Congress declined to mandate a post-election receipt deadline in the VRA amendments certainly does not demonstrate that Congress understood the Election Day Statutes to *prohibit* such a rule. That argument is expressly foreclosed by the VRA itself. The *same section* specifies: "Nothing in this

---

[13] The Libertarian Party cites 52 U.S.C. § 20307, which simply provides that the "Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as may be necessary to carry out this chapter."

[14] The Libertarian Party, in fact, appears to affirmatively argue that Congress has *not* passed such a law. Lib. Br. at 46.

section shall prevent any State or political subdivision from adopting less restrictive voting practices than those that are prescribed herein." 52 U.S.C. § 10502(g).

Appellants would have this Court believe that, for over 150 years, the Election Day Statutes have contained a latent election-day receipt deadline. If that view is correct, then numerous state legislatures across broad swathes of our history, federal courts, and even Congress itself have wrongly interpreted the Election Day Statutes for decades. Surely, if the meaning of the Election Day Statutes is as plain as Appellants suggest, somebody would have said something before this recent spate of failed lawsuits first raised the theory. But Appellants cannot identify a single authority that has ever endorsed their view. The reason is clear—the Election Day Statutes do not, and have never, required all ballots to be received in the mail by election day.

## II. Mississippi's Ballot Receipt Deadline does not burden Appellants' constitutional rights.

Appellants candidly acknowledge that their purported First and Fourteenth Amendment claims are simply repackaged preemption claims, and therefore must fail if the Ballot Receipt Deadline is not preempted by the Election Day Statutes. RNC Br. at 37; Lib. Br. at 48. Because that is plainly the case for the reasons explained above, the Court need not inquire further.

But Appellants' constitutional claims also fail on their own merits. Violations of the right to vote and to stand for office are reviewed under the *Anderson-Burdick*

standard, which requires courts to "weigh the character and magnitude of the asserted injury to voting rights against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020) (internal quotation marks omitted); *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). The first step is to determine whether the right to vote or stand for office has been impacted at all. *See Tex. League of United Latin Am. Citizens*, 978 F.3d at 144–45. Laws that do not make it harder to vote do not implicate the right to vote. *Id.* at 144. Laws that do not impede a candidate's ability to be placed on the ballot do not implicate the right stand for office. *See Tex. Indep. Party*, 84 F.3d at 184.[15]

Appellants cannot possibly show that the Ballot Receipt Deadline law makes it harder for anyone to exercise the right to vote or be placed on the ballot. On its face, the law simply ensures that qualified voters do not have their timely-cast ballots

---

[15] The RNC bizarrely tries to avoid the *Anderson-Burdick* analysis by recasting its constitutional claims brought under the First and Fourteenth Amendments as "§ 1983 claims." RNC Br. at 37. But that is not how their Complaint is pleaded. *See* RNC Compl. ¶ 73, ROA.35 ("Defendants, acting under color of Mississippi law, have deprived and are depriving Plaintiffs of rights protected under the First Amendment and 14th Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983."); *id.* ¶ 79, ROA.35 ("Defendants have acted and will continue to act under color of state law to violate the Fourteenth Amendment."). And "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Fennell v. Marion Ind. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (citation omitted). Here, the appropriate test for evaluating Appellants' *substantive* constitutional claims under the First and Fourteenth Amendments is the *Anderson-Burdick* framework.

rejected. It accordingly *protects* the right to vote; only if Appellants succeed will the right to vote be impeded. Thus, the Ballot Receipt Deadline cannot violate the right to vote under *Anderson-Burdick*. *See, e.g.*, *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (affirming dismissal of challenge to law that "does not burden anyone's right to vote" and instead "makes it easier for some voters to cast their ballots by mail"). In the end, Appellants' arguments that the Ballot Receipt Deadline violates their constitutional rights is premised entirely on the presumption that ballots received after election day are "unlawful" under federal law. Libertarian Party Compl. ¶¶ 66, 79, ROA.1291, 1292; *see also* RNC Compl. ¶ 66, ROA.34. Because the Election Day Statutes do not directly conflict with—and do not pre-empt—the Receipt Deadline, this claim, too, must fail.

Mississippi also has strong interests in ensuring that qualified voters who timely cast their votes do not have those ballots arbitrarily rejected, and in avoiding the voter confusion that would follow if the law was suddenly changed, as Appellants demand. The Ballot Receipt Deadline and the Election Day Statutes share common purpose in expanding the franchise and protecting the right to vote. "These state interests constitute the very backbone of our constitutional scheme—the right of the people to cast a meaningful ballot." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 778 (5th Cir. 1975) (noting "the avoidance of voter confusion is a worthwhile objective"

for the state). The Ballot Receipt Deadline sets a clear, predictable rule for voters to know when they must mail their ballot to ensure that it is counted, enabling eligible voters to consume more information about candidates as it becomes available closer to election day, which benefits both candidates and voters. It also accounts for significant mail delays that have plagued previous elections. All of these are compelling state interests that the Elections Clause allows Mississippi to pursue.

### III.    The *Purcell* principle bars relief.

Even if Appellants' claims had any merit, they can no longer obtain relief in advance of the 2024 general election. Time has simply run out. Oral argument in this case is scheduled for September 24, 2024. Mississippi elections officials must prepare and print absentee ballots no later than the previous day, September 23. *See* Miss. Code § 23-15-649. And those absentee ballots must be mailed with printed instructions informing voters that their ballots must "be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." Miss. Code § 23-15-631(1)(c). The risk of voter confusion is obvious and significant. *See Purcell v. Gonzalez*, 549 U.S. 1 at 4-5 (2006). Absentee voters in Mississippi—including elderly and disabled voters and members of the military—will undoubtedly rely on the printed instructions issued by state election officials in deciding when to cast their absentee ballots.

If ever there were a case for application of the so-called *Purcell* principle, it

is this one. This Court has applied the principle to hold that an injunction changing election procedures on September 25—eighteen days *before* early voting began in Texas in 2020—was issued too close to the election. *Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 565 (5th Cir. 2020); *see also Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (staying an injunction entered nine days before the start of early voting). Here, Appellants seek to change the rules for the 2024 election *after* absentee ballots have already been distributed.

This untenable situation was entirely of Appellants' own making. Mississippi's Receipt Deadline was enacted in 2020 and has been in place for two federal general elections. 2020 Miss. H.B. 1521, 2020 Miss. Gen. Laws 472, 2020 Miss. ALS 472.25. But Appellants waited until early 2024 to bring this lawsuit. They did not seek emergency or preliminary relief, choosing instead to progress directly to summary judgment. Nor have they sought an injunction pending appeal. Now, with oral argument scheduled just six weeks before election day, Appellants ask this Court to dramatically upset the settled expectations of Mississippi's absentee voters by contradicting the explicit instructions given to them by state election officials. The Court should decline to do so.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated:  September 9, 2024

Respectfully submitted,

/s/ *Elisabeth C. Frost*

Robert B. McDuff
Paloma Wu
**MISSISSIPPI CENTER FOR
 JUSTICE**
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
Telephone: (601) 259-8484
Facsimile: (601) 352-4769
rmcduff@mscenterforjustice.org
pwu@mscenterforjustice.org

Elisabeth C. Frost
Christopher D. Dodge
Richard A. Medina
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
efrost@elias.law
cdodge@elias.law
rmedina@elias.law

*Attorneys for Intervenor Defendants–
Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 9, 2024

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,294 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f). This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced, serifed typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 9, 2024

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost