No. 24-60395

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————————

REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN
PARTY; JAMES PERRY; MATTHEW LAMB,

Plaintiffs-Appellants

v.

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the
Circuit Court of Harrison County; TONI JO DIAZ, in their official
capacities as members of the Harrison County Election Commission;
BECKY PAYNE, in their official capacities as members of the Harrison
County Election Commission; BARBARA KIMBALL, in their official
capacities as members of the Harrison County Election Commission;
CHRISTENE BRICE, in their official capacities as members of the
Harrison County Election Commission; CAROLYN HANDLER, in their
official capacities as members of the Harrison County Election
Commission; MICHAEL WATSON, in his official capacity as the
Secretary of State of Mississippi,

Defendants-Appellees

VET VOICE FOUNDATION; MISSISSIPPI ALLIANCE FOR RETIRED
AMERICANS,

Intervenor Defendants-Appellees

———————————————

LIBERTARIAN PARTY OF MISSISSIPPI,

Plaintiff-Appellant

v.

(*See inside cover for continuation of caption and counsel*)

JUSTIN WETZEL, in his official capacity as the clerk and registrar of the Circuit Court of Harrison County; TONI JO DIAZ, in their official capacities as members of the Harrison County Election Commission; BECKY PAYNE, in their official capacities as members of the Harrison County Election Commission; BARBARA KIMBALL, in their official capacities as members of the Harrison County Election Commission; CHRISTENE BRICE, in their official capacities as members of the Harrison County Election Commission; CAROLYN HANDLER, in their official capacities as members of the Harrison County Election Commission; MICHAEL WATSON, in his official capacity as the Secretary of State of Mississippi,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT
OF DEFENDANTS-APPELLEES AND SUPPORTING AFFIRMANCE
ON THE ISSUE ADDRESSED

———————————

TODD W. GEE
United States Attorney

ANGELA GIVENS WILLIAMS
  (MSB # 102469)
MITZI DEASE PAIGE
  (MSB # 6014)
  Assistant United States Attorneys
  501 E. Court Street
  Suite 4.430
  Jackson, Mississippi 39201
  (601) 965-4480

KRISTEN CLARKE
  Assistant Attorney General

ELIZABETH PARR HECKER
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................. 1

STATEMENT OF THE ISSUE.............................................................. 1

STATEMENT OF THE CASE.............................................................. 2

    A.    Legal Background ............................................................... 2

    B.    Factual Background............................................................ 4

SUMMARY OF ARGUMENT.............................................................. 5

ARGUMENT

    I.    State laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with the Federal Election Day Statutes. ......................................................... 7

        A.    Mississippi's ballot receipt deadline is consistent with the Federal Election Day Statutes' text. .................................... 8

        B.    Many election activities occur after Election Day, confirming that post-Election-Day ballot receipt deadlines do not change the election's date. ........................... 14

        C.    History confirms that post-Election-Day ballot receipt deadlines comport with the federal statutes. ........................... 19

        D.    Congress has never repudiated or expressed disapproval of post-Election-Day ballot receipt deadlines......................... 23

        E.    Applying Mississippi's ballot receipt deadline does not conflict with Congress's purposes in enacting the Federal Election Day Statutes................................................ 27

II.     Mississippi's ballot receipt deadline protects military and overseas voters. ................................................................. 28

CONCLUSION ................................................................................. 33

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) ....................................................................... 8, 27

*Bognet v. Secretary Commonwealth of Pa.*,
    980 F.3d 336 (3d Cir. 2020), *vacated as moot sub nom.*
    *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) ....................... 7, 24

*Bost v. Illinois State Bd. of Elections*, No. 23-2644,
    2024 WL 3882901 (7th Cir. Aug. 21, 2024) .................................... 7

*Bourland v. Hildreth*, 26 Cal. 161 (1864) ............................................... 20

*Burke v. State Bd. of Canvassers*, 107 P.2d 773 (Kan. 1940) ................ 19

*Chase v. Miller*, 41 Pa. 403 (1862),
    *abrogated by McLinko v. Department of State*,
    279 A.3d 539 (Pa. 2022) .................................................................. 20

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ...................................... 26

*Ex Parte Siebold*, 100 U.S. 371 (1879) .................................................... 8

*Foster v. Love*, 522 U.S. 67 (1997) .................................................. *passim*

*Harris v. Florida Elections Canvassing Comm'n*,
    122 F. Supp. 2d 1317 (N.D. Fla. 2000) .......................................... 15

*Harris v. Florida Elections Comm'n*,
    235 F.3d 578 (11th Cir. 2000),
    *aff'g Harris v. Florida Elections Canvassing Comm'n*,
    122 F. Supp. 2d 1317 (N.D. Fla. 2000) ............................................ 7

*In re Opinion of Justs.*, 30 Conn. 591 (1862) .................................... 20-21

**CASES (continued):**                                        **PAGE**

*In re Opinions of Justs.*, 45 N.H. 595 (1864) ........................................... 20

*Lehman v. McBride*, 15 Ohio St. 573 (1863)...................................... 20-21

*Maddox v. Board of State Canvassers,*
    149 P.2d 112 (Mont. 1944) ....................................................... 18-19

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ............... 9, 12-13, 17

*Morrison v. Springer*, 15 Iowa 304 (1863) ............................................. 20

*Pennsylvania Democratic Party v. Boockvar,*
    238 A.3d 345 (Pa. 2020) .................................................................. 7

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    589 U.S. 423 (2020) (per curiam).................................................... 18

*Seago v. O'Malley*, 91 F.4th 386 (5th Cir. 2024) .................................... 27

*State ex rel. Chandler v. Main*, 16 Wis. 398 (1863)................................ 20

*Texas Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) .......................................................... 13

*United States v. Alabama,*
    857 F. Supp. 2d 1236 (M.D. Ala. 2012)........................................... 31

*United States v. New York*, No. 1:10-cv-1214,
    2012 WL 254263 (N.D.N.Y. Jan. 27, 2012) .................................... 31

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ..................... 8

*Voting Integrity Project, Inc. v. Bomer,*
    199 F.3d 773 (5th Cir. 2000) ................................................. *passim*

**CASES (continued):**                                                **PAGE**

*Voting Integrity Project, Inc. v. Keisling,*
    259 F.3d 1169 (9th Cir. 2001) ...............................................12-13, 23

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1..................................................................................2

U.S. Const. Art. II, § 1, Cl. 4 ...............................................................................2

**STATUTES:**

Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28............................................2-3

Act of Jan. 23, 1845, ch. 1, 5 Stat. 721......................................................2

Act of June 4, 1914, ch. 103, § 1, 38 Stat. 384............................................3

Help America Vote Act of 2002
    52 U.S.C. 21082(a)(1) ...................................................................15
    52 U.S.C. 21082(a)(2) ...................................................................15
    52 U.S.C. 21082(a)(3) ...................................................................15
    52 U.S.C. 21082(a)(4) ...................................................................15
    52 U.S.C. 21083(b)(2)(B)(ii)...........................................................25

Military and Overseas Voter Empowerment Act of 2009
    Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H,
        123 Stat. 2318................................................................1, 3-4

Uniformed and Overseas Citizens Absentee Voting Act of 1986
    52 U.S.C. 20301-20311 .....................................................................1
    52 U.S.C. 20302(a)(1) ................................................................3, 29
    52 U.S.C. 20302(a)(8) .......................................................................4
    52 U.S.C. 20302(a)(8)(A) ...............................................................29
    52 U.S.C. 20302(a)(10) ...................................................................30

52 U.S.C. 20302(g)(1)(A) ....................................................... 29

52 U.S.C. 20303(b) ................................................................. 30

52 U.S.C. 20303(b)(3) ........................................................... 30

52 U.S.C. 20304(b)(1) ........................................................... 30

52 U.S.C. 20307 ....................................................................... 1

Pub. L. No. 99-410, 100 Stat. 924 ...................................... 3

Voting Accessibility for the Elderly and Handicapped Act

52 U.S.C. 20102(b)(2)(B)(ii) ............................................... 25

Voting Rights Act

52 U.S.C. 10502 ..................................................................... 25

52 U.S.C. 10502(a)(1) ........................................................... 25

52 U.S.C. 10502(d) ............................................................... 25

52 U.S.C. 10502(g) ............................................................... 26

2 U.S.C. 1 ........................................................................... 1-2, 9

2 U.S.C. 7 ........................................................................ *passim*

2 U.S.C. 8 ............................................................................... 27

3 U.S.C. 1 ........................................................................ *passim*

3 U.S.C. 21(1) ............................................................ 2, 9, 26-27

Ala. Code § 17-11-18(b) (2024) ........................................ 23

Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii) (2024) ......................... 23

Cal. Pol. Code § 1360 (1923) ............................................. 24

Fla. Stat. § 101.6952(5) (2024) .......................................... 23

Ga. Code Ann. § 21-2-386(a)(1)(G) (2024) .......................... 23-24

**STATUTES (continued):** **PAGE**

Ind. Code § 3-12-1-17(b) (2024) ..................................................................24

Kan. Stat. § 25-1106 (1929) ..........................................................................24

Mich. Comp. Laws § 168.759a(18) (2024) ....................................................24

Miss. Code Ann. § 23-15-637(1)(a) (2024) .......................................4, 18, 28

Mo. Rev. Stat. § 115.920(1) (2024) ...............................................................24

Mo. Rev. Stat. § 10135 (1933), https://perma.cc/GPU9-X2VZ ..................24

N.C. Gen. Stat. § 163-258.10 (2024) .............................................................24

N.C. Gen. Stat. § 163-258.12 (2024) .............................................................24

N.D. Cent. Code § 16.1-07-09 (2024) ............................................................23

N.D. Cent. Code § 16.1-07-26 (2024) ............................................................23

N.D. Cent. Code § 16.1-05-17 (2024) ............................................................23

Neb. Comp. Stat. § 2007 (1921) .....................................................................24

Neb. Comp. Stat. § 2009 (1921) .....................................................................24

Neb. Comp. Stat. § 2011 (1921) .....................................................................24

Neb. Comp. Stat. § 2035 (1921) .....................................................................24

Ohio Rev. Code Ann. § 3509.05(D)(2)(a) (West 2024) ...............................23

25 Pa. Cons. Stat. § 3511(a) (2024) ...............................................................24

R.I. Gen. Laws § 17-20-16 (2024) ..................................................................24

**STATUTES (continued):**                                    **PAGE**

S.C. Code Ann. § 7-15-700(A) (2024) ......................................24

S.C. Code Ann. § 7-17-10 (2024) ..........................................24

3 Guam Code Ann. § 10114 (2024)..........................................23

2023 N.C. Sess. Laws 140 .................................................23

1866 Nev. Stat. 215, https://perma.cc/KM66-RCLE ..............................21

1933 Wash. Sess. Laws Extraordinary Sess. 102-103,
    https://perma.cc/3D85-LVAW. ......................................24

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 288, 111th Cong., 1st Sess. (2009) (Conf. Rep.)..............29

H.R. Rep. No. 765, 99th Cong., 2d Sess. (1986) ...........................3, 29-30

116 Cong. Rec. 6996 (1970) ...............................................26

**RULE:**

Fed. R. App. P. 29(a) .....................................................1

**MISCELLANEOUS:**

Consent Decree, *United States v. Idaho*, No. 88-cv-1187,
    (D. Idaho May 21, 1988; entered May 23, 1988)......................31-32

Consent Decree, *United States v. West Virginia*,
    No. 2:14-cv-27456, (S.D. W. Va. Nov. 3, 2014) ..............................32

John Fritze et al., *Biden Wins:  Democrat Who Vowed Return to
    'Normalcy' Defeats Trump in Cliffhanger Election*,
    USA Today (Nov. 9, 2020, 8:25 a.m.),
    https://perma.cc/5QFG-KGG6 .........................................................14

Josiah Henry Benton, *Voting in the Field* (1915),
    https://perma.cc/5HGD-K5JC ................................................19-22

*New Dictionary of the English Language*
    (Charles Richardson, ed. 1846) .......................................................11

Noah Webster, *An American Dictionary of the English Language*
    (C. Goodrich & N. Porter eds. 1869) .............................................10

Noah Webster, *Election*,
    *An American Dictionary of the English Language* 288 (1828),
    https://perma.cc/9SVD-48QA .........................................................11

Noah Webster, *Election*,
    *An American Dictionary of the English Language*
    (rev. ed., Chauncey A. Goodrich, ed. 1860),
    https://perma.cc/R8CF-9FAN .........................................................11

*Report:  Canvass, Certification and Contested Election Deadlines
    and Voter Intent Laws*,
    Nat'l Conf. of State Legislatures (Oct. 26, 2022),
    https://perma.cc/RVQ2-59XC ....................................................16-17

*Suspense!*, Nat'l Republican, Nov. 8, 1876,
    https://perma.cc/R44U-TDBH .........................................................15

*Table 11:  Receipt and Postmark Deadlines for
    Absentee / Mail Ballots*,
    Nat'l Conf. of State Legislatures (July 12, 2022),
    https://perma.cc/NX5Y-2ETA.........................................................23

**MISCELLANEOUS (continued):** PAGE

*The Recent Election—Its Numerous Results*, New York Herald,
Nov. 7, 1844, https://perma.cc/9EZY-2FJ9 ..................................... 15

*The Universal English Dictionary* (John Craig, ed. 1861) ..................... 11

U.S. Dep't of Just., *Cases Raising Claims Under the Uniformed
and Overseas Citizen Absentee Voting Act* (Mar. 24, 2022),
https://perma.cc/CQG5-M4PH ......................................................... 31

*What Time Is Allotted to Determine the Status of Provisional
Ballots?, Report: Provisional Ballots*,
Nat'l Conf. of State Legislatures (July 9, 2024),
https://perma.cc/3TLH-URVE ........................................................ 16

## INTEREST OF THE UNITED STATES

This case presents an important question about the interpretation of the federal statutes setting a uniform national Election Day, 2 U.S.C. 1, 7; 3 U.S.C. 1 (the Federal Election Day Statutes). Resolution of this question may affect the United States' enforcement of the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 52 U.S.C. 20301-20311 (UOCAVA), as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, 123 Stat. 2318 (MOVE Act). The Attorney General enforces UOCAVA. 52 U.S.C. 20307. The United States thus has an interest in clarifying that state laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with federal law. This brief is filed under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

The United States addresses the following question only:

Whether Mississippi's law allowing mail-in ballots postmarked by Election Day to be counted if received within five business days of Election Day comports with the Federal Election Day Statutes.

## STATEMENT OF THE CASE

### A.     Legal Background

1.  The Constitution's Elections Clause grants States the power to determine "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," but provides Congress with authority to "make or alter such Regulations."  U.S. Const. Art. I, § 4, Cl. 1.  The Elections Clause thus "invests the States with responsibility for the mechanics of congressional elections . . . so far as Congress declines to preempt state legislative choices."  *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted).  The Constitution also grants Congress the power to "determine the Time of chusing the Electors" for President and Vice President.  U.S. Const. Art. II, § 1, Cl. 4.

Exercising these powers, Congress has designated "[t]he Tuesday next after the 1st Monday in November" as the "day for the election" of Members of Congress and the appointment of presidential electors.  2 U.S.C. 7 (House of Representatives); *accord* 2 U.S.C. 1 (Senate); 3 U.S.C. 1, 21(1) (electors).  Congress first set this date for presidential elections in 1845, Act of Jan. 23, 1845, ch. 1, 5 Stat. 721, and set the same election date for the House of Representatives in 1872, Act of Feb.

2, 1872, ch. 11, § 3, 17 Stat. 28.  As States began electing senators directly, Congress tied their Election Day to that for representatives. Act of June 4, 1914, ch. 103, § 1, 38 Stat. 384.

2.  In 1986, Congress passed UOCAVA.  Pub. L. No. 99-410, 100 Stat. 924 (as amended, 52 U.S.C. 20301-20311).  UOCAVA guarantees the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office" to three categories of voters: members of the uniformed services away from home on active duty, their spouses and dependents who are also absent due to that active service, and United States citizens residing overseas.  52 U.S.C. 20302(a)(1).  UOCAVA reflects Congress's longstanding determination that "protect[ing] the voting rights of all eligible citizens living, working or serving their country in uniform and overseas" is an important national interest, and that the government must "provide a mechanism so that a person can participate in elections."  H.R. Rep. No. 765, 99th Cong., 2d Sess. 7, 13 (1986) (UOCAVA House Report).

Congress went further in 2009 by passing the MOVE Act, which amended UOCAVA in several ways to provide military and overseas voters sufficient time to receive, mark, and return their ballots.  Pub. L.

No. 111-84, Div. A, Tit. V, Subtit. H, 123 Stat. 2318 (10 U.S.C. 1566a;

52 U.S.C. 20301, 20302-20308, 20311).  The MOVE Act requires States

to transmit validly requested ballots to UOCAVA voters at least 45 days

before elections for federal office when the requests are received by that

date.  52 U.S.C. 20302(a)(8).

### B.  Factual Background

Mississippi law authorizes voting by mail and counts vote-by-mail

ballots that are "received by the registrar no more than five (5) business

days after the election."  Miss. Code Ann. § 23-15-637(1)(a) (2024).  Such

ballots may be counted, however, only if they were "postmarked on or

before the date of the election."  *Ibid.*

The plaintiffs in these two consolidated cases—including the

Republican National Committee (RNC) and the Libertarian Party of

Mississippi (LPM)—sued various state and local election officials,

alleging, among other things, that Mississippi's receipt deadline for

absentee ballots cast by mail conflicts with the Federal Election Day

Statutes.  ROA.1161-1162.[1]  The parties filed cross-motions for

---

[1] Two organizations also intervened as defendants.  Doc. 35.

summary judgment. ROA.1162. The district court granted defendants'

motions and denied plaintiffs'. ROA.1182-1183. As relevant here, the

court held that Mississippi's ballot receipt deadline "operates

consistently with" the Federal Election Day Statutes, because "no 'final

selection' is made after the federal election day under Mississippi's law."

ROA.1178, 1181. The court also emphasized that Congress has not

stepped in to alter the many state statutes that impose post-Election

Day deadlines for mail-in ballots. ROA.1178-1179.

Plaintiffs appealed. ROA.1186-1189.

## SUMMARY OF ARGUMENT

Counting ballots after Election Day that were mailed by Election

Day fully complies with the Federal Election Day Statutes. An election

occurs for purposes of the Federal Election Day Statutes once all voters

have made their final choice of candidates in compliance with state law.

And States may determine for themselves whether a vote is considered

cast when it is mailed rather than when election officials receive it.

While the Supreme Court has held that a federal election may not

legally conclude *before* Election Day, nothing in the Federal Election

Day Statutes prevents States from receiving and counting ballots later

that were properly cast *by* Election Day.  States already must perform

many tasks after Election Day to complete the legal process of holding

an election, and state officials have accepted timely-cast ballots that

arrive after Election Day at least since the Civil War.  Congress's

longtime tolerance for post-Election-Day ballot receipt deadlines, and

its purposes in enacting the Federal Election Day Statutes, confirm that

such deadlines do not violate federal law.

Furthermore, post-Election-Day ballot receipt deadlines like

Mississippi's protect military and overseas voters' right to vote, helping

to fulfill Congress's design in passing UOCAVA.  UOCAVA recognizes

and incorporates States' different absentee ballot receipt deadlines,

further indicating that all such deadlines comply with the Federal

Election Day Statutes.  The United States also routinely seeks and

receives court orders extending ballot receipt deadlines to remedy

violations of UOCAVA.

## ARGUMENT

**I.  State laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with the Federal Election Day Statutes.**

States may determine for themselves whether to count votes cast by Election Day under state law but received after that date.  As numerous appellate courts have found, post-Election-Day ballot receipt deadlines comply with the text of the Federal Election Day Statutes, as interpreted by the Supreme Court in *Foster v. Love*, 522 U.S. 67 (1997), as well as with the statutes' purposes.  *See Bognet v. Secretary Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Harris v. Florida Elections Comm'n*, 235 F.3d 578, 579 (11th Cir. 2000), *aff'g Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324-1325 (N.D. Fla. 2000); *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 368 & n.23 (Pa. 2020); *cf. Bost v. Illinois State Bd. of Elections*, No. 23-2644, 2024 WL 3882901 (7th Cir. Aug. 21, 2024) (rejecting near-identical challenge to plaintiffs' on standing grounds).

**A.    Mississippi's ballot receipt deadline is consistent with the Federal Election Day Statutes' text.**

1.  This Court has stated that, under the Elections Clause, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).  There is no conflict here.[2]  The Federal Election Day

---

[2]  Contrary to LPM's argument (Br. 13-18), the Supreme Court's decision in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013), which held to be preempted a state law that was "inconsistent with" the National Voter Registration Act, *id.* at 15 (quoting *Ex parte Siebold*, 100 U.S. 371, 397 (1879)), did not abrogate *Bomer*'s preemption standard.  The *Inter Tribal Council* Court drew the "inconsistent with" language from a decision issued 121 years before *Bomer*.  *Ibid.*  Indeed, *Bomer* itself used the same language regarding inconsistency.  *See* 199 F.3d at 776 ("Texas['s] scheme is not inconsistent with the federal election statutes as interpreted by the court in *Foster*.").  And the *Inter Tribal Council* Court elsewhere made clear that "[t]he straightforward textual question" in the case, as in *Bomer*, was whether the state law "conflicts with the [federal-law] mandate."  570 U.S. at 9.  Indeed, this Court again relied on *Bomer*'s "directly conflict" standard in a case issued months after—and which cited—*Inter Tribal Council*.  *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013).

But even if *Inter Tribal Council*'s preemption standard were lower than *Bomer*'s, the result in this case would not differ.  *Inter Tribal Council* simply clarified that Elections Clause legislation must be read using traditional tools of statutory interpretation, with no presumption against preemption.  *See* 570 U.S. at 15.  As explained herein, the

Statutes set the first Tuesday after the first Monday in November as "the day for the election" of Members of Congress, 2 U.S.C. 7; *see* 2 U.S.C. 1, and presidential electors, 3 U.S.C. 1, 21(1). This language mandates only when the "election"—the actions "meant to make a final selection of an officeholder"—must occur. *Foster*, 522 U.S. at 71. The text does not otherwise prohibit States from determining how to run their elections or dictate when a ballot is properly cast or counted. "Put another way, there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections." *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001).

Accordingly, the Supreme Court has embraced a narrow view of which state laws the Federal Election Day Statutes preempt. In *Foster*, the Court considered Louisiana's practice of holding an "open primary" in October of federal election years. 522 U.S. at 68. This primary "provide[d] an opportunity to fill" Congressional offices "without any action to be taken on federal election day." *Id.* at 68-69. A candidate

---

Federal Election Day Statutes' plain meaning is not inconsistent with Mississippi's ballot receipt deadline.

who received a majority of the votes in the open primary was "elected"; the State held a "runoff" on the federal Election Day only if no candidate received a majority in the primary. *Id.* at 70. Over 80% of Louisiana's open primaries elected a candidate outright. *Ibid.*

While holding that Louisiana's practice violated 2 U.S.C. 7, the Court refused to ascribe to the Federal Election Day Statutes a broad preemptive scope, or to "isolat[e] precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute[s]." *Foster*, 522 U.S. at 72. Instead, it determined only "that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress," violates the Federal Election Day Statutes. *Ibid.*

In holding so, the Court interpreted the Federal Election Day Statutes based on a contemporaneous dictionary that defined "election" as voters' "act of choosing a person to fill an office." *Foster*, 522 U.S. at 71 (quoting Noah Webster, *An American Dictionary of the English Language* 433 (C. Goodrich & N. Porter eds. 1869)). This "act of choosing" could occur "by any manifestation of [the voters'] preference,"

including "by ballot." Noah Webster, *Election, An American Dictionary of the English Language* 383 (rev. ed., Chauncey A. Goodrich, ed. 1860), https://perma.cc/R8CF-9FAN; *accord* Noah Webster, *Election, An American Dictionary of the English Language* 288 (1828), https://perma.cc/9SVD-48QA. Other contemporaneous dictionaries likewise define the statutory term "election" by reference to the point at which voters make their choice. *See The Universal English Dictionary* 638 (John Craig, ed. 1861) (defining "election" identically to *Webster*'s); *New Dictionary of the English Language* 649 (Charles Richardson, ed. 1846) (defining "elect" as "[t]o choose or pick out").[3]

Mississippi's ballot receipt deadline complies with *Foster*, and the contemporary definitions of "election" on which *Foster* relied, because it does not permit a federal election to be "concluded as a matter of law before the federal election day." 522 U.S. at 72. Rather, it requires that

---

[3] Even following appellants' preferred definition of "election" (LPM Br. 31; RNC Br. 19), one can just as easily view the "day of a public choice of officers" as the day on which voters *transmit* their ballots—irrevocably making their choice—as one can the day on which all ballots are received and counted.

ballots must be cast, and therefore the "public choice" made, no later than Election Day itself.

2.  In arguing otherwise, plaintiffs stretch *Foster* far beyond what its holding and reasoning can bear.  They assert that, because the *Foster* Court struck down a regime in which all the "combined actions" of voters and election officials could finish before Election Day, *Foster* requires that all such actions must also be completed *by* Election Day itself, and not after.  LPM Br. 18-19; RNC Br. 25.  But *Foster* says no such thing.  Rather, *Foster* requires invalidation only of laws that leave no "act in law or in fact to take place on" Election Day.  522 U.S. at 72.  Mississippi, by contrast, sets Election Day itself as the deadline for the most significant act of all:  the voter's casting of a vote.

This Court and others have rejected similar calls to expand *Foster* beyond its moorings, holding that various early voting regimes comply with the Federal Election Day Statutes.  *See Millsaps*, 259 F.3d at 545; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1176 (9th Cir. 2001); *Bomer*, 199 F.3d at 774.  Challengers in those cases made arguments like the one that plaintiffs make here, albeit on the other side of Election Day.  They asserted "that the federal statutes, by

establishing '*the* day for the election,' contemplate that the entire election, including all voting, will occur that day," such that counting any votes submitted before Election Day is illegal. *Bomer*, 199 F.3d at 775; *accord Keisling*, 259 F.3d at 1172; *Millsaps*, 259 F.3d at 546. This Court rightly rejected those arguments, because "*Foster* recognized that some acts pertaining to the election of federal officials would be performed on days other than the federal election day." *Bomer*, 199 F.3d at 776; *see Millsaps*, 259 F.3d at 545. So too here.

Plaintiffs also urge that the United States has a limited tradition of absentee balloting and post-Election-Day ballot receipt. LPM Br. 29-38; RNC Br. 3-8, 19-24. Their account is incomplete as a factual matter. *See* Parts I.B-I.D, *infra*. Regardless, this Court's "imperative is to focus on the text" as interpreted by the Supreme Court, because "[o]nly the written word is the law." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 188 (5th Cir. 2020) (citation omitted). And just as "the plain language of the statute[s]" allows election officials to receive ballots *before* Election Day, a "plain, common sense reading of the language" also allows state officials to receive and count ballots *after* Election Day, if voters' "final selection" is made by Election Day. *Bomer*, 199 F.3d at

776. "[T]his conclusion is consistent with the Supreme Court's refusal to give a hyper-technical meaning to 'election'" in *Foster*. *Ibid.*

**B. Many election activities occur after Election Day, confirming that post-Election-Day ballot receipt deadlines do not change the election's date.**

Plaintiffs' interpretation of the Federal Election Day Statutes also disregards the myriad activities that state laws require officials to undertake after Election Day to complete the process of electing federal officeholders. These universal practices illustrate that federal elections still are deemed to occur on Election Day, even if key actions essential to the election occur after that date.

1. a. First, it is unavoidable that States must continue to count ballots after Election Day itself. The process of counting votes just to determine the *unofficial* results can last hours or days after the polls close on election night. *See, e.g.*, John Fritze et al., *Biden Wins: Democrat Who Vowed Return to 'Normalcy' Defeats Trump in Cliffhanger Election*, USA Today (Nov. 9, 2020, 8:25 a.m.), https://perma.cc/5QFG-KGG6 (describing the "days of vote-counting" before the 2020 election could be unofficially called). This was equally true at the time Congress adopted 2 U.S.C. 7 and 3 U.S.C. 1. *See, e.g.*,

*Suspense!*, Nat'l Republican, Nov. 8, 1876, at 1, https://perma.cc/R44U-TDBH (detailing partial results from "close" 1876 presidential election on day after Election Day); *The Recent Election—Its Numerous Results*, New York Herald, Nov. 7, 1844, at 2, https://perma.cc/9EZY-2FJ9 (noting that observers were "unable to say who is elected President" two days after Election Day based on partial returns). "[Y]et votes are not routinely being thrown out [under the Federal Election Day statutes] because they could not be counted on election day." *Harris*, 122 F. Supp. 2d at 1325.

Congress also has ensured that at least some vote-counting will occur after Election Day. In the Help America Vote Act of 2002 (HAVA), Congress mandated that nearly all States issue provisional ballots to voters whose eligibility to vote in a jurisdiction is in question and required poll workers to transmit those ballots to an appropriate election official for "prompt" verification. 52 U.S.C. 21082(a)(1)-(3). Only when that official "determines that the individual is eligible under State law to vote" does HAVA provide that "the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." 52 U.S.C. 21082(a)(4). This verification process cannot

reasonably be finished on Election Day, particularly as provisional

ballots often are cast during Election-Day in-person voting. Hence, the

District of Columbia and the 48 States that issue provisional ballots all

set post-Election-Day deadlines for counting them. *See What Time Is*

*Allotted to Determine the Status of Provisional Ballots?*, *Report:*

*Provisional Ballots*, Nat'l Conf. of State Legislatures (July 9, 2024),

https://perma.cc/3TLH-URVE.

b. Second, the "actions of . . . officials meant to make a final

selection of an officeholder" continue after a State completes its

unofficial count. *Foster*, 522 U.S. at 71. Election officials in all States

must canvass the election, preparing final tallies. *See Report: Canvass,*

*Certification and Contested Election Deadlines and Voter Intent Laws*,

Nat'l Conf. of State Legislatures (Oct. 26, 2022), https://perma.cc/RVQ2-

59XC. Local officials then send those results to a statewide entity to

conduct a statewide canvass. *See ibid.* Candidates may contest the

results, and state officials must adjudicate those challenges. *See ibid.*

Finally, States review the results of the canvass and certify the results.

*See ibid.* It is only then that States officially determine results and

declare winners. All these activities take place after Election Day. *See ibid.*; *Millsaps*, 259 F.3d at 546 n.5.

2. a. Plaintiffs agree that election officials may engage in "canvassing, tallying, and certifying" after Election Day without running afoul of the Federal Election Day Statutes. RNC Br. 21; *see* LPM Br. 23. But in plaintiffs' view (RNC Br. 15; LPM Br. 23-25), Congress's decision to set an Election Day means that ballots can be considered timely cast only if they are *both* sent *and* received by that date. Yet plaintiffs cannot explain why, under federal law, the election is "consummated" at that arbitrary point (LPM Br. 23; RNC Br. 25), rather than when votes are cast. Federal election law simply does not draw plaintiffs' preferred line; it instead focuses on the *choice* of officials, and leaves to the individual States the determination of how a vote is deemed cast. "Providing various options for the time and place of depositing a completed ballot does not change 'the day for the election.'" *Millsaps*, 259 F.3d at 545 (citation omitted).

As the Supreme Court recently recognized in a mail-in voting case, ballots need not be *received* by election officials to be considered *cast*—and it is the *casting* of the votes that matters for determining

when the election takes place. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) ("Extending the date by which ballots may be cast by voters—*not just received by the municipal clerks but cast by voters*—for an additional six days after the scheduled election day fundamentally alters the nature of the election." (emphasis added)). Because Mississippi's ballot receipt deadline requires ballots to be sent out, completed, and postmarked by Election Day, Miss. Code Ann. § 23-15-637(1)(a) (2024), "the combined actions of voters and officials meant to make a final *selection* of an officeholder" occur by Congress's chosen date, *Foster*, 522 U.S. at 71 (emphasis added).

The principal case plaintiffs cite to buttress their contrary interpretation in fact refutes it. *Maddox v. Board of State Canvassers*, 149 P.2d 112 (Mont. 1944), examined a Montana statute that "provide[d] for voting by ballots deposited with the election officials," *id.* at 115. As a matter of state law, the court determined, votes are not cast until they are "delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Ibid.* The court recognized that "[t]he federal [Election Day Statutes] and state

laws must be read together." *Ibid.* It thus held that "since the *state law* provides for voting by ballots deposited with the election officials, that act must be completed on the day designated by state and federal laws." *Ibid.* (emphasis added).

The *Maddox* court thus properly followed the Federal Election Day Statutes' text and deferred to a State's determination of when a ballot is cast. But other States are free—and have long been free—to have different laws providing, for example, that a "vote is cast when the ballot is marked . . . [and] placed in envelopes and mailed on election day." *Burke v. State Bd. of Canvassers*, 107 P.2d 773, 778 (Kan. 1940). In both cases, the public choice of officers—and hence the election— occurs when all ballots are cast in accordance with state law.

### C. History confirms that post-Election-Day ballot receipt deadlines comport with the federal statutes.

Contemporaneous practice at the time of the Federal Election Day Statutes' passage also belies the notion that the word "election" required election officials' receipt of cast ballots. During the Civil War, 20 of 25 States, as well as 7 of 11 Confederate States, passed laws allowing soldiers to vote. Josiah Henry Benton, *Voting in the Field* 4, 27-28, 312-313, 315 (1915), https://perma.cc/5HGD-K5JC; *see also id.* at

269-270 (discussing similar New Jersey law implemented from 1815-1819). In most of these States, military officers were authorized to set up polling places in the field, and soldiers would vote for local, state, or federal offices on the relevant state or federal election day.[4] Military officers or regular soldiers, rather than local civilian election officials, usually operated these polling places and collected and counted the ballots.[5]

Though many States required the officers running the elections to swear oaths to uphold the state constitution or to fairly conduct the election, Benton 17, the States did not always "deputize[]" the officers as state officials (LPM Br. 36, 43-44; *see* RNC Br. 5). For instance, Nevada simply placed military polling sites "under the immediate

---

[4] Benton 15, 17, 43, 49, 63-64, 70-71, 74, 87, 100-101, 106, 115, 122, 129, 156, 171-172, 186, 190, 201-202, 217-218, 239; *see, e.g.*, *In re Opinions of Justs.*, 45 N.H. 595, 596-597 (1864); *Bourland v. Hildreth*, 26 Cal. 161, 177 (1864); *Morrison v. Springer*, 15 Iowa 304, 338 (1863); *Lehman v. McBride*, 15 Ohio St. 573, 589 (1863); *State ex rel. Chandler v. Main*, 16 Wis. 398, 411 (1863); *In re Opinion of Justs.*, 30 Conn. 591, 591 n.* (1862); *Chase v. Miller*, 41 Pa. 403, 416 (1862), *abrogated by McLinko v. Department of State*, 279 A.3d 539 (Pa. 2022).

[5] *See* Benton 17, 43, 49, 64, 74, 87-88, 106, 115-116, 122, 129, 156, 171-172, 186, 201-202, 218, 239-240; *Morrison*, 15 Iowa at 338-339; *State ex rel. Chandler*, 16 Wis. at 422; *In re Opinion of Justs.*, 30 Conn. at 591 n.*.

charge and direction of the three highest officers in command," without requiring any oath. 1866 Nev. Stat. 215, https://perma.cc/KM66-RCLE; *see* Benton 171-173. Likewise, Rhode Island merely required soldiers to "deliver" their ballots to their "commanding officer[s]" on Election Day. Benton 186-187 (citation omitted). And until 1864, Pennsylvania allowed soldiers to vote "at such place as may be appointed by the commanding officer," with no other regulations. Benton 190.

While soldiers cast these votes on the congressionally mandated federal Election Day for presidential elections, the soldiers' ballots still had to be sent back to election officials in their home States so those officials could canvass the votes and add the valid ones to the totals cast by other voters. This fact meant that soldiers' votes were not "received by the proper state election official" (LPM Br. 22) until *after* the dates that 3 U.S.C. 1 or state law set as the relevant election day.[6] States

---

[6] *See* Benton 43, 64, 71-72, 74, 89, 100-101, 106, 116-117, 123-124, 129, 156, 171-172, 186-187, 218-219, 240-241; *Lehman*, 15 Ohio St. at 603-604 (noting that Ohio's law "extend[ed] the time for receiving and opening the returns of votes cast under the act"); *In re Opinion of Justs.*, 30 Conn. at 591 n.* ("[A]ll the ballots cast . . . shall be sealed up by the commanding officer, and be by him forthwith transmitted by mail to the secretary of state at Hartford.").

often gave military voters until the deadline for canvassing in-state ballots to have their votes delivered to state election officials, and some States even extended their canvassing periods to accommodate the military vote. Benton 317-318.[7]

Congress presumably was aware of the States' widespread practice when, eight years after the Civil War's end, it enacted 2 U.S.C. 7 without requiring votes to be both cast and received by Election Day. Congress also did not amend 3 U.S.C. 1 to disturb States' understanding that ballots could be counted in presidential elections when submitted by voters on Election Day, even when those ballots would not be received by local election officials until a later date. Just as States were free during the Civil War to determine that ballots were cast when submitted to designated military officers or commissioners, they remain free now to determine that ballots are cast once mailed and out of the voter's control.

---

[7] Some States chose to appoint commissioners to visit each regiment, collect soldiers' ballots, and return them to local election officials, in a manner not dissimilar to absentee voting. *E.g.*, Benton 71-72, 180. To say, then, that neither Congress nor the public could have contemplated deeming votes cast when submitted (LPM Br. 33-35) is speculative at best.

**D. Congress has never repudiated or expressed disapproval of post-Election-Day ballot receipt deadlines.**

Mississippi's law draws additional support from "the long history of congressional tolerance, despite the federal election day statute, of absentee balloting" with post-Election-Day receipt deadlines. *Keisling*, 259 F.3d at 1175; *accord Bomer*, 199 F.3d at 776. Mississippi is one of 18 States—plus the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands—that accept absentee ballots received after Election Day if they are mailed on or before Election Day. *See Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures (July 12, 2022), https://perma.cc/NX5Y-2ETA; 3 Guam Code Ann. § 10114 (2024).[8] And 11 more States accept absentee ballots from UOCAVA voters that are mailed by, but received after, Election Day.[9]

---

[8] North Dakota currently accepts ballots for longer after Election Day, N.D. Cent. Code §§ 16.1-07-09, 16.1-07-26, 16.1-15-17 (2024), and Ohio for less time, Ohio Rev. Code Ann. § 3509.05(D)(2)(a) (West 2024), than listed in this table. North Carolina eliminated post-Election-Day ballot receipt for non-UOCAVA voters in October 2023. *See* 2023 N.C. Sess. Laws 140, § 35.

[9] *See* Ala. Code § 17-11-18(b) (2024); Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii) (2024); Fla. Stat. § 101.6952(5) (2024); Ga. Code Ann.

Contrary to plaintiffs' claims (RNC Br. 22-23; LPM Br. 39-41), many of these statutes have existed for decades, with some passed a century ago. *See, e.g.*, Neb. Comp. Stat. §§ 2007, 2009, 2011, 2035 (1921) (received before county canvassing board convenes, up to six days after Election Day); Cal. Pol. Code § 1360 (1923) (mailed by Election Day and received by 14 days after); Kan. Stat. § 25-1106 (1929) (mailed by Election Day and received by ten days after); Mo. Rev. Stat. § 10135 (1933) (postmarked by Election Day and received by the day after), https://perma.cc/GPU9-X2VZ; 1933 Wash. Sess. Laws Extraordinary Sess. 102-103 (postmarked by Election Day and received by canvassing six days after), https://perma.cc/3D85-LVAW.

Congress's continued tolerance of laws like Mississippi's illustrates that a "[d]eadline [e]xtension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously." *Bognet*, 980 F.3d at 354. This Court should decline plaintiffs' invitation

---

§ 21-2-386(a)(1)(G) (2024); Ind. Code § 3-12-1-17(b) (2024); Mich. Comp. Laws § 168.759a(18) (2024); Mo. Rev. Stat. § 115.920(1) (2024); N.C. Gen. Stat. §§ 163-258.10, 163.258.12 (2024); 25 Pa. Cons. Stat. § 3511(a) (2024); R.I. Gen. Laws § 17-20-16 (2024); S.C. Code Ann. §§ 7-15-700(A), 7-17-10 (2024).

"to read the federal election day statutes in a manner that would prohibit such a" widespread, "longstanding practice of which Congress was obviously well aware." *Bomer*, 199 F.3d at 776. Indeed, if anything, Congress has expressed a strong preference for *enlarging* access to mail-in voting. *See id.* at 776-777. Provisions of UOCAVA, pp. 28-30, *infra*, HAVA, 52 U.S.C. 21083(b)(2)(B)(ii), and the Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. 20102(b)(2)(B)(ii), for instance, all provide explicitly for or reduce barriers to absentee voting.

Section 202 of the Voting Rights Act, 52 U.S.C. 10502, passed in 1970, further illustrates how federal and state voting laws work in harmony. Concerned with "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections," 52 U.S.C. 10502(a)(1), Congress required all States to allow absentee voting for those who timely apply and "return[] such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election," 52 U.S.C. 10502(d). While the statute thus *requires* States to count qualifying absentee ballots for President received by Election Day—thereby

preempting earlier state deadlines—Congress specifically permitted
States to "adopt[] less restrictive voting practices than" the statute
mandates.  52 U.S.C. 10502(g).

Congress passed Section 202 with full knowledge that some States
had post-Election-Day ballot receipt deadlines:  The provision's sponsor,
Senator Barry Goldwater, provided research informing Congress that
40 States at the time already "expressly permit[ted] absentee ballots of
certain categories of their voters to be returned as late as the day of the
election *or even later*."  116 Cong. Rec. 6996 (1970) (statement of Sen.
Goldwater) (emphasis added).  And far from requiring all ballots to be
received by Election Day (RNC Br. 32-33), Congress expressly
authorized States to be "less restrictive" than federal law by accepting
absentee ballots past Election Day, 52 U.S.C. 10502(g).  Reading the
Federal Election Day Statutes harmoniously with Section 202, as they
must be, *see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018), confirms
that they do not prohibit post-Election-Day ballot receipt deadlines.[10]

---

[10]  The recently enacted Electoral Count Reform Act (ECRA) does
not alter the calculus.  *Contra* LPM Br. 28-29.  The ECRA redefines
"election day" to accommodate "force majeure events" if state law so
allows.  3 U.S.C. 21(1).  But the ECRA fully "modifies the period of

**E.    Applying Mississippi's ballot receipt deadline does not
conflict with Congress's purposes in enacting the
Federal Election Day Statutes.**

Because the Federal Election Day Statutes' text does not prohibit
Mississippi's ballot receipt deadline, consideration of the statutes'
"purpose" is "unnecessary." *Seago v. O'Malley*, 91 F.4th 386, 393 (5th
Cir. 2024); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570
U.S. 1, 15 (2013) (stating that "there is no compelling reason not to read
Elections Clause legislation simply to mean what it says").  However,
the legality of Mississippi's ballot receipt deadline "is buttressed by an
appreciation of Congress's object" in enacting the Federal Election Day
Statutes.  *Foster*, 522 U.S. at 73.

As the Supreme Court noted in *Foster*, in enacting a uniform
Election Day, "Congress was concerned" with two principal problems:
(1) "the distortion of the voting process threatened when the results of

voting" in such cases, *ibid.*, allowing voters not merely to have their
ballots counted if *received* by the new date but to *cast their ballots* by
that date.  The ECRA thus authorizes a change in the federal Election
Day itself under certain circumstances, but it says nothing about how
long after that date a ballot may be received to be counted.  The
statutes' other exceptions shed no more light on ballot receipt deadlines
(*contra* RNC Br. 20-21):  They authorize entirely new elections—with
new ballots and new rounds of voting—to fill vacancies or hold runoffs,
2 U.S.C. 8.

an early federal election in one State can influence later voting in other States," and (2) "the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years." 522 U.S. at 73. Mississippi's ballot receipt deadline implicates neither concern. First, Mississippi law requires that voters must vote and mail in their ballots by Election Day, before any election results are publicized. Miss. Code Ann. § 23-15-637(1)(a) (2024). And second, the ballot receipt deadline applies equally to all federal elections, which maintain the same, federally prescribed Election Day. *Ibid.*

## II. Mississippi's ballot receipt deadline protects military and overseas voters.

Laws like Mississippi's also provide critical protection for UOCAVA voters. The extended deadline ensures that these voters can receive, cast, and return their ballots in time for them to be counted.

Today, absentee voting laws generally are the only means by which American citizens deployed in the uniformed services or otherwise living overseas can exercise their right to vote. Prior to UOCAVA's adoption, the "single largest reason for disenfranchisement of military and overseas voters [was] State failure to provide adequate

ballot transit time." UOCAVA House Report 10. After problems persisted with delayed UOCAVA ballots, Congress further addressed the issue through the MOVE Act. To "allow absent uniformed services voters and overseas voters enough time to vote," 52 U.S.C. 20302(g)(1)(A), the Act "require[s] States to transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter at least 45 days before an election for federal office," H.R. Rep. No. 288, 111th Cong., 1st Sess. 744 (2009) (Conf. Rep.); *see* 52 U.S.C. 20302(a)(8)(A). This history of congressional action reflects a strong commitment to ensuring that military service members and overseas citizens enjoy access to the ballot box comparable to that of domestic civilians.

Indeed, UOCAVA recognizes and honors States' varying ballot receipt deadlines. Under UOCAVA, States must "permit absent uniformed services voters and overseas voters to . . . vote by absentee ballot in . . . elections for Federal office." 52 U.S.C. 20302(a)(1). Should covered voters request state absentee ballots but not receive them by 30 days before a federal election, the voters can submit alternative federal absentee ballots that are "submitted and processed in the manner

provided by law for absentee ballots in the State involved." 52 U.S.C. 20303(b). The federal ballots would not be counted, however, if the voters' state absentee ballots ended up being "received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law." 52 U.S.C. 20303(b)(3). UOCAVA could have, but did not, set Election Day as a backstop receipt deadline. Instead, it expressly incorporated States' various deadlines. *See* UOCAVA House Report 14.

The MOVE Act continued this deference to States' ballot receipt deadlines. It added a provision that required federal and state officials to ensure that overseas servicemembers' marked ballots for general federal elections are delivered, not necessarily by the federal Election Day, but rather by whatever "date by which an absentee ballot must be received in order to be counted in the election." 52 U.S.C. 20302(a)(10), 20304(b)(1). Congress's deference to States' ballot receipt deadlines further confirms that federal law maintains States' freedom to decide the point at which a ballot is considered cast.

Since UOCAVA's enactment, the United States repeatedly has enforced the statute against States that transmitted ballots late, to

prevent military and overseas voters from being disenfranchised in federal elections. *See, e.g.*, *United States v. Alabama*, 857 F. Supp. 2d 1236, 1242 (M.D. Ala. 2012); *United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012). In most of these cases, the remedy has involved extending the receipt deadline beyond Election Day for UOCAVA voters' absentee ballots cast by Election Day. The United States has secured the extension of UOCAVA ballot receipt deadlines by court-ordered consent decrees, court orders, or settlement agreements as a remedy for the late transmission of UOCAVA ballots since the statute's enactment in 1986. *See, e.g.*, Consent Decree, *United States v. Idaho*, No. 88-cv-1187 (D. Idaho May 21, 1988; entered May 23, 1988).

Since the year 2000 alone, the United States has secured such ballot receipt extensions in 29 of its cases and agreements. *See* U.S. Dep't of Just., *Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act* (Mar. 24, 2022), https://perma.cc/CQG5-M4PH. Many of the agreements or court orders that the United States has obtained to remedy UOCAVA violations have extended ballot receipt deadlines for UOCAVA voters for a period after Election Day

equal to the number of days after the federal-law deadline that the States transmitted the UOCAVA ballots.  *See, e.g.*, Consent Decree, *United States v. West Virginia*, No. 2:14-cv-27456 (S.D. W. Va. Nov. 3, 2014) (extending receipt deadline by seven days); Consent Decree, *Idaho*, *supra* (extending deadline by ten days).

This form of relief for UOCAVA violations provides sufficient opportunity for military and overseas voters to return their ballots by extending the receipt deadline, while also providing that ballots must be executed and sent by Election Day.  Mississippi's ballot receipt deadline operates the same way.  By requiring ballots to be postmarked by Election Day, Mississippi ensures that all valid votes are cast by Election Day, thereby complying with the Federal Election Day Statutes.  But by allowing additional time for election officials to receive those cast ballots, the ballot receipt deadline protects UOCAVA voters' right to have their valid votes counted.

# CONCLUSION

The Court should affirm on the issue addressed.

                              Respectfully submitted,

TODD W. GEE                   KRISTEN CLARKE
  United States Attorney        Assistant Attorney General

  ANGELA GIVENS WILLIAMS      s/ Noah B. Bokat-Lindell
    (MSB # 102469)            ELIZABETH PARR HECKER
  MITZI DEASE PAIGE           NOAH B. BOKAT-LINDELL
    (MSB # 6014)                Attorneys
    Assistant United States Attorneys    Department of Justice
    501 E. Court Street          Civil Rights Division
    Suite 4.430                  Appellate Section
    Jackson, Mississippi 39201   Ben Franklin Station
    (601) 965-4480               P.O. Box 14403
                                 Washington, D.C.  20044-4403
                                 (202) 598-0243

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6469 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date: September 10, 2024